**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DONITA J. STUBBS, | ) | |
| on behalf of plaintiff and a class, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 12-cv-7235 |
| v. | ) | |
| | ) | Judge Darrah |
| CAVALRY SPV I, LLC; and | ) | |
| CAVALRY PORTFOLIO | ) | |
| SERVICES, LLC; | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF
PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

Plaintiff, Donita J. Stubbs, has requested that this Court enter an order determining that this action may proceed as a class action against defendants Cavalry SPV I, LLC and Cavalry Portfolio Services, LLC ("Cavalry"). Plaintiff asserts claims against defendants based on the Fair Debt Collection Practices Act, 15 U.S.C. §1692 et seq. ("FDCPA"). This memorandum is submitted in support of plaintiff's motion.

## I.   BACKGROUND

This action complains of defendants' collection practices.  Defendants attempt to collect purported debts and defendants file suits against debtors in the State of Illinois, such as Appendix A. Defendants have a practice of including affidavits in the form of Appendix B in the complaints against debtors. These affidavits state the following:

(1)    "In the normal course of business, Cavalry Portfolio Services, LLC maintains computerized account records for account holders.  Cavalry Portfolio Services, LLC maintains such records in the ordinary and routine course of business and is charged with the duty to accurately record any business act, condition or event onto the computer record maintained for the accounts, with the entries made at or very near the time of any such

1

occurrence. . . ."

(2)     "In connection with the purchase of the account, Bank of America/ FIA

Card Services, N.A. transferred copies of its electronic business records to

Cavalry SPV I, LLC, which records were loaded into the computer system

of Cavalry Portfolio Services, LLC and which are maintained in an

electronic format."

On information and belief, defendants purport to acquire Bank of America/ FIA debts pursuant

to agreements which disclaim the accuracy of the information provided. Such an example is

reference by <u>Appendix C</u>, a 2008 FIA agreement with defendant Cavalry SPV for the sale of

receivables.

In Article IX of the agreement, Bank of America/ FIA provides that the

loans are sold "as is" and without "any representations, warranties, promises, covenants,

agreements or guaranties of any kind or character whatsoever, whether express or implied, oral

or written, past present or future, of, as to, concerning or with respect to the following: (a) the

marketability, value, quality or condition of any loan or loans; (b) the validity, enforceability or

collectibility of the evidence of indebtedness; . . . (d) the accuracy or completeness of any

information provided by the seller to the buyer, including without limitation, the accuracy of any

sums shown as current balance or accrued interest amounts due under the loans; and (e) any

other matters pertaining to the loans." On information and belief, the provisions quoted above

were included in the agreement applicable to the alleged purchase by Cavalry SPV of the in

which plaintiff's debt was supposedly a part.

The debt buyer represents  that its  purchase decision is based upon its own

independent expert evaluations of the nature, validity, collectability, enforceability, and value of

the Accounts and that it is purchasing them "AS IS, WHERE IS" and "WITH ALL FAULTS."

Defendants endeavor to avoid producing their agreements for the purchase

and  sale of debts in collection actions.  Where the consumer appears to be familiar with such

2

agreements, or retains counsel who display such familiarity, defendants usually voluntarily dismiss a collection action.

A document is not admissible as a "business record" under Illinois law if "the source of information or the method or circumstances of preparation indicate lack of trustworthiness . . . ." Illinois R. Evid. 803(6). By submitting to the consumer an affidavit in the form of Appendix B, while concealing documents in which the alleged account seller effectively disclaims the accuracy of its records and information, defendants perpetrate a fraud on the consumer.

Plaintiff contends that it is the policy and practice of defendants to serve consumers with affidavits in the form represented by Appendix B, even though the purchase and sale agreement contains disclaimers such as those quoted above. Plaintiff also alleges that it is the policy and practice of defendants to serve consumers with affidavits in the form represented by Appendix B in all collection actions filed in Cook County and, on information and belief, those filed in other counties.

Count I alleges that defendants violated the Fair Debt Collection Practices Act, §1692 et seq., by engaging in deceptive collection practices, in violation of 15 U.S.C. §§1692e, 1692e(2), and 1692e(10), by providing fraudulent affidavits to consumers. The provision of the false affidavits to consumers is material because they effectively represent to consumers that defendants can prove the debt, when it cannot.

## II.     THE FAIR DEBT COLLECTION PRACTICES ACT

The FDCPA states that its purpose, in part, is "to eliminate abusive debt collection practices by debt collectors". 15 U.S.C. §1692(e).  It is designed to protect consumers from unscrupulous collectors, whether or not there is a valid debt.  *Mace v. Van Ru Credit Corp.*, 109 F.3d 338 (7th Cir. 1997); *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998); *Baker v. G.C. Services Corp.*, 677 F.2d 775, 777 (9th Cir. 1982); *McCartney v. First City Bank*, 970 F.2d 45, 47 (5th Cir. 1992). The FDCPA broadly prohibits unfair or unconscionable collection methods;

conduct which harasses, oppresses or abuses any debtor; and any false, deceptive or misleading statements, in connection with the collection of a debt; it also requires debt collectors to give debtors certain information.  15 U.S.C. §§1692d, 1692e, 1692f and 1692g.

> In enacting the FDCPA, Congress recognized the --
> **universal agreement among scholars, law enforcement officials, and even debt collectors that the number of persons who willfully refuse to pay just debts is minuscule [sic].  . . .  [T]he vast majority of consumers who obtain credit fully intend to repay their debts.  When default occurs, it is nearly always due to an unforeseen event such as unemployment, overextension, serious illness, or marital difficulties or divorce.**

S. Rep. No. 382, 95th Cong., 1st Sess. 3 (1977), *reprinted in* 1977 USCCAN 1695, 1697.

The Seventh Circuit has held that whether a debt collector's conduct violates the FDCPA should normally be judged from the standpoint of an "unsophisticated consumer." *Avila v. Rubin*, 84 F.3d 222 (7th Cir. 1996); *Gammon v. GC Services, LP*, 27 F.3d 1254 (7th Cir. 1994).  The standard is an objective one  --  whether the plaintiff or any class member was misled is not an element of a cause of action.  "The question is not whether these plaintiffs were deceived or misled, but rather whether an unsophisticated consumer would have been misled." *Beattie v. D.M. Collections, Inc.*, 754 F.Supp. 383, 392 (D.Del. 1991).

Because it is part of the Consumer Credit Protection Act, 15 U.S.C. §§1601 et seq., the FDCPA should be liberally construed in favor of the consumer to effectuate its purposes.  *Cirkot v. Diversified Fin. Services, Inc.*, 839 F.Supp. 941 (D. Conn. 1993).

> **The [Consumer Credit Protection] Act is remedial in nature, designed to remedy what Congressional hearings revealed to be unscrupulous and predatory creditor practices throughout the nation.  Since the statute is remedial in nature, its terms must be construed in liberal fashion if the underlying Congressional purpose is to be effectuated.**

*N.C. Freed Co. v. Board of Governors*, 473 F.2d 1210, 1214 (2d Cir. 1973).

Statutory damages are recoverable for violations, whether or not the consumer proves actual damages.  *Bartlett v. Heibl*, 128 F.3d 497, 499  (7th Cir.1997); *Baker*, 677 F.2d at 780-1; *Woolfolk v. Van Ru Credit Corp.*, 783 F. Supp. 724, 727 and n. 3 (D. Conn. 1990); *Cacace v. Lucas*, 775 F. Supp. 502 (D. Conn. 1990); *Riveria v. MAB Collections, Inc.*, 682 F.

4

Supp. 174, 177 (W.D.N.Y. 1988); *Kuhn v. Account Control Technol.*, 865 F. Supp. 1443, 1450 (D.Nev. 1994); *In re Scrimpsher*, 17 B.R. 999, 1016-7 (Bankr.N.D.N.Y. 1982); *In re Littles*, 90 B.R. 669, 680 (Bankr. E.D.Pa. 1988), aff'd as modified sub nom. *Crossley v. Lieberman*, 90 B.R. 682 (E.D.Pa. 1988), aff'd, 868 F.2d 566 (3d Cir. 1989).

The FDCPA encourages consumers to act as "private attorneys general" to enforce the public policies expressed therein. *Crabill v. Trans Union, L.L.C.*, 259 F.3d 662, 666 (7th Cir. 2001); *Baker*, 677 F.2d at 780; *Whatley v. Universal Collection Bureau*, 525 F. Supp. 1204, 1206 (N.D.Ga. 1981). "Congress intended the Act to be enforced primarily by consumers . . . ." *FTC v. Shaffner*, 626 F.2d 32, 35 (7th Cir. 1980). "Congress painted with a broad brush in the FDCPA to protect consumers from abusive and deceptive debt collection practices, and courts are not at liberty to excuse violations where the language of the statute clearly comprehends them . . . ." *Pibiles v. Credit Bureau of Lockport, Inc.*, 886 F.2d 22, 27 (2d Cir. 1989).

Plaintiff need not prove intent, bad faith or negligence in an FDCPA case. The "FDCPA is a strict liability statute," and "proof of one violation is sufficient to support summary judgment for the plaintiff." *Cacace v. Lucas*, 775 F. Supp. at 505. *Accord*, *Turner v. J.V.D.B. & Associates, Inc.*, 330 F.3d 991, 995 (7th Cir. 2003); *Gearing v. Check Brokerage Corp.*, 233 F.3d 469, 472 (7th Cir.2000).

## III.   STANDARD FOR CLASS CERTIFICATION

Class actions are essential to enforce laws protecting consumers. As the court stated in *Eshaghi v. Hanley Dawson Cadillac Co.*, 214 Ill.App.3d 995, 574 N.E.2d 760 (1st Dist. 1991):

> **In a large and impersonal society, class actions are often the last barricade of consumer protection. . . . To consumerists, the consumer class action is an inviting procedural device to cope with frauds causing small damages to large groups. The slight loss to the individual, when aggregated in the coffers of the wrongdoer, results in gains which are both handsome and tempting. The alternatives to the class action -- private suits or governmental actions -- have been so often found wanting in controlling consumer frauds that not even the ardent critics of class actions seriously contend that they are truly**

5

**effective. The consumer class action, when brought by those who have no other avenue of legal redress, provides restitution to the injured, and deterrence of the wrongdoer.** (574 N.E.2d at 764, 766).

Congress expressly recognized the propriety of a class action under the FDCPA by providing special damage provisions and criteria in 15 U.S.C. §§1692k(a) and (b) for FDCPA class action cases. As a result, numerous FDCPA class actions have been certified. *Carroll v. United Compucred Collections*, 1-99-0152 H/G, 2002 U.S. Dist. LEXIS 25032, *43-44 (M.D.Tenn. Nov. 15, 2002), adopted in pertinent part, 2003 U.S. Dist. LEXIS 5996 (M.D. Tenn., Mar. 31, 2003), aff'd, 399 F.3d 620 (6th Cir. 2005); *Wahl v. Midland Credit Mgmt.*, 06 C 1708, 2007 U.S. Dist. LEXIS 39626, *14-15 (N.D.Ill., May 30, 2007); *Vines v. Sands*, 188 F.R.D. 302 (N.D. Ill. 1999); *Nielsen v. Dickerson*, 98 C 5909, 1999 WL 350694, 1999 U.S. Dist. LEXIS 8334 (N.D. Ill. May 19, 1999); *Sledge v. Sands*,182 F.R.D. 255 (N.D. Ill. 1998); *Shaver v. Trauner*, C.A. 97-1309, 1998 U.S. Dist. LEXIS 19648 (C.D. Ill. July 31, 1998); *Keele v. Wexler & Wexler*, 95 C 3483, 1996 WL 124452, 1996 U.S. Dist. LEXIS 3253 (N.D. Ill., March 18, 1996), *aff'd*, 149 F.3d 589 (7th Cir. 1998); *Miller v. Wexler & Wexler*, 97 C 6593, 1998 WL 60798, 1998 U.S. Dist. LEXIS 1382 (N.D. Ill. Feb. 5, 1998); *Wilborn v. Dun & Bradstreet*, 180 F.R.D. 347 (N.D. Ill. 1998); *Arango v. GC Services LP*, 97 C 7912, 1998 WL 325257, 1998 U.S. Dist. LEXIS 9124 (N.D. Ill. 1998) (misleading collection letters); *Avila v Van Ru Credit Corp.*,94 C 3234, 1995 WL 683775, 1995 U.S. Dist. LEXIS 461 (N.D. Ill. 1995), *aff'd*, *Avila v. Rubin*, *supra*, 84 F.3d 222; *Carr v. Trans Union Corp.*, C.A. 94-22, 1995 WL 20865, 1995 U.S. Dist. LEXIS 567 (E.D. Pa. 1995) (FDCPA class certified regarding defendant Trans Union's transmission of misleading collection notices to consumers); *Colbert v. Trans Union Corp.*, C.A. 93-6106, 1995 WL 20821, 1995 U.S. Dist. LEXIS 578 (E.D. Pa. 1995) (same); *Gammon v. GC Services, L.P.*, 162 F.R.D. 313 (N.D. Ill. 1995) (similar); *Zanni v. Lippold*, 119 F.R.D. 32, 35 (C.D. Ill. 1988); *West v. Costen*, 558 F. Supp. 564, 572-573 (W.D. Va. 1983) (FDCPA class certified regarding alleged failure to provide required "validation" notices and addition of unauthorized fees); *Cheqnet Systems, Inc. v. Montgomery*, 322 Ark. 742, 911 S.W.2d 956 (1995)

(class certified in FDCPA action challenging bad check charges); *Brewer v. Friedman*, 152 F.R.D. 142 (N.D. Ill. 1993) (FDCPA class certified regarding transmission of misleading collection demands to consumers), earlier opinion, 833 F. Supp. 697 (N.D. Ill. 1993); *Duran v. Credit Bureau of Yuma, Inc.*, 93 F.R.D. 607 (D. Ariz. 1982) (class certified in action complaining of unauthorized charges).

## IV. THE PROPOSED CLASS MEETS THE REQUIREMENTS FOR CERTIFICATION

### 1. Rule 23(a)(1) -- Numerosity

Fed.R.Civ.P. 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." "When the class is large, numbers alone are dispositive . . . ." *Riordan*, 113 F.R.D. at 62. Where the class numbers are at least 40, joinder is generally considered impracticable. *Cypress v. Newport News General & Nonsectarian Hosp. Ass'n*, 375 F.2d 648, 653 (4th Cir. 1967) (18 sufficient); *Swanson v. American Consumer Industries*, 415 F.2d 1326, 1333 (7th Cir. 1969) (40 sufficient); *Riordan*, 113 F.R.D. 60 (10-29 sufficient); *Philadelphia Electric Co. v. Anaconda American Brass Co.*, 43 F.R.D. 452, 463 (E.D.Pa. 1968) (25 sufficient); *Sala v. National R. Pass. Corp.*, 120 F.R.D. 494, 497 (E.D.Pa. 1988) (40-50 sufficient); *Scholes v. Stone, McGuire & Benjamin*, 143 F.R.D. 181, 184 (N.D. Ill. 1992) (about 70). It is not necessary that the precise number of class members be known. "A class action may proceed upon estimates as to the size of the proposed class." *In re Alcoholic Beverages Litigation*, 95 F.R.D. 321 (E.D.N.Y. 1982); *Lewis v. Gross*, 663 F. Supp. 1164, 1169 (E.D.N.Y. 1986).

In the present case, it is reasonable to infer that the number of class members exceeds 40 with respect to the class. CPS files thousands of lawsuits against Illinois consumers each year and sends out thousands of collection letters with affidavits in the form of Appendix B. It appears to have been defendants' regular practice to attempt to collect on debts which are subjects of "as is" disclaimers. Based on the volume of defendants' cases and the prevalence of disclaimers, there are more than 100 class members. It is therefore reasonable to infer that the

7

number of class members exceeds 40 with respect to each class.

Plaintiff will obtain the exact number of class members through discovery. *Swiggett v. Watson*, 441 F. Supp. 254, 256 (D.Del. 1977) (in action challenging certain welfare policies, existence of policies and 148 families who were denied benefits to which policies applied sufficient to show numerosity, even though it was impossible to identify which of 148 families were denied benefits because of policies complained of); *Carr v. Trans Union Corporation*, 1995 U.S. Dist. LEXIS 567 (E.D.Penn 1995) (FDCPA class certified regarding defendant Trans Union's transmission of misleading collection notices to consumers in which court inferred numerosity from the use of form letters); *Colbert v. Trans Union Corporation*, 1995 U.S. Dist. LEXIS 578 (E.D.Penn 1995); *Keele v. Wexler*, 1996 U.S. Dist. LEXIS 3253 (N.D.Ill 1996).

**2.    Rules 23(a)(2) and 23(b)(3)  –  Predominance of common questions of law or fact**

Fed.R.Civ.P. 23(a)(2) requires that there be a common question of law *or* fact. Rule 23(b)(3) requires that the questions of law or fact common to all members of the class predominate over questions pertaining to individual members.

These requirements are normally satisfied when there is an essential common factual link between all class members and the defendants for which the law provides a remedy. *Halverson v. Convenient Food Mart, Inc.*, 69 F.R.D. 331, 334 (N.D.Ill. 1974).  Where a question of law involves "standardized conduct of the defendants toward members of the proposed class, a common nucleus of operative facts is typically presented, and the commonality requirement . . . is usually met."  *Franklin v. City of Chicago*, 102 F.R.D. 944, 949 (N.D.Ill. 1984); *accord*, *Patrykus v. Gomilla*, 121 F.R.D. 357, 361 (N.D.Ill. 1988); *Carroll v. United Compucred Collections*, 1-99-0152 H/G, 2002 U.S. Dist. LEXIS 25032, *43-44 (M.D.Tenn.  Nov. 15, 2002), adopted in pertinent part, 2003 U.S. Dist. LEXIS 5996 (M.D. Tenn.,  Mar. 31, 2003), aff'd, 399 F.3d 620 (6th Cir. 2005);  *Wahl v. Midland Credit Mgmt.*, 06 C 1708, 2007 U.S. Dist. LEXIS 39626, *14-15 (N.D.Ill., May 30, 2007); *Smith v. Nike Retail Services, Inc.*, 234 F.R.D. 648, 659

(N.D.Ill. 2006). The authorities hold that cases dealing with the legality of standardized documents or conduct are generally appropriate for resolution by means of a class action because the document or conduct is the focal point of the analysis. *Halverson*, *supra*, 69 F.R.D. at 334-336; *Haroco v. American Nat'l Bank*, 121 F.R.D. 664, 669 (N.D. Ill. 1988) (improper computation of interest); *Kleiner v. First Nat'l Bank*, 97 F.R.D. 683, 692 (N.D.Ga. 1983) (same); *Heastie v. Community Bank*, 125 F.R.D. 669, 675 (N.D.Ill. 1989) (execution of home improvement financing documents in sequence that evaded consumers' rescission rights); *Carroll v. United Compucred Collections*, 1-99-0152 H/G, 2002 U.S. Dist. LEXIS 25032, *47-48 (M.D.Tenn. Nov. 15, 2002) (collection practices).

Here, there are common questions of law and fact which will predominate and, in fact, will dictate the outcome. The predominant common questions are whether: defendants regularly provide consumers with affidavits in the form of <u>Appendix B</u>, defendants regularly obtain debts subject to "as is" disclaimers, and the provision of an affidavit in the form of <u>Appendix B</u> concerning a debt that is the subject of an "as is" disclaimer is fraudulent.

The only individual issue is the identification of the members of the classes, a matter capable of ministerial determination from defendants' records. Questions readily answerable from a defendants' files and business records do not present an obstacle to class certification. *Heastie v. Community Bank of Greater Peoria*, 125 F.R.D. 669, 674-676 (N.D.Ill. 1989), found that the commonality and predominance requirements were met even though there were individual questions of injury and damages; those questions could be answered by "merely… comparing the contract between the consumer and the contractor with the contract between the consumer and Community Bank." *Accord*, *George v. Kraft Foods Global, Inc.*, 251 F.R.D. 338, 347 (N.D.Ill 2008) ("some factual variation among the class grievances will not defeat a class action.... so long as those individual issues are manageable through bifurcated hearings or some other mechanism that allows the common issues to be adjudicated together.")

The Seventh Circuit has held that the need for "separate proceedings of some

9

character ... to determine the entitlements of the individual class members to relief" should "not defeat class treatment of the question whether defendants violated [the law]." *Carnegie v. Household International, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004). "Once that question is answered, if it is answered in favor of the class, a global settlement... will be a natural and appropriate sequel. And if there is no settlement, that won't be the end of the world. [Fed.R.Civ.P.] 23 allows... courts to devise imaginative solutions to problems created by the presence in a class action litigation of individual damages issues. Those solutions include (1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class member concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class." *Id.*

### 3. Rule 23(a)(3) -- Typicality

The rule requires that the claims of the named plaintiff be typical of the claims of the class:

> **A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory. The typicality requirement may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of other class members. Thus, similarity of legal theory may control even in the face of differences of fact.**

*De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983) (citation omitted).

In the instant case, typicality is inherent in the class definition. Each of the class members has been subjected to the same practice as plaintiff. Defendants' practices consist of including collection complaints affidavits in the form of <u>Appendix B</u>, with respect to debts which are subject to "as is" disclaimers.

### 4. Rule 23(a)(4) -- Adequacy of representation

The rule also requires that the named plaintiff provide fair and adequate protection for the interests of the class. That protection involves two factors: (a) the plaintiff's

attorney must be qualified, experienced, and generally able to conduct the proposed litigation; and (b) the plaintiff must not have interests antagonistic to those of the class. *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992); *accord*, *Wetzel v. Liberty Mutual Ins. Co.*, 508 F.2d 239, 247 (3d Cir. 1975); *In re Alcoholic Beverages Litigation*, 95 F.R.D. 321.

Plaintiff understands the obligations of a class representative, and has retained experienced counsel, as is indicated by <u>Appendix D</u>, which sets forth counsel's qualifications.

The second relevant consideration under Rule 23(a)(4) is whether the interests of the named plaintiff are coincident with the general interests of the class. Here, the named plaintiff and the class members all seek equal the relief and damages as the result of defendants' violations of the Fair Debt Collection Practices Act. Given the identity of claims between plaintiff and the class members, there is no potential for conflicting interests in this action. There is no antagonism between the interests of the named plaintiff and those of the classes.

### 5. Rule 23(b)(3) -- Class action is superior to other available methods of resolving this controversy

Efficiency is the primary focus in determining whether the class action is the superior method for resolving the controversy presented. *Eovaldi v. First Nat'l Bank*, 57 F.R.D. 545 (N.D. Ill. 1972). The Court is required to determine the best available method for resolving the controversy in keeping with judicial integrity, convenience, and economy. *Scholes*, 143 F.R.D. at 189; *Hurwitz v. R.B. Jones Corp.*, 76 F.R.D. 149 (W.D.Mo. 1977). It is proper for a court, in deciding the "best" available method, to consider the ". . . inability of the poor or uninformed to enforce their rights, and the improbability that large numbers of class members would possess the initiative to litigate individually." *Haynes v. Logan Furniture Mart, Inc.*, 503 F.2d 1161, 1165 (7th Cir. 1974).

In this case there is no better method available for the adjudication of the claims which might be brought by each individual debtor. Individual cases are not economically feasible.

The special efficacy of the consumer class action has been noted by the courts and is applicable to this case:

> **A class action permits a large group of claimants to have their claims adjudicated in a single lawsuit. This is particularly important where, as here, a large number of small and medium sized claimants may be involved. In light of the awesome costs of discovery and trial, many of them would not be able to secure relief if class certification were denied . . . .**

*In re Folding Carton Antitrust Litigation*, 75 F.R.D. 727, 732 (N.D. Ill. 1977) (citations omitted).

Another court noted:

> **Given the relatively small amount recoverable by each potential litigant, it is unlikely that, absent the class action mechanism, any one individual would pursue his claim, or even be able to retain an attorney willing to bring the action. As Professors Wright, Miller and Kane have discussed, in analyzing consumer protection class actions such as the instant one, 'typically the individual claims are for small amounts, which means that the injured parties would not be able to bear the significant litigation expenses involved in suing a large corporation on an individual basis. These financial barriers may be overcome by permitting the suit to be brought by one or more consumers on behalf of others who are similarly situated.' 7B Wright et al., §1778, at 59; see e.g., <u>Phillips Petroleum Co. v. Shutts</u>, 472 U.S. 797, 809 (1985) ('Class actions . . . may permit the plaintiff to pool claims which would be uneconomical to litigate individually.') The public interest in seeing that the rights of consumers are vindicated favors the disposition of the instant claims in a class action form.**

*Lake v. First Nationwide Bank*, 156 F.R.D. 615, 628-629 (E.D.Pa 1994).

Class certification will provide an efficient and appropriate resolution of the controversy. *Zanni v. Lippold*, 119 F.R.D. 32, (C.D.Ill 1988).

## V.     <u>CONCLUSION</u>

The proposed class meets the requirements of Rules 23(a) and (b)(3). Plaintiff respectfully requests that this Court certify this action as a class action.

Respectfully submitted,


 s/ Catherine A. Ceko
Catherine A. Ceko


Daniel A. Edelman
Cathleen M. Combs

James O. Latturner
Catherine A. Ceko
EDELMAN, COMBS, LATTURNER
    & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX)


## <u>CERTIFICATE OF SERVICE</u>

       I, Catherine A. Ceko, hereby certify that on September 11, 2012, or as soon as service may be effectuated, I caused to be filed the foregoing documents via the CM/ECF System and served the foregoing documents via process server on the parties listed below.

Cavalry Portfolio Services, LLC
c/o Registered Agent,
CT Corporation System
208 S. LaSalle Street, Suite 814
Chicago, IL 60604

Cavalry SPV I, LLC
c/o Registered Agent,
CT Corporation System
208 S. LaSalle Street, Suite 814
Chicago, IL 60604


                          <u>s/Catherine A. Ceko</u>
                          Catherine A. Ceko


Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Catherine A. Ceko
EDELMAN, COMBS, LATTURNER
    & GOODWIN, L.L.C.
120 S. LaSalle Street, 18th Floor
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX)

# APPENDIX A

93829

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
MUNICIPAL DEPARTMENT, FIRST DISTRICT

CAVALRY PORTFOLIO SERVICES, LLC, )
)
)
Plaintiff, )
) No. **12M1 116644**
vs. )
) Return Date: ___ AUG 27 2012 _____
DONITA J STUBBS, )
)
Defendant. ) Amount Claimed: $6,542.44, Plus court Costs

### SMALL CLAIMS COMPLAINT

NOW COMES the Plaintiff, Cavalry Portfolio Services, LLC, by and through their attorneys, The Shindler Law Firm., and complaining of the Defendant(s), states as follows:

1. The Defendant(s) DONITA J STUBBS, opened a credit card or line of credit account on 06/15/2006 with BANK OF AMERICA whereby Defendant(s) received a credit card or line of credit and could charge goods and services to their account and receive cash advances.

2. The Defendant(s) subsequently defaulted by failing to pay for the indebtedness incurred resulting in the balance due to BANK OF AMERICA in the amount of $4,504.65.

3. BANK OF AMERICA sold and assigned its right title and interest to defendant's account to Cavalry SPV I, LLC pursuant to a written assignment in conformity with the Illinois Collection Agency Act, 225 ILCS 425/8b.

4. Cavalry SPV I, LLC assigned its right to pursue collection of defendant's account to Plaintiff pursuant to a written assignment in conformity with the Illinois Collection Agency Act, 225 ILCS 425/8b.

5. In conformity with the Illinois Collection Agency Act, 225 ILCS 425/8b, Plaintiff is in possession of the aforementioned assignments which specifically state and include the effective date of assignment, the consideration paid and the identifying information for the account transferred.

6. Plaintiff is entitled to recover additional interest pursuant to the agreement between Defendant(s) and BANK OF AMERICA.

7. Due demand has been made on the Defendant(s) to pay the amount(s) due and owing and the Defendant(s) has failed to do so.

8. Defendant(s) has been credited with payments made after charge off.

WHEREFORE, Plaintiff prays for judgment against the Defendant(s) for $6,542.44 plus court costs.

_____
Brian D. Schulman ARDC #6216815

The Shindler Law Firm.
1990 E. Algonquin Rd Suite 180
Schaumburg, IL 60173
(847) 537-1000
Cook County #: 27053
DuPage County#: 21020
ARDC #: 6202882

THIS IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION
WILL BE USED FOR THAT PURPOSE.



# APPENDIX B

93829

## AFFIDAVIT OF CLAIM

STATE OF NEW YORK      )
                               ) SS

COUNTY OF WESTCHESTER )

RE: Cavalry Portfolio Services, LLC, as assignee of Cavalry SPV I, LLC

vs.

DONITA J STUBBS

I, Stephanie Cappelli, being duly sworn on oath, depose and say:

1. I am an agent and duly authorized representative for Plaintiff and am competent to testify to the matters set forth herein.

2. I am acting in the capacity of Legal Administrator for my employer Cavalry Portfolio Services LLC, a Delaware limited liability company. Cavalry Portfolio Services, LLC performs recovery services for its affiliate, Cavalry SPV I, LLC. In performing recovery services for Cavalry SPV I, LLC, I am familiar with and have access to the books and records of Cavalry SPV I, LLC and of Cavalry Portfolio Services, LLC.

3. That the defendant, DONITA J STUBBS, the account holder(s), opened an account with Bank of America/FIA Card Services, N.A. on 6/15/2006, which account became delinquent and was charged off on 8/31/2009 (the "Account").

4. As of 12/5/2011, the balance due and owing by the account holder(s) on the account was $6,539.98, which balance is comprised of $4,504.65 of principal balance and $2,035.33 + $0 + $0 of other charges. The principal balance continues to accrue interest as of the 12/5/2011 at a rate of 19.99%. The account holder(s) have been credited for all payments, set-offs or other credits due.

5. That the Account was purchased by Cavalry SPV I, LLC on or about 8/23/2011 and the servicing and collection rights for the account were assigned by Cavalry SPV I, LLC to Cavalry Portfolio Services, LLC.

6. In the normal course of business, Cavalry Portfolio Services, LLC maintains computerized account records for account holders. Cavalry Portfolio Services, LLC maintains such records in the ordinary and routine course of business and is charged with the duty to accurately record any business act, condition or event onto the computer record maintained for the accounts, with the entries made at or very near the time of any such occurrence. I have reviewed the applicable computer record as it relates to the Account, and I make this Affidavit based upon information from that review, and if called as a witness, I could testify to the matters set forth herein based on that review.

7. In connection with the purchase of the account, Bank of America/FIA Card Services, N.A. transferred copies of its electronic business records to Cavalry SPV I, LLC, which records were loaded into the computer system of Cavalry Portfolio Services, LLC and which are maintained in an electronic format.

8. Upon information and belief, no Defendant is an infant or incompetent or an active member of the United States Armed Forces who would be entitled to stay relief.

9. Under oath, I am authorized to make this affidavit for Plaintiff and I am informed and believe the above statements are true and correct.

Subscribed and sworn to before me on 1/13/2012

_____
Legal Administrator

_____
Notary Public, State of New York

Law Office of Keith Shindler, Ltd.
16722057

Louis Dardignac
Notary Public - State of New York
No. 01DA5057380
Qualified in Rockland County
Commission Expires March 25, 2014

# **APPENDIX C**

# LOAN SALE AGREEMENT

DATED AND EFFECTIVE AS OF October 29, 2008

BY AND AMONG

SELLER:     FIA Card Services, N.A.,

AND

BUYER:     CAVALRY SPV I, LLC



vi

DEFENDANT'S EXHIBIT

CPS 001

## LOAN SALE AGREEMENT

THIS LOAN SALE AGREEMENT (this "Agreement") is dated and effective as of the day and year as set forth on the cover page of this Agreement by and among FIA Card Services N. A. (the "Seller") and Cavalry SPV I, LLC (the "Buyer").

### RECITALS:

Recital 1.  Seller desires (1) to sell certain loans, representing credit card and credit line receivables, as identified on the Loan Schedule a copy of which is attached hereto as Schedule 1;

Recital 2.  The Seller has reached an agreement to sell the Loans to the Buyer for the consideration and under the express terms, provisions, conditions and limitations as set forth herein;

Recital 3.  Seller is willing, subject to the express terms, provisions, conditions, limitations, waivers and disclaimers as set forth herein, to sell, transfer, assign and convey to Buyer all of Seller's right, title and interest in, to and under the Loans; and

NOW, THEREFORE, in consideration of the mutual promises herein set forth and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Seller and Buyer agree as follows:

### ARTICLE I

### DEFINITIONS AND INTERPRETATION

For purposes of this Agreement, the parties hereto agree to the following terms, which shall have the meanings indicated:

Section 1.1.  "Affiliate" means any affiliate of Buyer.

Section 1.2.  "Agreement" means this Loan Sale Agreement, including the cover page and all Addenda, Exhibits and Schedules hereto.

Section 1.3.  "Bill of Sale and Assignment" means the document to be delivered in accordance with Section 3.1 to Buyer on or before each Transfer Date with respect to the Loans purchased under this Agreement, substantially in the form attached hereto as Exhibit C, together with the Loan Schedule describing the Loans being sold on such Transfer Date.

Section 1.4.  "Business Day" means a day that is not a Saturday, Sunday or legal holiday recognized by the federal government.

CPS 002

Section 1.5. "Buyer" means Cavalry SPV I, LLC.

Section 1.6. "Claim" means any claim, demand, cause of action, judgment, loss, damage, penalty, fines, forfeitures, fees, liability, cost and expense (including attorneys' fees, whether suit is instituted or not), whether known or unknown, liquidated or contingent.

Section 1.7. "Current Balance" means the unpaid balance in United States Dollars for each Loan sold hereunder. The Current Balance for the Loans is as set forth in the Loan Schedule. The Buyer acknowledges that the figure provided as the Current Balance for any Loan may include interest (accrued or unaccrued), costs, fees and expenses and it is possible that the figure provided as the Current Balance for any Loan may not reflect credits for payments made by or on behalf of any Obligor prior to the Cut-Off Date. This figure may also reflect payments made by or on behalf of any Obligor which have been deposited and credited to the Current Balance of such Loan, but that may subsequently be returned to Seller due to insufficient funds to cover such payments. Buyer acknowledges, understands and agrees (i) that Seller makes no representations or warranties whatsoever, express or implied, as to the accuracy of the Current Balance, and (ii) except as set forth in Sections 8.5 and 10.2, that Buyer shall have no right, whatsoever, to make any claim against Seller should the actual unpaid balance of any Loan be different from the Current Balance of such Loan set forth in the Loan Schedule delivered to the Buyer in connection with the sale of such Loan.

Section 1.8. "Cut-Off Date" means no later than October 27, 2008.

Section 1.9. "Evidence of Indebtedness" means with respect to each Loan: (a) each loan agreement, line of credit agreement, or other evidence of indebtedness for such Loan, judgment, deficiency or charge-off; (b) any judgment against any Obligor; (c) any settlement agreements or other evidence of compromise by the creditor relating to the amounts due under any Loan or (d) any other evidence, including, without limitation, any Loan payment history data or computer printouts, creditor notations or any other Loan summary information upon which a creditor could reasonably rely in asserting that the same represents a balance due and owing on a right of collection. THE EXISTENCE OF AN EVIDENCE OF INDEBTEDNESS SHALL EVIDENCE AN UNPAID AND OUTSTANDING CLAIM AGAINST AN OBLIGOR BUT SHALL NOT BE DEEMED TO IMPLY THAT THE DEBT EVIDENCED THEREBY IS ENFORCEABLE. THE EVIDENCE OF INDEBTEDNESS MAY BE SUBJECT TO BANKRUPTCY OR OTHER ENFORCEMENT OR COLLECTION RESTRICTIONS. The Evidence of Indebtedness may include, without limitation, original documents or copies thereof, whether by photocopy, microfiche, microfilm or other reproduction process. Such Evidence of Indebtedness shall be provided to the Buyer on a case-by-case basis where proof of debtor's obligation to pay is requested, pursuant to the requirements and restrictions set forth in Sections 3.1, Exhibit E to this Agreement. Buyer expressly acknowledges that the sole Evidence of Indebtedness to be delivered to Buyer on any Transfer Date under the terms and provisions of this Agreement for any Loans shall be the information set forth on the Loan Schedule provided to the Buyer on computer tape or diskette, with any amendments or changes as shall be forwarded to the Buyer pursuant to the terms and provisions of this Agreement.

2

Section 1.10. "Financial Instruments Trust Account" means the account designated by Seller from time to time into which Buyer shall deposit the Purchase Price.

Section 1.11. "Information" means the confidential information and other information about the Loans supplied by the Seller, from time to time, to the Buyer and any work products or other materials produced from or incorporating such information.

Section 1.12. "Loan Schedule" means the Loan schedule delivered on computer tape or diskette for any sale of the Loans purchased by Buyer pursuant to the terms and provisions of this Agreement or repurchased by Seller pursuant to the provisions of Article 8, and with respect to the sale of Loans to the Buyer, setting forth the following information concerning each Loan, if available: the loan numbers for Seller (but not necessarily the loan numbers maintained or assigned by Seller), the name, address (including state and zip code), Social Security number and telephone numbers of Obligor, name of any co-maker, the date of charge-off, the last payment date, the interest rate immediately preceding charge off and the Current Balance of each of the Loans. A copy of the Loan Schedule shall be attached hereto as Schedule 1.

Section 1.13. "Loans" means (a) the obligations sold from time to time pursuant to this Agreement as identified in each Loan Schedule delivered by the Seller to the Buyer and which obligations represent unsecured credit card and credit line receivables which have been charged off by the Seller; (b) all rights, powers, liens or security interests of the Seller relating to the obligations identified in subsection (a) of this definition; (c) any judgments founded upon an Evidence of Indebtedness, to the extent attributable thereto, and any lien arising therefore; and (d) the proprietary interest of Seller in any Evidence of Indebtedness, forming the subject matter of any litigation (including, without limitation, any foreclosure, judgment, deficiency or charge-off) or bankruptcy to which Seller is a party or claimant. Nothing in this definition shall be deemed to imply that the Loans are enforceable; the Loans may constitute unenforceable Loans. "Loan" refers to an individual Loan and "Loans" refers, collectively, to all of the Loans purchased by Buyer pursuant to this Agreement.

Section 1.14. "Obligor" means with respect to each Loan, the obligor(s) on an Evidence of Indebtedness, including, without limitation, any and all makers, and the guarantors, sureties or other persons or entities liable on the Loan.

Section 1.15. "Purchase Price" means an amount equal to    REDACTED          REDACTED             , which Purchase Price is to be paid on the Transfer Date.

Section 1.16. "Retained Claims" means with respect to each Loan, the claims or causes of action retained by Seller pursuant to Article XIV.

Section 1.17. "Retention Price" means that amount calculated in accordance with the provisions of Section 5.2.

Section 1.18. "Transaction Documents" means this Agreement, the Mutual Non-Disclosure Agreement attached hereto as Exhibit F, and, with respect to the parties thereto, each

3

Assignment and Acceptance Agreement entered into pursuant to Section 11.2 hereof, and, with respect to each of such documents, all addenda, exhibits and schedules thereto.

Section 1.19. "Transfer Date" no later than October 29, 2008.

Section 1.20. "Transfer Documents" means the Bill of Sale and Assignment in substantially the form of Exhibit C hereto (accompanied by a Loan Schedule), which Bill of Sale and Assignment the Buyer and Seller hereby deem appropriate for the transfer of Seller's right, title and interest in and to the Loans purchased by Buyer pursuant to this Agreement.

Section 1.21. "Wire Transfer Instructions" means the instructions for wire transferring the Purchase Price to Seller as set forth on Exhibit D attached hereto or as set forth in any other written notice from the Seller to the Buyer.

Section 1.22. "Interpretation of Use of the Term "Buyer". Wherever in this Agreement the term "Buyer" is used, such term shall refer to the entity which is then the Buyer hereunder, provided, however, that with respect to obligations incurred and actions taken by an entity while it was the Buyer and with respect to the servicing and other ongoing matters related to Loans purchased by an entity while it was a Buyer hereunder, the term "Buyer" shall include such prior Buyers and assignment of the rights and obligations hereunder from one Buyer to the next shall not relieve any entity from the obligations it incurred while it was the Buyer hereunder or from the ongoing obligations with respect to Loans purchased while such entity was the Buyer hereunder.

CPS 005

## ARTICLE II

## PURCHASE AND SALE OF THE LOANS

Section 2.1. <u>Agreement to Sell and Purchase Loans</u>. Seller agrees to sell, and Buyer agrees to purchase on the Transfer Date the Loans described on the Loan Schedule, at the Purchase Price and subject to the terms, provisions, conditions, limitations, waivers and disclaimers set forth in this Agreement. The Seller's right, title and interest to the Loans purchased by the Buyer shall be transferred and assigned by delivery of the Transfer Documents to the Buyer. BUYER EXPRESSLY ACKNOWLEDGES AND AGREES THAT THE ORIGINAL ACCOUNT NUMBER WHICH IDENTIFIED ANY LOAN (PRIOR TO ITS CHARGE OFF BY THE SELLER AND THE ASSIGNMENT OF A NEW ACCOUNT NUMBER) AND THE ACCOUNT RELATING TO THE ORIGINAL ACCOUNT NUMBER, IS NOT BEING PURCHASED UNDER THIS AGREEMENT AND THAT BUYER WILL NOT ASSERT ANY OWNERSHIP OR OTHER INTEREST OVER THE ORIGINAL ACCOUNT NUMBER OR THE ACCOUNT RELATING THERETO. SELLER AGREES TO PROVIDE THE ORIGINAL ACCOUNT NUMBER TO BUYER SOLELY FOR THE PURPOSE OF ALLOWING BUYER TO USE THE ORIGINAL ACCOUNT NUMBER IN ITS COLLECTION ACTIVITIES RELATED TO THE LOANS.

Section 2.2. <u>Purchase Price</u>. The Purchase Price due on the Transfer Date shall be paid by the Buyer to the Seller prior to the close of business on the Transfer Date. Payment must be made in immediately available funds in United States dollars by wire transfer to the Financial Instruments Trust Account in accordance with the Wire Transfer Instructions.

Section 2.3. <u>Agreement to Assign/Buyer's Right to Act</u>. After Seller has confirmation of the receipt of the Purchase Price due on such date, Seller shall deliver to Buyer a Bill of Sale and Assignment, substantially in the form of <u>Exhibit C</u> hereto, executed by an authorized representative of Seller, which Transfer Documents shall sell, transfer, assign, set-over, quitclaim and convey to Buyer, without recourse, warranty or representation, all right, title and interest of Seller in and to each of the Loans sold on such Transfer Date, and the right to all principal and/or interest and/or other amounts due under the Loans and/or other proceeds of any kind paid thereon after the Cut-Off Date, but excluding any and all payments, proceeds or other consideration received by or on behalf of Seller on or before the Cut-Off Date with respect to such Loans, regardless of whether timely paid or applied, and excluding any amounts due or collected by Seller in connection with any Retained Claims. Upon each sale of Loans, the Loan Schedule relating to such Loans shall be attached to the Transfer Documents, identifying the Loans purchased by Buyer.

Section 2.4. <u>Payments Received</u>. Any payments received by Seller on or after the Effective Date and within eighteen (18) months of the Closing Date, with respect to an Account (except for any Account which has been replaced or repurchased by Seller under the terms of the Agreement), shall be forwarded to Buyer as promptly as possible. Seller shall have no obligation to remit any payments to Buyer that are received by Seller after the eighteen month period, and

CPS 006

any such payment that is received by Seller may be returned to the remitter of the payment. If Seller elects to remit to buyer after said period, a $5.00 fee may be charged per transaction.

## ARTICLE III

### TRANSFER OF LOANS AND LOAN DOCUMENTS

Section 3.1. Assignment of Loans and Loan Documents/Paid Off Loans.

a.      For three hundred sixty five days (365) after the Closing Date, with respect to Accounts sold on such Closing Date, Seller agrees to provide Buyer with copies (but only to the extent such material may exist, which extent is not guaranteed, warranted or represented) of only (a) the Account application, (b) signed charge slips, (c) last Account statement with respect to any Account, within a reasonable period of time following Seller's receipt of Buyer's request for such information, and (d) any Affidavits of Lost or Destroyed Documents. Up to one hundred (100) requests may be made per calendar day. (Requests for an application, charge slip and a statement on a single Account are deemed to be three (3) requests.) Notwithstanding any other provision in this Paragraph 3.2(a) to the contrary, Seller shall not be required to provide Buyer with  free copies of the Account application, signed charge slips and last Account statement when the total number of has exceeded twenty five percent (25%) of the number of Accounts sold on the Closing Date.  When the total number of requests exceeds twenty five percent (25%) of the number of Accounts sold, or after one year from the date of this Agreement, whichever shall first occur, Seller reserves the right to charge a $15.00 fee per document request. In the event that Buyer requests that document be provided to Buyer within five (5) business days of the date request, Seller may charge $25.00 for each such expedited request.

b.      With respect to information requests not covered in the paragraph above that occur in writing after the three hundred sixty five days (365) subsequent to the Closing Date has passed, Seller may provide Buyer with additional information from the books and records of Seller concerning the Accounts sold on such Closing Date if Buyer requests such information.  However, Seller shall have no obligation to provide such information, and shall have no obligation to execute or provide any documents, files, records, testimony or other information to Buyer, its successors or assigns, concerning any Account, except as set forth in section (a) above, or elsewhere in the Agreement, or unless otherwise agreed to by the parties.

c.      Buyer has been advised by Seller that (a) it is Seller's policy not to retain all Account Documents and (b) some of the Accounts do not have an original application or a copy thereof (whether by microfilm, microfiche or other media). To what extent applications are or are not available, is not known by Seller nor represented to Buyer.

6

ARTICLE IV

SERVICING OF THE LOANS

Section 4.1. Servicing After Transfer Date. The Loans shall be sold and conveyed to Buyer on a servicing-released basis. As of each Transfer Date, all rights, obligations, liabilities and responsibilities with respect to the post-Transfer Date servicing of the Loans sold on such Transfer Date shall pass to Buyer, and Seller shall be discharged from all liability therefore, except for any applicable indemnification obligation, as provided in Section 10.2 hereof. Seller shall have no obligation to perform any servicing activities with respect to the Loans from and after the Transfer Date of such Loans.

Section 4.2. Interim Servicing/Buyer Bound. Until the Transfer Date, Seller shall continue to service the Loans to be transferred and in connection therewith, Seller shall have the right, among other things, to postpone any pending litigation or bankruptcy matter until after the Transfer Date for such Loans. Buyer shall be bound by the actions taken by Seller with respect to any Loan prior to the Transfer Date of such Loan. BUYER SHALL TAKE NO ACTION TO COMMUNICATE WITH ANY OBLIGOR OR ITS ACCOUNTANTS OR ATTORNEYS OR ENFORCE OR OTHERWISE SERVICE OR MANAGE ANY SUCH LOAN UNTIL AFTER THE TRANSFER DATE OF SUCH LOAN. In no event shall Seller be deemed a fiduciary for the benefit of Buyer with respect to the Loans, or any Loan.

Section 4.3. Buyer Servicer Requirements/Hold Harmless and Indemnity. Buyer shall be responsible for complying with all state and federal laws, rules, regulations and other statutory requirements, if any, with respect to the ownership and/or servicing and/or collection of any of the Loans from and after the Transfer Date of such Loan including, without limitation, the obligation to notify any Obligor of the transfer of servicing rights from Seller to Buyer.

Section 4.4. Disputes With Obligors Resolved Through Arbitration or Litigation. Buyer acknowledges and agrees that any claim, dispute or action against an Obligor of a Loan shall be resolved by arbitration or litigation pursuant to the terms and conditions of the underlying loan agreement between Seller and such Obligor, which is assigned to and assumed by Buyer, pursuant to the terms of this Agreement. The underlying loan agreement provides that any arbitration shall be conducted by the National Arbitration Forum, under the Code of Procedure in effect at the time the claim is filed.

ARTICLE V

REPURCHASE OF LOAN AND REFUND OPTION OF SELLER

Section 5.1. Seller's Right to Notification of Claims and Actions. Buyer shall promptly notify Seller of any Claim, threatened Claim or pending or threatened arbitration or other legal

7

CPS 008

proceeding by any Obligor against Seller that arises from or relates to any of the loans purchased hereunder.

Section 5.2.  Retention Refund.  If Seller determines in its sole discretion that any of the circumstances set forth in Section 5.3 exist with respect to any Loan and Seller elects to retain or repurchase the Loan, Seller shall refund a portion of the Purchase Price relating to such Loan equal to the amount determined according to the following formula: (i) (a) the current outstanding principal balance of the Loan (or if such loan is to be retained prior to transfer to the Buyer the amount set forth on the Loan Schedule containing the Loan being retained); multiplied by ᴿᴱᴰᴬᶜᵀᴱᴰ b) then (ii) the amount determined under the preceding clause (i), shall be decreased by the aggregate amount of other payments, credits or other consideration, if any, attributable to such Loan only to the extent that such credits or other consideration were actually paid over or delivered by the related Obligors or the Seller to the Buyer after the date of the repurchase notice.

Section 5.3.  Seller's Right to Retain and to Repurchase Loan(s).  If any of the circumstances described in (a), (b) or (c) of this section exist with respect to any loan which is charged off by the Seller, the Seller may retain such loan and not include such loan in the Loans designated for sale or sold to the Buyer.

In addition, if Seller determines (i) after the designation of Loans for sale and the determination of Purchase Price of the Loans to be sold on any Transfer Date or (ii) after the Transfer Date that any of the following circumstances exist with respect to any of such Loan or Loans, then Seller shall have the right but not the obligation, to refund to Buyer the Retention Price relating to such Loan(s) calculated pursuant to the provisions set forth in Section 5.2 and withdraw such Loan or Loans from the - Loan Schedule and from the Transfer Documents and Buyer, upon ten (10) days written notice, agrees to reconvey such Loan or Loans to Seller:

(a)    The loan is participated among different financial entities or depository institutions or is otherwise subject to an agreement between Seller and another depository institution or third party, which restricts or otherwise limits the sale, transfer or assignment of the loan or the servicing of the loan without obtaining the prior consent of such third party; or

(b)    Seller determines that there is a pending or threatened suit, action, arbitration, bankruptcy proceeding or other legal proceeding or investigation relating to the loan or any Obligor for such loan and naming Seller or otherwise involving Seller's interest therein in a manner unacceptable to Seller, or Seller otherwise determines that such matter cannot be resolved and/or that Seller's interest therein cannot be adequately protected without Seller owning such loan, or for which a settlement agreement was entered into prior to the Cut-off Date for such loan; or

(c)    Seller determines that the loan is (i) cross defaulted, (ii) cross collateralized, or (iii) otherwise so inextricably related to any loan, asset, claim, or right of action owned by Seller or any of Seller's predecessors in interest and not expressly transferred to Buyer pursuant to this Agreement, that Seller determines that it reasonably requires the retention of such loan in order to protect Seller's interests in such other loan, asset claim or right of action.

8

CPS 009

ARTICLE VI

NO RIGHT TO REPURCHASE

OTHER THAN SELLER'S RIGHT TO RETAIN OR REPURCHASE A LOAN PURSUANT TO ARTICLE V, OR SELLER'S DUTY TO REPURCHASE A LOAN PURSUANT TO THE TERMS AND PROVISIONS OF ARTICLE VIII, BUYER ACKNOWLEDGES AND AGREES THAT THE LOANS MAY BE UNENFORCEABLE LOANS AND MAY HAVE LITTLE OR NO VALUE AND THAT SELLER SHALL HAVE NO OBLIGATION TO REPURCHASE ANY LOAN SOLD HEREUNDER.

ARTICLE VII

REPRESENTATIONS, WARRANTIES AND COVENANTS OF BUYER

Buyer hereby represents, warrants and covenants, to and with Seller, as of the effective date of this Agreement, as of the Effective Date of each Assignment and Acceptance Agreement entered into as provided in Section 11.2 of this Agreement and as of the Transfer Date that:

Section 7.1. No Collusion. Neither Buyer, its affiliates, nor any of their respective officers, partners, agents, representatives, employees or parties in interest (i) has in any way colluded, conspired, connived or agreed directly or indirectly with any other bidder, firm or person to submit a collusive or sham bid or offer, or any bid other than a bona fide bid, in connection with the selection of the Buyer to purchase the Loans subject to this Agreement, or (ii) has, in any manner, directly or indirectly, sought by agreement or collusion or communication or conference with any other bidder, firm or person to fix the price or prices, or to fix any overhead, profit or cost element of the bid price or terms of the agreement the bid price or terms of the agreement of any other bidder with respect to the selection of the Buyer to purchase the Loans subject to this Agreement, or to secure any advantages against Seller.

Section 7.2. Authorization. Buyer is duly and legally authorized to enter into this Agreement and the other Transaction Documents and has complied with all laws, rules, regulations, charter provisions and bylaws to which it may be subject or by which its assets may be bound and that the undersigned representative is authorized to act on behalf of and bind Buyer to the terms of this Agreement. Buyer will deliver to Seller, contemporaneously with this Agreement (or, where applicable, with the Assignment and Acceptance Agreement described in Section 11.2 of this Agreement), a certified copy of a resolution of its Board of Directors authorizing Buyer's entry into this Agreement through such representative, together with such documents as evidence Buyer's authority.

Section 7.3. Binding Obligations. Assuming due authorization, execution and delivery by Seller, this Agreement and each of this other Transaction Documents and all of the obligations of Buyer hereunder and thereunder are the legal, valid and binding obligations of Buyer, enforceable in accordance with their respective terms, except as such enforcement may be limited

9

CPS 010

by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and by general equity principles (regardless of whether such enforcement is considered in a proceeding in equity or at law.)

Section 7.4. <u>No Breach or Default</u>. The execution and delivery of this Agreement (or, where applicable, the Assignment and Acceptance Agreement described in Section 11.2 of this Agreement) and the performance of its obligations hereunder by Buyer will not conflict with any provision of any law or regulation to which Buyer is subject or by which any of its assets may be bound or conflict with or result in a breach of or constitute a default under any of the terms, conditions or provisions of any agreement or instrument to which Buyer is a party or by which it or any of its assets may be bound, or any order or decree applicable to Buyer.

Section 7.5. <u>Nondisclosure and Compliance with Transaction Documents</u>. Buyer is in full compliance with its obligations under the terms of the Mutual Non-Disclosure Agreement, attached hereto as <u>Exhibit F</u> and the terms thereof are hereby incorporated herein, subject to Buyer's ownership rights and interests acquired by Buyer hereunder.

Section 7.6. <u>Identity</u>. Buyer is a "United States person" within the meaning of Paragraph 7701(a) (30) of the Internal Revenue Code of 1986, as amended.

Section 7.7. <u>No Affiliation with Seller</u>. Except as may have been previously disclosed to Seller in writing, Buyer is not or has not been affiliated, directly or indirectly, with Seller, or any of its respective agents, affiliates or employees.

Section 7.8. <u>Assistance of Third Parties</u>. Buyer hereby agrees, acknowledges, confirms and understands that Seller shall have no responsibility or liability to Buyer arising out of or related to any third party's failure to assist or cooperate with Buyer. In addition, Buyer is not relying upon the continued actions or efforts of Seller or any third party in connection with its decision to purchase the Loans. The risks attendant to the potential failure or refusal of third parties to assist or cooperate with Buyer and/or Seller in the effective transfer, assignment, and conveyance of the purchased Loans, and/or assigned rights shall be borne by Buyer.

Section 7.9. <u>Enforcement/Legal Actions/Unfair Collection Practices</u>. Buyer covenants, agrees, warrants and represents that Buyer shall not institute any enforcement or legal action or proceeding in the name of Seller or any subsidiary or affiliate thereof. Buyer also represents warrants and covenants not to take any enforcement action against any Obligor that would be commercially unreasonable by the standards applicable to companies in the same industry as Buyer, and Buyer shall not misrepresent, mislead, deceive, or otherwise fail adequately to disclose to any particular Obligor the identity of Buyer as the owner of the Loans. Buyer further represents, warrants and covenants not to use, adopt, exploit, or allude to Seller or any name derived therefrom or confusingly similar therewith or the name of any other local, state or federal agency or association to promote Buyer's sale, enforcement, collection, or management of the Loans. Buyer covenants, agrees, warrants and represents that it will not violate any laws relating to unfair credit collection practices in connection with any of the Loans transferred to Buyer pursuant to this Agreement. Buyer agrees, acknowledges, confirms and understands that there

10

CPS 011

may be no adequate remedy at law for a violation of the terms, provisions, conditions and limitations set forth in this Section 7.9 and Seller shall have the right to seek the entry of an order by a court of competent jurisdiction enjoining any violation hereof. Buyer agrees to notify Seller within ten (10) business days of notice or knowledge of any Claim or demand.

Section 7.10. <u>Status of Buyer.</u> Buyer represents, warrants and certifies to Seller that it is (i) a financial institution, (ii) an institutional purchaser including a sophisticated purchaser that is in the business of buying or originating loans of the type being purchased or that otherwise deals in such loans in the ordinary course of the Buyer's business, or (iii) an entity that is defined as an accredited investor under the federal securities laws. Buyer covenants, agrees, represents and warrants that all information provided to Seller or its agents by or on behalf of Buyer in connection with this Agreement and the transactions contemplated hereby is true and correct in all material respects and does not fail to state any fact required to make the information contained therein not misleading.

Section 7.11. <u>No Broker's/Finder's Fees.</u> Buyer has not dealt with any broker, agent or finder in connection with the transaction contemplated by this Agreement that would give rise to a claim for a brokerage commission or finder's fee. Buyer hereby indemnifies and agrees to defend and hold harmless Seller from and against any claims for brokerage fees or commissions of any broker, agent or finder resulting from the transaction contemplated by this Agreement. Buyer acknowledges that Seller shall have no liability for the payment of Buyer's brokerage fees, commissions or finder's fees in connection with the transaction contemplated by this Agreement.

Section 7.12. <u>Buyer Insurance Requirements</u> shall, at its sole cost and expense, procure and maintain in full force and effect the following insurance coverages with an insurance carrier which is at least "A" rated by Best.

| General Liability | $2,000,000 General Aggregate |
| | $2,000,000 Product Aggregate |
| | $1,000,000 Each Occurrence |
| Excess Liability | $5,000,000 Each Accident |
| | $5,000,000 Aggregate |

Seller must be provided a certificate of insurance evidencing that such coverage is in effect prior to execution of this Agreement and upon each assignment to a subsequent Buyer as provided in Section 11.2 hereof. All certificates of insurance shall be amended to name Seller and its affiliates as additional insured parties, and shall require that Seller be provided with at least 30 days advance written notice of cancellation or material change in the stated coverage of such insurance. Amended certificates of insurance shall be delivered to the attention of the Seller's Corporate Insurance Department at the address provided in <u>Exhibit A</u>, and approved by said department prior to the commencement of any collection efforts by the Buyer on the Loans. Buyer shall furnish to Seller renewal certificates of insurance, on an annual basis, until all collection efforts with respect to the Loans have ceased.

11

CPS 012

Section 7.13. <u>No Proceeding</u>. There is no litigation or administrative proceeding before any court, tribunal or governmental body presently pending or, to the knowledge of Buyer, threatened against Buyer which would have a material adverse effect on the transactions contemplated by, or Buyer's ability to perform its obligations under, this Agreement, or any of the other Transaction Documents.

Section 7.14. <u>Survival of Representations, Warranties and Covenants</u>. The representations, warranties and covenants set forth in this Article shall continue notwithstanding the closing on the sale of any Loans.

ARTICLE VIII

## LIMITED REPURCHASE/REPRESENTATIONS AND WARRANTIES OF SELLER

Section 8.1. <u>Limited Repurchase at Buyer's Option</u>. The Buyer may, twice, at any time within one hundred eighty (180) days of the Transfer Date of a specific Loan pool, submit a listing of Loans and require the Seller to repurchase Loans from such pool, in the event that, with respect to any Loan on such list, prior to the Cut-Off Date:

1.     All Obligors have filed an active bankruptcy proceeding as of the Cut-Off Date which has not been adjudicated or discharged and the Loan is listed or is reasonably likely to be listed as one of the obligations to be extinguished in such proceeding; or,

2.     All Obligors were declared legally dead prior to the Cut-Off Date; or,

3.     The Seller, or any of its duly appointed agents, had delivered to all Obligors a release of liability or satisfaction of their obligations to the Seller; or

4.     That the Seller, acting alone or in concert with its duly appointed agents, knowingly created a forged, fraudulent or fictitious Loan; or

5.     That the Seller, on the Cut-Off Date, did not have good and marketable title to the Loan, (except for any defect in title, lien or encumbrance arising from, related to, or resulting from (i) the expiration of any statute of limitations, or (ii) Seller's inability to produce documentation for such Loan, either of which shall negate Seller's obligation to repurchase the Loan pursuant to the terms of this Section 8.1.5); or

6.     That, prior to the Transfer Date, the Seller was not in substantial compliance with any material provisions of state and federal consumer credit laws, including, without limitation, the Truth-in-Lending Act, the Equal Credit Opportunity Act, the Fair Debt Collection Practices Act and the Fair Credit Billing Act, that Seller was required to comply with in its origination (if the Loan was originated by the Seller) or servicing of the Loan.

7.     That, prior to the Transfer Date, the Seller issued a 1099-C to any Obligor.

12

CPS 013

Section 8.2. <u>Repurchase of Loans</u>. In the event that Buyer gives Seller written notice of Buyer's election to have Seller repurchase Loans pursuant to the provisions of Section 8.1, and supplies the Seller with evidence satisfactory to Seller that the same constitutes Loans subject to repurchase, on or before one hundred and eighty (180) days after the Transfer Date of such Loan (the "<u>Repurchase Period</u>"), then Seller shall repurchase the Loan(s) identified in such notice for an amount equal to the Retention Price calculated in accordance with the terms of Section 5.2. Buyer and Seller agree that with respect to any individual monthly Loan sale pool, Seller will only be obligated to perform this repurchase and its attendant procedures and operations once, and that Buyer will submit only two notifications, during the 180 day period from the Transfer Date. Seller shall not be responsible for replacing or repurchasing the first five (5%) percent of accounts sold pursuant to this agreement and submitted by Buyer for repurchase or replacement.

Repurchase by the Seller pursuant to the provisions of this Article VIII shall constitute the sole and exclusive remedy of the Buyer. Except for the remedies in this Section 8.2, Buyer hereby waives any and all rights and remedies to sue Seller in law or equity for damages and other relief, including, without limitation, actual, special, consequential or punitive damages. Seller shall have no obligation to repurchase any Loan for which notice and all supporting evidence have not been received by Seller within the one hundred and eighty (180) day period following the Transfer Date of such Loan. Within thirty (30) days of receiving the Retention Price from Seller, Buyer shall reconvey the repurchased Loan to Seller using the same form of Bill of Sale and Assignment Seller used to transfer the Loan to Buyer, along with any amounts due or collected by Buyer in connection with such Loan and release its security interest on any repurchased Loan.

Section 8.3. <u>Representations and Warranties of Seller</u>. The Seller hereby represents and warrants, to the Buyer, as of the effective date of this Agreement and as of each Transfer Date that:

(a)     Seller is a national banking association duly organized, validly existing and in good standing under the laws of the United States with full power and authority to enter into this Agreement to sell the Loans and to carry out the terms and provisions hereof;

(b)     The execution and delivery of this Agreement and the performance hereunder have been duly authorized on or prior to the effective date of this Agreement, by all necessary action on the part of the Seller and no provision of applicable law or regulation or the charter or bylaws of Seller or any judgment, injunction, order, decree or other instrument binding upon Seller is or will be contravened by Seller's execution and delivery of this Agreement or Seller's performances hereunder;

(c)     Assuming due authorization, execution and delivery by Buyer, this Agreement and all of the obligations of Seller hereunder are the legal, valid and binding obligations of Seller, enforceable in accordance with the terms of this Agreement, except as such enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and by general equity

13

CPS 014

principles (regardless of whether such enforcement is considered in a proceeding in equity or at law);

(d)     No authorization, consent, approval, license, qualification or formal exemption from, nor any filing, declaration or registration with, any governmental agency or regulatory authority or any other body is required in connection with the execution, delivery or performance by Seller of this Agreement, which authorization, consent, approval, license, qualification or formal exemption from, or filing, declaration or registration has not been obtained on or prior to the Transfer Date; and

(e)     No authorization, consent, approval, license, qualification or formal exemption from, nor any filing, declaration or registration with, any governmental agency or regulatory authority or other body is required in connection with the sale of any or all of the Loans to be sold on the Transfer Date, which authorization, consent, approval, license, qualification or formal exemption, or filing, declaration or registration has not been obtained on or prior to such date.

Section 8.4.   Survival of Representations, Warranties and Covenants.  The representations, warranties and covenants set forth in this Article shall continue notwithstanding the closing on the sale of any Loans.

Section 8.5   Discrepancies in Current Balance.  In the event that during the Repurchase Period either party gives notice to the other that the aggregate Current Balance given to Buyer by Seller (upon which the purchase price is based) for the Loans sold hereunder differs from the actual aggregate Current Balance of the Loans (after the application of all credits, payments, interest, costs, fees, expenses and deductions for returned payments)(the "Discrepancy"), the parties hereto agree that an amount equal to the amount of the Discrepancy, multiplied by REDACTED shall be paid by the positively affected party to the adversely affected party.

# ARTICLE IX

## BUYER'S EVALUATION AND ACCEPTANCE OF RISK OF LOANS SOLD "AS-IS"

Buyer hereby represents, warrants, acknowledges and agrees to the following:

Section 9.1.  Independent Evaluation.  Buyer's decision to enter into this Agreement and to purchase the Loans pursuant to this Agreement is and was based upon Buyer's own independent evaluation of information deemed relevant by Buyer, including, but not limited to, the information made available by Seller to the Buyer, and Buyer's independent evaluation of the Loans and related information. Buyer has relied solely on its own investigation and it has not relied upon any oral or written information provided by Seller or its employees, contractors, officers, representatives, directors or agents.

14

CPS 015

Section 9.2. <u>Due Diligence</u>. Buyer has had the opportunity to conduct such due diligence review and analyses of the Information together with such records as are generally available to the public from local, county, state and federal authorities, record keeping offices and courts (including, without limitation, any bankruptcy courts in which any Obligor(s), if any, may be subject to any pending bankruptcy proceedings); as Buyer deemed necessary, proper or appropriate in order to make a complete informed decision with respect to the purchase and acquisition of the Loans.

Section 9.3. <u>Economic Risk</u>. Buyer acknowledges that the Loans may have limited or no liquidity and Buyer has the financial wherewithal to own the Loans for an indefinite period of time and to bear the economic risk of an outright purchase of the Loans and a total loss of the Purchase Price for the Loans. Buyer acknowledges that the Loans may be unenforceable Loans.

Section 9.4. <u>Loans Sold As Is</u>. With respect to this paragraph, the term Seller shall include its affiliates, agents, directors, officers, representatives, contractors and employees. THE BUYER ACKNOWLEDGES AND AGREES THAT THE SALE OF ALL LOANS MADE BY SELLER PURSUANT TO THIS AGREEMENT SHALL BE WITHOUT RECOURSE, REPRESENTATION OR WARRANTY, AND THAT SELLER HAS NOT MADE, DID NOT MAKE AND SPECIFICALLY DISCLAIMS (AND BUYER IS NOT RELYING ON SELLER WITH RESPECT TO) ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO THE FOLLOWING:

    (a)    THE MARKETABILITY, VALUE, QUALITY OR CONDITION OF ANY LOAN OR LOANS;

    (b)    THE VALIDITY, ENFORCEABILITY OR COLLECTIBILITY OF THE EVIDENCE OF INDEBTEDNESS;

    (c)    THE COMPLIANCE OF THE LOANS WITH ANY STATE OR FEDERAL USURY LAWS AND REGULATIONS APPLICABLE THERETO;

    (d)    THE ACCURACY OR COMPLETENESS OF ANY INFORMATION PROVIDED BY THE SELLER TO THE BUYER, INCLUDING WITHOUT LIMITATION, THE ACCURACY OF ANY SUMS SHOWN AS CURRENT BALANCE OR ACCRUED INTEREST AMOUNTS DUE UNDER THE LOANS; AND

    (e)    ANY OTHER MATTERS PERTAINING TO THE LOANS.

IN ADDITION, SELLER EXPRESSLY DISCLAIMS ANY EXPRESS OR IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

CPS 016

BUYER ACKNOWLEDGES AND AGREES THAT BUYER IS PURCHASING THE LOANS BASED UPON BUYER'S INDEPENDENT EXAMINATION, STUDY, INSPECTION AND KNOWLEDGE OF THE LOANS AND THAT BUYER IS RELYING UPON ITS OWN DETERMINATION OF THE QUALITY, VALUE AND CONDITION OF THE LOANS AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY SELLER. BUYER ACKNOWLEDGES AND AGREES THAT ANY INFORMATION PROVIDED OR TO BE PROVIDED WITH RESPECT TO THE LOANS WAS OR WILL BE OBTAINED FROM A VARIETY OF SOURCES AND THAT SELLER HAS NOT MADE OR WILL NOT BE OBLIGATED TO MAKE AN INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION AND SELLER MAKES NO REPRESENTATIONS AS TO THE ACCURACY OR COMPLETENESS OR SUCH INFORMATION. BUYER ACKNOWLEDGES AND AGREES THAT SELLER HAS NOT UNDERTAKEN TO CORRECT ANY MISINFORMATION OR OMISSION OF INFORMATION WHICH MIGHT BE NECESSARY TO MAKE ANY INFORMATION DISCLOSED TO SUCH BUYER NOT MISLEADING IN ANY RESPECT. FINALLY BUYER SHALL BE DEEMED TO UNDERSTAND THAT ANY DOCUMENTS EXCLUDED FROM THE INFORMATION PROVIDED TO BUYER COULD CONTAIN INFORMATION WHICH, IF KNOWN TO BUYER, COULD HAVE A MATERIAL IMPACT ON ITS DETERMINATION OF VALUE OF THE LOANS. EXECUTION OF THIS AGREEMENT SHALL CONSTITUTE AN ACKNOWLEDGMENT BY BUYER THAT THE EXISTING LOANS WERE ACCEPTED WITHOUT REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED OR OTHERWISE IN AN "AS IS", "WHERE IS" AND "WITH ALL FAULTS" CONDITION BASED SOLELY ON BUYER'S OWN INSPECTION. NO EVENT OR CONDITION SHALL ENTITLE BUYER TO REFUSE TO PURCHASE A LOAN OR TO REQUEST SELLER TO REPURCHASE A LOAN, EXCEPT AS SPECIFIED IN THIS AGREEMENT. NOTHING IN THIS SECTION 9.4 AFFECTS SELLER'S INDEMNIFICATION OBLIGATIONS SET FORTH IN SECTION 10.2.

CPS 017

ARTICLE X

INDEMNIFICATION

Section 10.1. Buyer's Indemnification. From and after the Transfer Date, Buyer shall defend, indemnify and hold harmless Seller or Seller's agents, affiliates, employees, contractors, officers, directors and representatives against and from any and all liability for, and from and against any and all losses or damages Seller may suffer as a result of any Claim or threatened Claim that Seller shall incur or suffer as a result of (i) any act or omission of Buyer or Buyer's agents, affiliates, employees, contractors, officers, assignees, directors and representatives in connection with the Loans and its purchase of the Loans, pursuant to the Agreement, or (ii) the breach or inaccuracy of any of Buyer's representations or warranties as set forth in this Agreement and in the other documents executed in connection with the selection of the Buyer to enter into this agreement and the sale of the Loans, or (iii) the breach of any of Buyer's covenants as set forth in this Agreement and in the other documents executed in connection with Buyer's purchase of the Loans or in the Mutual Non-Disclosure Agreement attached hereto as Exhibit F or (iv) any Claim or threatened Claim by any Obligor regarding any assignment, enforcement, servicing or administration of the Loans by Buyer or Buyer's agents, affiliates, employees, contractors, officers, directors, assignees and representatives on or after the Transfer Date.

Section 10.2. Seller's Indemnification. From and after the first Transfer Date, Seller shall defend, indemnify and hold harmless Buyer or Buyer's agents, affiliates, employees, contractors, officers, directors and representatives against and from any and all liability for, and from and against any and all losses or damages Buyer may suffer as a result of any Claim or threatened Claim that Buyer shall incur or suffer as a result of (i) any act or omission of Seller or Seller's agents, affiliates, employees, contractors, officers, assignees, directors and representatives in connection with the Loans and its sale of the Loans, pursuant to the Agreement, (ii) the breach or inaccuracy of any of the Seller's representations or warranties as set forth in this Agreement and in the other documents executed by the Seller in connection with the sale of the Loans, or (iii) the breach of any of Seller's covenants as set forth in this Agreement and in the other documents executed in connection with Seller's sale of the Loans, or (iv) any Claim or threatened Claim by any Obligor regarding any assignment, enforcement, servicing or administration of the Loans by Seller or Seller's agents, affiliates, employees, contractors, officers, directors, assignees and representatives arising prior to the Transfer Date.

17

CPS 018

ARTICLE XI

<u>ASSIGNMENT OF RIGHTS TO THIRD PARTIES</u>

Section 11.1. <u>Assignment of Agreement; Assignment of Loans</u>. Buyer may assign this Agreement to an Affiliate as provided in Section 11.2. of this Agreement and may assign the Loans for purposes of collateralizing financing arrangements as provided in Section 11.3. of this Agreement. Except as provided in Sections 11.2. and 11.3. of this Agreement, Buyer shall not assign, encumber, transfer or convey its rights under this Agreement or any Loan purchased pursuant to the terms of this Agreement, without the prior written consent of Seller, in each instance, which approval shall not be unreasonably withheld. ALL REQUESTS TO ASSIGN OR TRANSFER BUYER'S INTEREST IN, TO OR UNDER THIS AGREEMENT MUST BE MADE IN WRITING AND RECEIVED BY SELLER PURSUANT TO THE NOTICE PROVISIONS OF THIS AGREEMENT. Buyer may not resell or transfer any Account, with the exception of any Account involved in a bankruptcy proceeding, to any third party within the first twelve (12) months from the Closing Date.

Notwithstanding any consent by Seller to any assignment or transfer of this Agreement or any Loan, no assignee or transferee shall, except in compliance with the terms of Section 11.2. or 11.3. below, further assign or transfer this Agreement or any Loan without Seller's prior written consent in each instance. No assignment or transfer of the Agreement or any Loan shall relieve Buyer of any of its liabilities or obligations under this Agreement. Each transferee of this Agreement shall be bound by all of the terms and provisions of this Agreement, and Buyer shall remain liable for all obligations of Buyer to Seller hereunder, notwithstanding such assignment.

Section 11.2. <u>Assignment to Affiliate</u>. Such entity as may from time to time be the Buyer hereunder may assign all of its rights and obligations with respect to the purchase and sale of Loans occurring after such assignment to an Affiliate provided that assignor, assignee and the Seller enter into an Assignment and Acceptance Agreement, substantially in the form of Exhibit G attached hereto and, upon delivery of such Assignment and Acceptance Agreement to the Seller, the assignee named in such document shall, as of the Effective Date set forth in such Agreement, become the Buyer under the terms of this Agreement and shall be bound by the terms of this Agreement and shall, as of the time of such assignment be deemed to have made all of the representations, warranties and covenants of the Buyer set forth in Article VII of this Agreement. Each such assignment shall be effective only if such assignment is made to an Affiliate.

Section 11.3. <u>Assignment of Loans</u>. The Buyer and any Affiliate may assign its rights under this Agreement and the Loans purchased hereunder to a bank or to or through any other entity as collateral for a loan or other funding arrangement to be made for the purposes of financing the purchase of such Loans and the Buyer or any Affiliate may assign its rights under this Agreement and the Loans into a trust or other special purpose entity for purpose of providing collateral in the context of a securitization of such Loans as a financing vehicle for the Buyer or an Affiliate. Any Loan assigned pursuant this Section 11.3 may not be subsequently sold,

18

CPS 019

assigned or transferred to any person or entity (a 'subsequent assignee') unless Seller grants its prior written consent, which consent may not be unreasonably withheld or delayed. Notwithstanding the transfer of Loans and any of its rights under this Agreement pursuant to the terms of this Section 11.3, the Buyer which transfers such Loans or rights shall remain liable for all obligations of the Buyer hereunder and with respect to such Loans and/or rights.

## ARTICLE XII

### FILES AND RECORDS

Section 12.1. <u>Conformity to Law</u>. Buyer agrees, at its sole cost and expense, to abide by all applicable state and federal laws, rules and regulations regarding the handling, maintenance, servicing and collection of all Loans and in the maintenance of all documents and records relating to the Loans purchased hereunder, including, but not limited to, the length of time such documents and records are to be retained, and making any disclosures to Obligors as may be required by law.

Section 12.2. <u>Credit Bureau Reporting</u>. Seller agrees to report all Loans as sold or transferred to another lender, as permitted by the Fair Credit Reporting Act.

## ARTICLE XIII

### INFORMATIONAL TAX REPORTING

Section 13.1. <u>Informational Tax Reporting</u>. Buyer hereby agrees to perform all of its obligations with respect to federal and/or state tax reporting relating to or arising out of the Loans sold and assigned pursuant to this Agreement including, without limitation, the obligations with respect to Form 1099 and backup withholding with respect to the same, if required, for the year 2008 and thereafter. Seller reserves the right to notify Buyer that Seller shall file such reporting forms relating to the accounts that have received a payment during the period prior to the Transfer Date. Upon reasonable request, each party will provide the requesting party with copies, delivered in a commercially reasonable format, of their respective Form 1099.

CPS 020

## ARTICLE XIV

### RETAINED CLAIMS

Section 14.1. Retained Claims. Buyer and Seller agree that the sale of the Loans pursuant to this Agreement shall exclude the transfer to Buyer of any and all claims and/or causes of action Seller has or may have (i) against officers, directors, employees, insiders, accountants, attorneys, other persons employed by Seller, underwriters or any other similar person or persons who have caused a loss to Seller in connection with the initiation, origination or administration of any of the Loans, or (ii) against any third parties involved in any alleged fraud or other misconduct relating to the making or servicing of any of the Loans, or (iii) against any other party from whom Seller contracted services in connection with any of the Loans.

## ARTICLE XV

### NOTICES

Section 15.1. Notices. All notices, waivers, demands, requests and other communications required or permitted by this Agreement (collectively, "Notices") shall be in writing and given as follows by (a) personal delivery, (b) established overnight commercial courier with delivery charges prepaid or duly charged, or (c) registered or certified mail, return receipt requested, first class postage prepaid. All Notices which relate to any of the Loans shall specify the Transfer Date of such Loans. Such Notices shall be addressed to the Buyer, as the case may be, at the address set forth on Exhibit B to this Agreement and incorporated herein or with respect to Buyers subsequent to the initial Buyer to the address provided in the Assignment and Acceptance Agreement. Such Notices shall be sent to Seller at the address set forth on Exhibit A to this Agreement and incorporated herein. Notices so given by personal delivery shall be presumed to have been received upon tender to the applicable natural person designated below to receive notices or, in the absence of such a designation, upon tender to the person signing this Agreement on behalf of the applicable party. Notices so given by overnight courier shall be presumed to have been received the next Business Day after delivery to such overnight commercial courier. Notices so given by mail shall be presumed to have been received on the third (3rd) day after deposit into the United States postal system. All copies to the applicable persons or entity(ies) designated above to receive copies shall be given in the same manner as the original Notice, and such giving shall be a prerequisite to the effectiveness of any Notice.

CPS 021

ARTICLE XVI

WAIVER AND RELEASE

Section 16.1. Waiver and Release. Buyer, its affiliates, officers, directors, successors or assignees thereof, and all subsequent transferees of the Loans, and all others claiming by or through Buyer or subsequent transferees, hereby disclaim and waive any right or cause of action they may now or in the future have against Seller, and any of Seller's respective contractor's officers, directors, employees, attorneys, agents, and predecessors in interest as a result of the purchase of the Loans; provided, however, that this waiver and release shall not extend to any liability of Seller arising from Seller's failure to perform its obligations in accordance with the terms of this Agreement or any liability of Seller to Buyer indemnified pursuant to Section 10.2. In addition, Buyer, its affiliates, officers, directors, successors or assignees thereof, and all subsequent transferees of the Loans, and all others claiming by or through Buyer or subsequent transferees, hereby release Seller, its agents, officers, directors, representatives, contractors, employees, attorneys and their successors and assigns, from any and all Claims arising from or related to the Loans or arising out of the violation of any applicable laws (including, without limitation, state and federal securities laws), except for Claims indemnified pursuant to Section 10.2.

ARTICLE XVII

MISCELLANEOUS PROVISIONS

Section 17.1. Severability. If any term, covenant, condition or provision hereof is unlawful, invalid, or unenforceable for any reason whatsoever, and such illegality, invalidity, or unenforceability does not affect the remaining parts of this Agreement, then all such remaining parts hereof shall be valid and enforceable and have full force and effect as if the invalid or unenforceable part had not been included. In addition, the parties hereto agree to amend the Agreement to add a legally valid and enforceable provision, which will provide the same or similar economic benefits or other benefits to the affected party as the deleted, unenforceable or invalid provision.

Section 17.2. Rights Cumulative; Waivers. The rights of each of the parties under this Agreement are cumulative and may be exercised as often as any party considers appropriate under the terms and conditions specifically set forth. The rights of each of the parties hereunder shall not be capable of being waived or varied otherwise than by an express waiver or variation in writing. Any failure to exercise or any delay in exercising any of such rights shall not operate as a waiver or variation of that or any other such right. Any defective or partial exercise of any of

21

CPS 022

such rights shall not preclude any other or further exercise of that or any other such right. No act or course of conduct or negotiation on the part of any party shall in any way preclude such party from exercising any such right or constitute a suspension or any variation of any such right.

Section 17.3. <u>Headings</u>. The headings of the Articles and Sections contained in this Agreement are inserted for convenience only and shall not affect the meaning or interpretation of this Agreement or any provision hereof.

Section 17.4. <u>Construction</u>. Unless the context otherwise requires, singular nouns and pronouns, when used herein, shall be deemed to include the plural of such noun or pronoun, and pronouns of one gender shall be deemed to include the equivalent pronoun of the other gender.

Section 17.5. <u>Assignment</u>. Subject to the restrictions set forth in Article XI, this Agreement and the terms, covenants, conditions, provisions, obligations, undertakings, rights and benefits hereof, including the Addenda, Exhibits and Schedules hereto, shall be binding upon, and shall inure to the benefit of, the undersigned parties and their respective heirs, executors, administrators, representatives, successors and assigns.

Section 17.6. <u>Prior Understandings</u>. This Agreement supersedes any and all prior discussions and agreements among Seller and Buyer with respect to the purchase of the Loans and other matters contained herein, and the Transaction Documents contain the sole and entire understanding between the parties hereto with respect to the transactions contemplated herein.

Section 17.7. <u>Integrated Agreement</u>. The Transaction Documents hereto constitute the final complete expression of the intent and understanding of Buyer and Seller. This Agreement shall not be altered or modified except by a subsequent writing, signed by Buyer and Seller.

Section 17.8. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall constitute one and the same instrument, and any party hereto may execute this Agreement by signing any such counterpart. This Agreement shall be deemed to be binding when executed by Buyer and Seller and signature pages have been exchanged by the parties hereto via facsimile. Telecopy signatures shall be deemed valid and binding to the same extent as original signatures.

Section 17.9. <u>Non-Merger/Survival</u>. Each and every covenant made by Buyer or Seller in the Transaction Documents including, without limitation, any representation, warranty, covenant and any indemnity shall survive the execution and delivery of the Transfer Documents and this Agreement and shall not merge into the Transfer Documents, but instead shall be independently enforceable.

Section 17.10. <u>Governing Law/Choice of Forum</u>. This Agreement shall be construed, and the rights and obligations of Seller and Buyer hereunder determined, in accordance with the laws of the State of Delaware.

22

CPS 023

Section 17.11. <u>No Third-Party Beneficiaries</u>. Each of the provisions of this Agreement is for the sole and exclusive benefit of the parties hereto, and none of the provisions of this Agreement shall be deemed to be for the benefit of any other person or entity.

IN TESTIMONY WHEREOF, the parties hereto have executed this Agreement.

BUYER: CAVALRY SPV I, LLC

By: _____
      Name: Michael S. Godner
      Title: Chief Financial Officer


SELLER: FIA CARD SERVICES, N.A.

By: _____
      Name: Jim Novosad
      Title: Senior Vice President

CPS 024

Section 17.11. <u>No Third-Party Beneficiaries</u>. Each of the provisions of this Agreement is for the sole and exclusive benefit of the parties hereto, and none of the provisions of this Agreement shall be deemed to be for the benefit of any other person or entity.

IN TESTIMONY WHEREOF, the parties hereto have executed this Agreement.

BUYER: CAVALRY SPV I, LLC

By: _____
      Name: Michael S. Godner
      Title: Chief Financial Officer

SELLER: FIA CARD SERVICES, N.A.

By: _____
      Name: Jim Novosad
      Title: Senior Vice President

CPS 025

**SCHEDULE 1**

Loan Schedule

Seller Name     Loan Asset No.     Obligor Last Name     Current Balance (approximate)

FIA CARD SERVICES, N.A.

Summary:

| | Number of Accounts | Current Balance | Purchase Price Percentage | Purchase Price |
|---|---|---|---|---|
| MBNA | REDACTED | REDACTED | REDACTED | REDACTED |

## EXHIBIT A

## IDENTITY OF SELLER

Name: FIA CARD SERVICES, N. A.

Address:  655 Papermill Rd Newark, De 19884-1322
          City/State/Zip Code

Contact Person:  Manager of Sales Support
                 Attention: Jim Novosad

Telephone No.:  (602) 597-3737
Telecopy No.:   (602) 597-2385

EXHIBIT B

<u>IDENTITY OF BUYER</u>

Name:    Cavalry SPV I, LLC

Address:    7 Skyline Drive, Hawthorne, New York, 10532

Contact Person: Michael S. Godner

Telephone No.: 914-347-3440 x 13409

Telecopy No.: 914-347-7552

Tax I.D./SS No.: 01-0711035

Seller will document systematically Buyer's name and telephone number on each Loan purchased in this Agreement. Seller shall maintain these accounts on computer system for 5 years.

Seller will provide Buyer with a support person to handle inquiries related to the sale of the Loans in this Agreement.

CPS 028

EXHIBIT C

BILL OF SALE AND ASSIGNMENT OF LOANS

The undersigned Assignor ("Assignor") on and as of the date hereof hereby absolutely sells, transfers, assigns, sets-over, quitclaims and conveys to Cavalry SPV I, LLC a limited liability company organized under the laws of Delaware ("Assignee") without recourse and without representations or warranties of any type, kind, character or nature, express or implied, subject to Buyer's repurchase rights as set forth in Sections 8.1 and 8.2, all of Assignor's right, title and interest in and to each of the loans identified in the loan schedule ("Loan Schedule") attached hereto (the "Loans"), together with the right to all principal, interest or other proceeds of any kind with respect to the Loans remaining due and owing as of the Cut-Off Date applicable to such Loans as set forth in the Loan Sale Agreement pursuant to which the Loans are being sold (including but not limited to proceeds derived from the conversion, voluntary or involuntary, of any of the Loans into cash or other liquidated property).

DATED: —————————October 29, 2008.

ASSIGNOR: FIA CARD SERVICES, N.A.

Name: _____
Title: _____

CPS 029

# EXHIBIT D

## WIRE TRANSFER INSTRUCTIONS

Bank Name:   FIA CARD SERVICES, N.A. - NEWARK, DE

ABA Number:   REDACTED

DDA Code:   REDACTED

Reference:   Please indicate that the funds are loan sale proceeds, along with your name.

Attention:  Mike Crowe

In order to assure proper allocation of funds to Buyer's purchase price, this information must be included on all wire transfers.

CPS 030

## EXHIBIT E

## DELIVERY OF CREDIT APPLICATIONS
## AND STATEMENTS

Seller will deliver to Buyer one copy of the credit application (or affidavit if application is not available) and statements for three consecutive months for the Loans upon request for 25% of the Loans purchased by Buyer. Seller will deliver to Buyer additional copies of the credit application and statements for the Loans upon receipt of payment of $15.00 per application or statement (or other available information to be provided under the terms of Section 3.1 of this Agreement) requested by Buyer, within three hundred sixty five (365) days after the Transfer Date of such Loan, if such documents are available. With respect to any such request, Seller shall have sixty (60) days from the receipt of the Buyer's request to deliver the requested documents, provided the number of requests does not exceed two hundred (200) items in any one calendar month. Otherwise, Seller shall have ninety (90) days from the receipt of the Buyer's request to deliver the requested documents. Buyer expressly acknowledges that Seller only retains the credit applications for a period of five (5) years and that documentation may not exist with respect to the Loans purchased by Buyer.

**EXHIBIT F**

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

**EXHIBIT F**

<u>MUTUAL NON-DISCLOSURE AGREEMENT</u>

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

CPS 035

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

CPS 037

EXHIBIT G

FORM OF
ASSIGNMENT AND ACCEPTANCE AGREEMENT

THIS ASSIGNMENT AND ACCEPTANCE AGREEMENT (the "Assignment Agreement") dated as of _____, 2008 is entered into among _____ ("Assignor"), _____ ("Assignee") and FIA Card Services, N.A. (the "Seller").

Reference is made to the Loan Sale Agreement _____, as amended and modified from time to time (the "Loan Sale Agreement") between Buyer, Guarantor and Seller. Terms defined in the Loan Sale Agreement are used herein with the same meaning.

The Assignor hereby sells and assigns, without recourse, to the Assignee, and the Assignee hereby purchases and assumes, without recourse, from the Assignor, effective as of _____, 2008 (the "Effective Date") all of the Assignor's rights and obligations under the Loan Sale Agreement with respect to the purchase and sale of Additional Loans occurring after such Effective date ("Future Sales"). From and after the Effective Date (i) the Assignee shall be the "Buyer" under, and be bound by the provisions of the Loan Sale Agreement and have the rights and obligations of the Buyer thereunder with respect to Future Sales and (i) the Assignor shall relinquish its rights and be released from it obligations under the Loan Sale Agreement with respect to Future Sales. The Assignee hereby makes all of the representations, warranties and covenants set forth in Article VII of the Loan Agreement as of the Effective Date. Notwithstanding anything to the contrary herein contained, the representations and warranties made by the Seller to the Assignor in the Loan Sale Agreement shall survive, with respect to the Assignor, the assignment effected by this Agreement.

This Assignment Agreement shall be governed by and construed in accordance with the laws of the State of Delaware.

The terms set forth above are hereby agreed to by

_____, as Assignor

By: _____
Name: _____
Title: _____


_____, as Assignee

By: _____
Name: _____
Title: _____

_____, as Seller

By: _____
Name: _____
Title: _____

Address and information relating to the Assignee:

Name:

Address:

Contact Person:

Telephone No.:

Telecopy No.:

Tax I.D. /ss No:



## EXHIBIT C

### BILL OF SALE AND ASSIGNMENT OF LOANS

The undersigned Assignor ("Assignor") on and as of the date hereof hereby absolutely sells, transfers, assigns, sets-over, quitclaims and conveys to Cavalry SPV I, LLC a limited liability company organized under the laws of Delaware ("Assignee") without recourse and without representations or warranties of any type, kind, character or nature, express or implied, subject to Buyer's repurchase rights as set forth in Sections 8.1 and 8.2, all of Assignor's right, title and interest in and to each of the loans identified in the loan schedule ("Loan Schedule") attached hereto (the "Loans"), together with the right to all principal, interest or other proceeds of any kind with respect to the Loans remaining due and owing as of the Cut-Off Date applicable to such Loans as set forth in the Loan Sale Agreement pursuant to which the Loans are being sold (including but not limited to proceeds derived from the conversion, voluntary or involuntary, of any of the Loans into cash or other liquidated property).

DATED: October 29, 2008.

ASSIGNOR: FIA CARD SERVICES, N.A.

Name: Debra L. Pellicciaro

Title:   Assistant Vice President

# APPENDIX D

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DONITA J. STUBBS, | ) | |
| on behalf of plaintiff and a class, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 12-cv-7235 |
| v. | ) | |
| | ) | Judge Darrah |
| CAVALRY SPV I, LLC; and | ) | |
| CAVALRY PORTFOLIO | ) | |
| SERVICES, LLC; | ) | |
| | ) | |
| Defendants. | ) | |

**DECLARATION OF DANIEL A. EDELMAN**

Daniel A. Edelman declares under penalty of perjury, as provided for by 28 U.S.C. §1746, that the following statements are true:

     **1.** Edelman, Combs, Latturner & Goodwin, LLC, has 9 principals, Daniel A. Edelman, Cathleen M. Combs, James O. Latturner, Tara L. Goodwin, Michelle R. Teggelaar, Francis R. Greene, Julie Clark, Heather Kolbus and Thomas E. Soule, and 5 associates.

     **2. Daniel A. Edelman** is a 1976 graduate of the University of Chicago Law School. From 1976 to 1981 he was an associate at the Chicago office of Kirkland & Ellis with heavy involvement in the defense of consumer class action litigation (such as the General Motors Engine Interchange cases). In 1981 he became an associate at Reuben & Proctor, a medium-sized firm formed by some former Kirkland & Ellis lawyers, and was made a partner there in 1982. From the end of 1985 he has been in private practice in downtown Chicago. Virtually all of his practice involves litigation on behalf of consumers, mostly through class actions. He is the co-author of Rosmarin & Edelman, Consumer Class Action Manual (2d-4th editions, National Consumer Law Center 1990, 1995 and 1999); author of Collection Defense (Ill. Inst. Cont. Legal Educ. 2008, 2011); Representing Consumers in Litigation with Debt Buyers (Chicago Bar Ass'n 2008); Predatory Mortgage Lending (Ill. Inst. for Cont. Legal. Educ. 2008, 2011), author of Chapter 6, "Predatory Lending and Potential Class Actions," in Real Estate Litigation (Ill. Inst. For Cont. Legal Educ. 2008), Chapter, "Truth in Lending Act," in Illinois Causes of Action (Ill. Inst. For Cont. Legal Educ. 2008, 2011), Chapter, "Fair Debt Collection Practices Act," in Illinois Causes of Action (Ill. Inst. For Cont. Legal Educ. 2011), Predatory Lending and Potential Class Actions, ch. 6 of Illinois Mortgage Foreclosure Practice (Ill. Inst. For Cont. Legal Educ.2003); Predatory Lending and Potential Class Actions, ch. 5 of Real Estate Litigation (Ill. Inst. For Cont. Legal Educ.2004); Illinois Consumer Law, in Consumer Fraud and Deceptive Business Practices Act and Related Areas Update (Chicago Bar Ass'n 2002); Payday Loans: Big Interest Rates and Little Regulation, 11 Loy.Consumer L.Rptr. 174 (1999); author of Consumer Fraud and Insurance Claims, in Bad Faith and Extracontractual Damage Claims in Insurance Litigation, Chicago Bar Ass'n 1992; co-author of Chapter 8, "Fair Debt Collection

1

Practices Act," Ohio Consumer Law (1995 ed.); co-author of Fair Debt Collection: The Need for Private Enforcement, 7 Loy.Consumer L.Rptr. 89 (1995); author of An Overview of The Fair Debt Collection Practices Act, in Financial Services Litigation, Practicing Law Institute (1999); co-author of Residential Mortgage Litigation, in Financial Services Litigation, Practicing Law Institute (1996); author of Automobile Leasing: Problems and Solutions, 7 Loy.Consumer L.Rptr. 14 (1994); author of Current Trends in Residential Mortgage Litigation, 12 Rev. of Banking & Financial Services 71 (April 24, 1996); author of Applicability of Illinois Consumer Fraud Act in Favor of Out-of-State Consumers, 8 Loy.Consumer L.Rptr. 27 (1996); co-author of Illinois Consumer Law (Chicago Bar Ass'n 1996); co-author of D. Edelman and M. A. Weinberg, Attorney Liability Under the Fair Debt Collection Practices Act (Chicago Bar Ass'n 1996); author of The Fair Debt Collection Practices Act: Recent Developments, 8 Loy.Consumer L. Rptr. 303 (1996); author of Second Mortgage Frauds, Nat'l Consumer Rights Litigation Conference 67 (Oct. 19-20, 1992); and author of Compulsory Arbitration of Consumer Disputes, Nat'l Consumer Rights Litigation Conference 54, 67 (1994).  He is a member of the Illinois bar and admitted to practice in the following courts: United States Supreme Court, Seventh Circuit Court of Appeals, First Circuit Court of Appeals, Second Circuit Court of Appeals, Third Circuit Court of Appeals, Fifth Circuit Court of Appeals, Sixth Circuit Court of Appeals, Eighth Circuit Court of Appeals, Ninth Circuit Court of Appeals, Tenth Circuit Court of Appeals, Eleventh Circuit Court of Appeals, United States District Courts for the Northern and Southern Districts of Indiana, United States District Courts for the Northern, Central, and Southern Districts of Illinois, and the Supreme Court of Illinois.  He is a member of the Northern District of Illinois trial bar.

      **3.**      **Cathleen M. Combs** is a 1976 graduate of Loyola University Law School.  From 1984-1991, she supervised the Northwest office of the Legal Assistance Foundation of Chicago, where she was lead or co-counsel in class actions in the areas of unemployment compensation, prison law, social security law, and consumer law.  She joined what is now Edelman, Combs, Latturner & Goodwin, LLC in early 1991 and became a named partner in 1993.  Her reported decisions include: Nielsen v. Dickerson, 307 F. 3d 623 (7th Cir. 2002); Chandler v. American General Finance, Inc., 329 Ill. App.3d 729, 768 N.E.2d 60 (1st Dist. 2002);  Miller v. McCalla Raymer, 214 F. 3d 872 (7th Cir. 2000);  Bessette v. Avco Financial Services, 230 F. 3d 439 (1st Cir.2000); and Emery v. American Gen. Fin., Inc., 71 F. 3d 1343 (7th Cir. 1995).  She is a member of the Illinois bar and admitted to practice in the following courts:  United States District Courts for the Northern, Central and Southern Districts of Illinois, Seventh Circuit Court of Appeals, Third Circuit Court of Appeals, Fifth Circuit Court of Appeals, Tenth Circuit Court of Appeals, and United States District Court for the District of Colorado. She is a member of the Northern District of Illinois trial bar.

      **4.**      **James O. Latturner** is a 1962 graduate of the University of Chicago Law School.  Until 1969, he was an associate and then a partner at the Chicago law firm of Berchem, Schwanes & Thuma.  From 1969 to 1995 he was Deputy Director of the Legal Assistance Foundation of Chicago, where he specialized in consumer law, including acting as lead counsel in over 30 class actions.  His publications include Chapter 8 ("Defendants") in Federal Practice Manual for Legal Services Attorneys (M. Masinter, Ed., National Legal Aid and Defender Association 1989); Governmental Tort Immunity in Illinois, 55 Ill.B.J. 29 (1966); Illinois Should Explicitly Adopt the Per Se Rule for Consumer Fraud Act Violations, 2 Loy.Consumer L.Rep. 64 (1990), and Illinois Consumer Law (Chicago Bar Ass'n 1996).  He has taught in a nationwide series of 18 Federal Practice courses sponsored by the Legal Services Corporation, each lasting four days and designed for attorneys with federal litigation experience.  He has argued over 30

appeals, including two cases in the United States Supreme Court, three in the Illinois Supreme Court, and numerous cases in the Seventh, Third, Fifth, and Eleventh Circuits. Mr. Latturner was involved in many of the significant decisions establishing the rights of Illinois consumers. He is a member of the Northern District of Illinois trial bar.

      5.     **Tara L. Goodwin** is a graduate of the University of Chicago (B.A., with general honors, 1988)and Illinois Institute of Technology, Chicago-Kent College of Law (J.D., with high honors,1991). She has been with the firm since her graduation and has participated in many of the cases described below. **Reported Cases.** Williams v. Chartwell Financial Services, LTD, 204 F.3d 748 (7th Cir. 2000); Hillenbrand v. Meyer Medical Group, 682 N.E.2d 101 (Ill.1st Dist. 1997), 720 N.E.2d 287 (Ill.1st Dist. 1999); Bessette v. Avco Fin. Servs., 230 F.3d 439 (1st Cir. 2000);; Large v. Conseco Fin. Servicing Co., 292 F.3d 49 (1st Cir. 2002);; Carbajal v. Capital One, 219 F.R.D. 437 (N.D.Ill. 2004); Russo v. B&B Catering, 209 F.Supp.2d 857 (N.D.IL 2002); Garcia v. Village of Bensenville, 2002 U.S.Dist. LEXIS 3803 (N.D.Ill.); Romaker v. Crossland Mtg. Co., 1996 U.S.Dist. LEXIS 6490 (N.D.IL); Mount v. LaSalle Bank Lake View, 926 F.Supp. 759 (N.D.Ill 1996). She is a member of the Northern District of Illinois trial bar.

      6.     **Michelle R. Teggelaar** is a graduate of the University of Illinois (B.A., 1993) and Chicago-Kent College of Law, Illinois Institute of Technology (J.D., with honors, 1997). **Reported Cases:** Johnson v. Revenue Management, Inc., 169 F.3d 1057 (7th Cir.1999); ; Hernandez v. Attention, LLC, 429 F. Supp. 2d 912 (N.D. Ill. 2005); Coelho v. Park Ridge Oldsmobile, Inc., 247 F. Supp. 2d 1004 (N.D. Ill. 2003); Dominguez v. Alliance Mtge., Co., 226 F. Supp. 2d 907 (N.D. Ill. 2002); Watson v. CBSK Financial Group, Inc., 197 F. Supp. 2d 1118 (N.D. Ill. 2002); Van Jackson v. Check 'N Go of Illinois, Inc. 123 F. Supp. 2d 1085 (N.D. Ill. 2000), Van Jackson v. Check 'N Go of Illinois, Inc., 123 F. Supp. 2d 1079, Van Jackson v. Check 'N Go of Illinois, Inc., 114 F. Supp. 2d 731 (N.D. Ill. 2000); Van Jackson v. Check 'N Go of Illinois, Inc., 193 F.R.D. 544 (N.D. Ill. 2000); Vines v. Sands, 188 F.R.D. 302 (N.D. Ill. 1999); Veillard v. Mednick, 24 F. Supp. 2d 863 (N.D. Ill.1998); Sledge v. Sands, 182 F.R.D. 255 (N.D. Ill. 1998), Vines v. Sands, 188 F.R.D. 203 (N.D. Ill. 1999), Livingston v. Fast Cash USA, Inc., 753 N.E.2d 572 (Ind. 2001); Binder v. Atlantic Credit and Finance, Inc., 2007 U.S. Dist. LEXIS 11483 (S.D. Ind. 2007); Carroll v. Butterfield Heath Care, Inc., 2003 WL 22462604 (N.D. Ill. 2003); Payton v. New Century Mtge., Inc., 2003 WL 22349118 (N.D. Ill. 2003); Seidat v. Allied Interstate, Inc., 2003 WL 2146825 (N.D. Ill. 2003) (Report and Recommendation); Michalowski v. Flagstar Bank, FSB, 2002 WL 112905 (N.D. Ill. 2002); Bigalke v. Creditrust Corp., 2001 WL 1098047 (N.D. Ill 2001) (Report and Recommendation); Donnelly v. Illini Cash Advance, 2000 WL 1161076 (N.D. Ill. 2000); Mitchem v. Paycheck Advance Express, 2000 WL 419992 (N.D. Ill 2000); Pinkett v. Moolah Loan Co., 1999 WL 1080596 (N.D. Ill. 1999); Farley v. Diversified Collection Serv., 1999 WL 965496 (N.D. Ill. 1999); Davis v. Commercial Check Control, 1999 WL 965496 (N.D. Ill. 1999); Sledge v. Sands, 1999 WL 261745 (N.D. Ill. 1999); Slater v. Credit Sciences, Inc., 1998 WL 341631 (N.D. Ill. 1998); Slater v. Credit Sciences, Inc., 1998 WL 299803 (N.D. Ill. 1998).

      7.     **Francis R. Greene** is a graduate of Johns Hopkins University (B.A., with honors, May 1984), Rutgers University (Ph.D., October 1991), and Northwestern University Law School (J.D., 2000). **Reported Cases:** Soppet v. Enhanced Recovery Co., LLC, 679 F.3d 637 (7th Cir. Ill. 2012); O'Rourke v. Palisades Acquisition XVI, LLC, 635 F.3d 938 (7th Cir. 2011); Ruth v. Triumph Partnerships, 577 F.3d 790 (7th Cir. 2009); Handy v. Anchor Mortgage Corp., 464 F.3d 760 (7th Cir. 2006); Roquet v. Arthur Andersen LLP, 398 F.3d 585 (7th Cir.

3

2005); Tri-G, Inc. v. Burke, Bosselman & Weaver, 856 N.E.2d 389 (Ill. 2006); Johnson v. Thomas, 794 N.E.2d 919 (Ill.App.Ct. 2003);  Hale v. Afni, Inc., 2010 U.S. Dist. LEXIS 6715 (N.D. Ill. 2010); Parkis v. Arrow Fin Servs., 2008 U.S. Dist. LEXIS 1212 (N.D.Ill. 2008); Foster v. Velocity Investments, 2007 U.S. Dist. LEXIS 63302 (N.D.Ill. 2007); Foreman v. PRA III, LLC, 2007 U.S. Dist. LEXIS 15640 (N.D. Ill. 2007); Schutz v. Arrow Fin. Services, 465 F. Supp. 2d 872 (N.D. Ill. 2006); Pleasant v. Risk Management Alternatives, 2003 WL 22175390 (N.D. Ill. 2003).  He is a member of the Northern District of Illinois trial bar.

       **8.**      **Julie Clark** (neé Cobalovic) is a graduate of Northern Illinois University (B.A., 1997) and DePaul University College of Law (J.D., 2000). **Reported Cases:** Qualkenbush v. Harris Trust & Savings Bank,  219 F. Supp.2d 935 (N.D. Ill.,2002); Covington-McIntosh v. Mount Glenwood Memory Gardens 2002 WL 31369747 (N.D.Ill.,2002), 2003 WL 22359626 (N.D. Ill. 2003); Record-A-Hit, Inc. v. Nat'l. Fire Ins. Co., 377 Ill. App. 3d 642; 880 N.E.2d 205 (1st Dist. 2007); Western  Ry. Devices Corp. v. Lusida Rubber Prods., 06 C 52, 2006 U.S. Dist. LEXIS 43867 (N.D. Ill. June 13, 2006); Nautilus Ins. Co. v. Easy Drop Off, LLC, 06 C 4286, 2007 U.S. Dist. LEXIS 42380 (N.D. Ill. June 4, 2007); Ballard Nursing Center, Inc.  v. GF Healthcare Products, Inc., 07 C 5715, 2007 U.S. Dist. LEXIS 84425 (N.D. Ill. Nov. 14, 2007) ; Sadowski v. Med1 Online, LLC, 07 C 2973, 2008 U.S. Dist. LEXIS 41766 (N.D. Ill. May 17,  2008); Sadowski v. OCO Biomedical, Inc., 08 C 3225, 2008 U.S. Dist. LEXIS 96124 (N.D. Ill. Nov. 25, 2008).

       **9.**      **Heather A. Kolbus** (neé Piccirilli) is a graduate of DePaul University (B.S. *cum  laude,* 1997), and Roger Williams University School of Law (J.D., 2002). **Reported Cases:** Clark v. Experian Info. Solutions, Inc., 2004 U.S. Dist. LEXIS 28324 (D.S.C. Jan. 14, 2004); DeFrancesco v. First Horizon Home Loan Corp., 2006 U.S. Dist. LEXIS 80718 (S.D. Ill. Nov. 2, 2006); Jeppesen v. New Century Mortgage Corp., 2006 U.S. Dist. LEXIS 84035 (N.D. Ind. Nov. 17, 2006); Benedia v. Super Fair Cellular, Inc., 2007 U.S. Dist. LEXIS 71911 (N.D. Ill. Sept. 26, 2007).

       **10.**     **Thomas E. Soule** is a graduate of Stanford University (B.A., 2000), and the University of Wisconsin Law School (J.D., 2003). **Reported Cases:**  Murray v. Sunrise Chevrolet, Inc., 441 F.Supp.2d 940 (N.D. Ill. 2006); Iosello v. Leiblys, Inc., 502 F.Supp.2d 782 (N.D. Ill. 2007); Claffey v. River Oaks Hyundai, Inc., 486 F.Supp.2d 776 (N.D. Ill. 2007); Cicilline v. Jewel Food Stores, Inc., 542 F.Supp.2d 842 (N.D.Ill. 2008); Randolph v. Crown Asset Management LLC, 254 F.R.D. 513 (N.D.Ill. 2008); Irvine v. 233 Skydeck LLC, 597 F.Supp.2d 799 (N.D.Ill. 2009); Brittingham v. Cerasimo, Inc., 621 F.Supp.2d 646 (N.D.Ill. 2009); Clark v. Pinnacle Credit Services, LLC, 697 F.Supp.2d 995 (N.D.Ill. 2010); Wendorf v. Landers, 755 F.Supp.2d 972 (N.D.Ill. 2010); QuickClick Loans LLC v. Russell, 407 Ill.App.3d 46; 943 N.E.2d 166 (1st Dist. 2011), *leave to appeal denied*, 949 N.E.2d 1103 (2011).

       **11.**     **Associates**

         **a.**      **Cassandra P. Miller** is a graduate of the University of Wisconsin – Madison (B.A. 2001) and John Marshall Law School (J.D. *magna cum laude* 2006). **Reported Cases:** Pietras v. Sentry Ins. Co., 513 F.Supp.2d 983 (N.D. Ill. 2007); Hernandez v. Midland Credit Mgmt., 2007 U.S. Dist. LEXIS 16054 (N.D. Ill. Sept. 25, 2007); Balogun v. Midland Credit Mgmt., 2007 U.S. Dist. LEXIS 74845 (S.D. Ind. Oct. 5, 2007); Herkert v. MRC Receivables, Corp, et al., 655 F. Supp. 2d 870 (N.D. Ill. 2008); Miller v. Midland Credit Management, Inc., et al., 621 F. Supp. 2d 621 (N.D. Ill. 2009); Miller v. Midland Credit

Management, Inc., et al., 2009 U.S. Dist. LEXIS 16273 (N.D. Ill. 2009); Frydman v. Portfolio Recovery Associates, LLC, 2011 U.S. Dist. LEXIS 69502 (N.D. Ill. 2011).

        **b.**      **Tiffany N. Hardy** is a graduate of Tuskegee University (B.A. 1998) and Syracuse University College of Law (J.D.2001). **Reported cases:** Unifund v. Shah, 2011 Ill. App. LEXIS 61 (Ill. App. Feb. 1, 2011); Balbarin et. al. v. North Star et. al., 2011 U.S. Dist. LEXIS 686 (N.D. Ill. Jan. 5, 2011)(class certified); Manlapaz v. Unifund, 2009 U.S. Dist. LEXIS 85527 (N.D. Ill. Sept. 15, 2009); Matmanivong v. Unifund, 2009 U.S. Dist. LEXIS 36287 (N.D. Ill. Apr. 28, 2009); Kubiski v. Unifund, 2009 U.S. Dist. LEXIS 26754 (N.D. Ill. Mar. 25, 2009); Cox v. Unifund CCR Partners, 2008 C 1005 (N.D. Ill. Dec. 4, 2008) (Report and Recommendation for Class Certification); Ramirez v. Palisades Collection, LLC, 2008 U.S. Dist. LEXIS 48722 (N.D. Ill. June 23, 2008)(class certified); 2008 U.S. Dist. LEXIS 24921 (N.D. Ill. Mar. 28, 2008); Cotton/Scott v. Asset Acceptance, 2008 U.S. Dist. LEXIS 49042 (N.D. Ill. June 26, 2008) (class certified); Ketchem v. American Acceptance Co., LLC, 641 F. Supp. 2d 782, 2008 U.S. Dist. LEXIS 49532 (N.D. Ind. June 26, 2008); D'Elia v. First Capital, 2008 U.S. Dist. LEXIS 22461 (N.D. Ill. Mar. 19, 2008).

        **c.**      **Zachary A. Jacobs** is a graduate of the University of South Dakota (B.S. 2002) and Chicago-Kent College of Law, Illinois Institute of Technology (J.D. 2007).

        **d.**      **Rupali R. Shah** is a graduate of the University of Chicago (B.A. 2004) and University of Illinois (J.D. *cum laude* 2007).

        **e.**      **Catherine A. Ceko** is a graduate of Northwestern University (B.A. 2005) and DePaul University (J.D. *summa cum laude* 2008). **Reported cases:** Vance v. Bureau of Collection Recovery, LLC, 2011 U.S. Dist. LEXIS 24908 (N.D. Ill. 2011).

        **12.**      The firm also has 15 legal assistants, as well as other support staff.

        **13.**      Since its inception, the firm has recovered more than $500 million for consumers. The types of cases handled by the firm are illustrated by the following:

        **14.**      **Mortgage charges and servicing practices:** The firm has been involved in dozens of cases, mostly class actions, complaining of illegal charges on mortgages and improper servicing practices. These include MDL-899, In re Mortgage Escrow Deposit Litigation, and MDL-1604, In re Ocwen Federal Bank FSB Mortgage Servicing Litigation, as well as the Fairbanks mortgage servicing litigation. Decisions in the firm's mortgage cases include: ; Hamm v. Ameriquest Mortg. Co., 506 F.3d 525 (7th Cir. 2007); Handy v. Anchor Mortg. Corp., 464 F.3d 760 (7th Cir. 2006); Christakos v. Intercounty Title Co., 196 F.R.D. 496 (N.D.Ill. 2000); Johnstone v. Bank of America, N.A., 173 F.Supp.2d 809 (N.D.Ill. 2001); Leon v. Washington Mut. Bank, F.A., 164 F.Supp.2d 1034 (N.D.Ill. 2001); Williamson v. Advanta Mortg. Corp., 1999 U.S. Dist. LEXIS 16374 (N.D.Ill., Oct. 5, 1999); McDonald v. Washington Mut. Bank, F.A., 99 C 6884, 2000 U.S. Dist. LEXIS 11496 (N.D.Ill., June 22, 2000); Metmor Financial, Inc. v. Eighth Judicial District Court, No. 23848 (Nev.Sup.Ct., Apr. 27, 1993); GMAC Mtge. Corp. v. Stapleton, 236 Ill.App.3d 486, 603 N.E.2d 767 (1st Dist. 1992), leave to appeal denied, 248 Ill.2d 641, 610 N.E.2d 1262 (1993); Leff v. Olympic Fed. S. & L. Ass'n, 1986 WL 10636 (N.D.Ill. 1986); Aitken v. Fleet Mtge. Corp., 90 C 3708, 1991 U.S.Dist. LEXIS 10420 (N.D.Ill. 1991), and 1992 U.S.Dist. LEXIS 1687 (N.D.Ill., Feb. 12, 1992); Poindexter v.

National Mtge. Corp., 91 C 4223, 1991 U.S.Dist. LEXIS 19643 (N.D.Ill., Dec. 23, 1991), later opinion, 1995 U.S.Dist. LEXIS 5396 (N.D.Ill., April 24, 1995); Sanders v. Lincoln Service Corp., 91 C 4542,1993 U.S.Dist. LEXIS 4454 (N.D.Ill. April 5, 1993); Robinson v. Empire of America Realty Credit Corp., 90 C 5063, 1991 U.S.Dist. LEXIS 2084 (N.D.Ill., Feb. 20, 1991); In re Mortgage Escrow Deposit Litigation, M.D.L. 899, 1994 U.S.Dist. LEXIS 12746 (N.D.Ill., Sept. 8, 1994); Greenberg v. Republic Federal S. & L. Ass'n, 94 C 3789, 1995 U.S.Dist. LEXIS 5866 (N.D.Ill., May 1, 1995).

**15.** The recoveries in the escrow overcharge cases alone are over $250 million. Leff was the seminal case on mortgage escrow overcharges.

**16.** The escrow litigation had a substantial effect on industry practices, resulting in limitations on the amounts which mortgage companies held in escrow.

**17. Bankruptcy:** The firm brought a number of cases complaining that money was being systematically collected on discharged debts, in some cases through the use of invalid reaffirmation agreements, including the national class actions against Sears and General Electric. Conley v. Sears, Roebuck, 1:97cv11149 (D.Mass); Fisher v. Lechmere Inc., 1:97cv3065 (N.D.Ill.). These cases were settled and resulted in recovery by nationwide classes. Cathleen Combs successfully argued the first Court of Appeals case to hold that a bankruptcy debtor induced to pay a discharged debt by means of an invalid reaffirmation agreement may sue to recover the payment. Bessette v. Avco Financial Services, 230 F.3d 439 (1st Cir. 2000).

**18. Automobile sales and financing practices:** The firm has brought many cases challenging practices relating to automobile sales and financing, including:

**a.** Hidden finance charges resulting from pass-on of discounts on auto purchases. Walker v. Wallace Auto Sales, Inc., 155 F.3d 927 (7th Cir. 1998).

**b.** Misrepresentation of amounts disbursed for extended warranties. Taylor v. Quality Hyundai, Inc., 150 F.3d 689 (7th Cir. 1998); Grimaldi v. Webb, 282 Ill.App.3d 174, 668 N.E.2d 39 (1st Dist. 1996), leave to appeal denied, 169 Ill.2d 566 (1996); Slawson v. Currie Motors Lincoln Mercury, Inc., 94 C 2177, 1995 U.S.Dist. LEXIS 451 (N.D.Ill., Jan. 5, 1995); Cirone-Shadow v. Union Nissan, Inc., 94 C 6723, 1995 U.S.Dist. LEXIS 1379 (N.D.Ill., Feb. 3, 1995), later opinion, 1995 U.S.Dist. LEXIS 5232 (N.D.Ill., April 20, 1995) (same); Chandler v. Southwest Jeep-Eagle, Inc., 162 F.R.D. 302 (N.D.Ill. 1995); Shields v. Lefta, Inc., 888 F. Supp. 891 (N.D.Ill. 1995).

**c.** Spot delivery. Janikowski v. Lynch Ford, Inc., 98 C 8111, 1999 U.S. Dist. LEXIS 3524 (N.D.Ill., March 11, 1999); Diaz v. Westgate Lincoln Mercury, Inc., 93 C 5428, 1994 U.S.Dist. LEXIS 16300 (N.D.Ill. Nov. 14, 1994); Grimaldi v. Webb, 282 Ill.App.3d 174, 668 N.E.2d 39 (1st Dist. 1996), leave to appeal denied, 169 Ill.2d 566 (1996).

**d.** Force placed insurance. Bermudez v. First of America Bank Champion, N.A., 860 F.Supp. 580 (N.D.Ill. 1994); Travis v. Boulevard Bank, 93 C 6847, 1994 U.S.Dist. LEXIS 14615 (N.D.Ill., Oct. 13, 1994), modified, 880 F.Supp. 1226 (N.D.Ill., 1995); Moore v. Fidelity Financial Services, Inc., 884 F. Supp. 288 (N.D.Ill. 1995).

**e.** Improper obligation of cosigners. Lee v. Nationwide Cassell, 174

Ill.2d 540, 675 N.E.2d 599 (1996); Taylor v. Trans Acceptance Corp., 267 Ill.App.3d 562, 641 N.E.2d 907 (1st Dist. 1994), leave to appeal denied, 159 Ill.2d 581, 647 N.E.2d 1017 (1995); Qualkenbush v. Harris Trust & Sav. Bank, 219 F. Supp. 2d 935 (N.D. Ill. 2002).

   **f.**  Evasion of FTC holder rule.  Brown v. LaSalle Northwest Nat'l Bank, 148 F.R.D. 584 (N.D.Ill. 1993), 820 F.Supp. 1078 (N.D.Ill. 1993), and 92 C 8392, 1993 U.S.Dist. LEXIS 11419 (N.D.Ill., Aug. 13, 1993).

   **19.**  These cases also had a substantial effect on industry practices.  The warranty cases, such as Grimaldi, Gibson, Slawson, Cirone-Shadow, Chandler, and Shields, resulted in the Federal Reserve Board's revision of applicable disclosure requirements, so as to prevent car dealers from representing that the charge for an extended warranty was being disbursed to a third party when that was not in fact the case.

   **20.**  **Predatory lending practices:**  The firm has brought numerous cases challenging predatory mortgage and "payday" lending practices, both as individual and class actions.  Livingston v. Fast Cash USA, Inc., 753 N.E.2d 572 (Ind. Sup. Ct. 2001); Hamm v. Ameriquest Mortg. Co., 506 F.3d 525 (7th Cir.  2007); Handy v. Anchor Mortg. Corp., 464 F.3d 760 (7th Cir. 2006); Williams v. Chartwell Fin. Servs., 204 F.3d 748 (7th Cir. 2000); Hubbard v. Ameriquest Mortg. Co., 05 C 389, 2008 U.S. Dist. LEXIS 75799 (N.D.Ill., September 30, 2008); Martinez v. Freedom Mortg. Team, Inc., 527 F. Supp. 2d 827 (N.D.Ill. 2007); Pena v. Freedom Mortg. Team, Inc., 07 C 552, 2007 U.S. Dist. LEXIS 79817 (N.D.Ill., October 24, 2007); Miranda v. Universal Fin. Group, Inc., 459 F. Supp. 2d 760 (N.D.Ill. 2006); Parker v. 1-800 Bar None, a Financial Corp., Inc., 01 C 4488, 2002 WL 215530 (N.D.Ill.,  Feb. 12, 2002); Gilkey v. Central Clearing Co., 202 F.R.D. 515 (E.D.Mich. 2001); Van Jackson v. Check 'N Go of Ill., Inc., 114 F.Supp.2d 731 (N.D.Ill. 2000), later opinion, 193 F.R.D. 544 (N.D.Ill. 2000), 123 F.Supp. 2d 1079 (N.D.Ill. 2000), later opinion, 123 F.Supp. 2d 1085 (N.D.Ill. 2000); Henry v. Cash Today, Inc., 199 F.R.D. 566 (S.D.Tex.  2000); Donnelly v. Illini Cash Advance, Inc., 00 C 94, 2000 WL 1161076, 2000 U.S. Dist. LEXIS 11906 (N.D.Ill., Aug. 14, 2000); Jones v. Kunin, 99-818-GPM, 2000 U.S. Dist. LEXIS 6380 (S.D.Ill., May 1, 2000); Davis v. Cash for Payday, 193 F.R.D. 518 (N.D.Ill. 2000); Reese v. Hammer Fin. Corp., 99 C 716, 1999 U.S. Dist. LEXIS 18812, 1999 WL 1101677  (N.D.Ill., Nov. 29, 1999); Pinkett v. Moolah Loan Co., 99 C 2700, 1999 U.S. Dist. LEXIS 17276 (N.D.Ill., Nov. 1, 1999); Gutierrez v. Devon Fin. Servs., 99 C 2647, 1999 U.S. Dist. LEXIS 18696 (N.D.Ill., Oct. 6, 1999); Vance v. National Benefit Ass'n, 99 C 2627, 1999 WL 731764, 1999 U.S. Dist. LEXIS 13846 (N.D.Ill., Aug. 26, 1999).

   **21.**  **Other consumer credit issues:**  The firm has also brought a number of other Truth in Lending and consumer credit cases, mostly as class actions, involving such issues as:

   **a.**  Phony nonfiling insurance.  Edwards v. Your Credit Inc., 148 F.3d 427 (5th Cir. 1998); Adams v. Plaza Finance Co., 168 F.3d 932  (7th Cir. 1999); Johnson v. Aronson Furniture Co., 96 C 117, 1997 U.S. Dist. LEXIS 3979 (N.D. Ill., March 31, 1997).

   **b.**  The McCarran Ferguson Act exemption.  Autry v. Northwest Premium Services, Inc., 144 F.3d 1037 (7th Cir. 1998).

   **c.**  Loan flipping.  Emery v. American General, 71 F.3d 1343 (7th Cir. 1995).  Emery limited the pernicious practice of "loan flipping," in which consumers are

solicited for new loans and are then refinanced, with "short" credits for unearned finance charges and insurance premiums being given through use of the "Rule of 78s."

> **d.** Home improvement financing practices. Fidelity Financial Services, Inc. v. Hicks, 214 Ill.App.3d 398, 574 N.E.2d 15 (1st Dist. 1991), leave to appeal denied, 141 Ill.2d 539, 580 N.E.2d 112; Heastie v. Community Bank of Greater Peoria, 690 F.Supp. 716 (N.D.Ill. 1989), later opinion, 125 F.R.D. 669 (N.D.Ill. 1990), later opinions, 727 F.Supp. 1133 (N.D.Ill. 1990), and 727 F.Supp. 1140 (N.D.Ill. 1990). Heastie granted certification of a class of over 6,000 in a home improvement fraud case.

> **e.** Arbitration clauses. Wrightson v. ITT Financial Services, 617 So.2d 334 (Fla. 1st DCA 1993).

> **f.** Insurance packing. Elliott v. ITT Corp., 764 F.Supp. 102 (N.D.Ill. 1990), later opinion, 150 B.R. 36 (N.D.Ill. 1992).

> **22.** **Automobile leases:** The firm has brought a number of a cases alleging illegal charges and improper disclosures on automobile leases, mainly as class actions. Decisions in these cases include Lundquist v. Security Pacific Automotive Financial Services Corp., Civ. No. 5:91-754 (TGFD) (D.Conn.), aff'd, 993 F.2d 11 (2d Cir. 1993); Kedziora v. Citicorp Nat'l Services, Inc., 780 F.Supp. 516 (N.D.Ill. 1991), later opinion, 844 F.Supp. 1289 (N.D.Ill. 1994), later opinion, 883 F.Supp. 1144 (N.D.Ill. 1995), later opinion, 91 C 3428, 1995 U.S.Dist. LEXIS 12137 (N.D.Ill., Aug. 18, 1995), later opinion, 1995 U.S.Dist. LEXIS 14054 (N.D.Ill., Sept. 25, 1995); Johnson v. Steven Sims Subaru and Subaru Leasing, 92 C 6355, 1993 U.S.Dist. LEXIS 8078 (N.D.Ill., June 9, 1993), and 1993 U.S.Dist. LEXIS 11694 (N.D.Ill., August 20, 1993); McCarthy v. PNC Credit Corp., 2:91CV00854 (PCD), 1992 U.S.Dist. LEXIS 21719 (D.Conn., May 27, 1992); Kinsella v. Midland Credit Mgmt., Inc., 91 C 8014, 1992 U.S.Dist. LEXIS 1405, 1992 WL 26908 (N.D.Ill. 1992); Highsmith v. Chrysler Credit Corp., 18 F.3d 434 (7th Cir. 1994); Black v. Mitsubishi Motors Credit of America, Inc., 94 C 3055, 1994 U.S.Dist. LEXIS 11158 (N.D.Ill., August 10, 1994); Simon v. World Omni Leasing Inc., 146 F.R.D. 197 (S.D.Ala. 1992). Settlements in such cases include Shepherd v. Volvo Finance North America, Inc., 1-93-CV-971 (N.D.Ga.)($8 million benefit); McCarthy v. PNC Credit Corp., 291 CV 00854 PCD (D.Conn.); Lynch Leasing Co. v. Moore, 90 CH 876 (Circuit Court of Cook County, Illinois) (class in auto lease case was certified for litigation purposes, partial summary judgment was entered, and case was then settled); Blank v. Nissan Motor Acceptance Corp., 91 L 8516 (Circuit Court of Cook County, Illinois); Mortimer v. Toyota Motor Credit Co., 91 L 18043 (Circuit Court of Cook County, Illinois); Duffy v. Security Pacific Automotive Financial Services, Inc., 93-729 IEG (BTM) (S.D.Cal., April 28, 1994).

> **23.** Lundquist and Highsmith are leading cases; both held that commonly-used lease forms violated the Consumer Leasing Act. As a result of the Lundquist case, the Federal Reserve Board completely revamped the disclosure requirements applicable to auto leases, resulting in vastly improved disclosures to consumers.

> **24.** **Collection practices:** The firm has brought a number of cases under the Fair Debt Collection Practices Act, both class and individual. Decisions in these cases include: Jenkins v. Heintz, 25 F.3d 536 (7th Cir. 1994), aff'd 514 U.S. 291 (1995) (FDCPA coverage of attorneys); Fields v. Wilber Law Firm, P.C., 383 F.3d 562 (7th Cir. 2004); Schlosser v. Fairbanks Capital Corp., 323 F.3d 534 (7th Cir. 2003) (coverage of debt buyers); Peter v. GC Servs. L.P.,

310 F.3d 344 (5th Cir. 2002); Nielsen v. Dickerson, 307 F.3d 623 (7th Cir. 2002) (attorney letters without attorney involvement); Boyd v. Wexler, 275 F.3d 642 (7th Cir. 2001); Miller v. McCalla, Raymer, Padrick, Cobb, Nichols, & Clark, L.L.C., 214 F.3d 872 (7th Cir. 2000); Johnson v. Revenue Management Corp., 169 F.3d 1057 (7th Cir. 1999); Keele v. Wexler & Wexler, 1996 U.S.Dist. LEXIS 3253 (N.D.Ill., March 18, 1996) (class), 1995 U.S.Dist. LEXIS 13215 (N.D.Ill. 1995) (merits), aff'd, 149 F.3d 589 (7th Cir. 1998); Mace v. Van Ru Credit Corp., 109 F.3d 338 (7th Cir. 1997); Maguire v. Citicorp Retail Services, Inc., 147 F.3d 232 (2nd Cir. 1998); Young v. Citicorp Retail Services, Inc., .97-9397, 1998 U.S.App. LEXIS 20268 (2nd Cir. 1998); Charles v. Lundgren & Assocs., P.C., 119 F.3d 739 (9th Cir. 1997); Avila v. Rubin, 84 F.3d 222 (7th Cir. 1996), aff'g Avila v. Van Ru Credit Corp., 94 C 3234, 1995 U.S.Dist. LEXIS 461 (N.D.Ill., Jan. 10, 1995), later opinion, 1995 U.S.Dist. LEXIS 1502 (N.D.Ill., Feb. 6, 1995), later opinion, 1995 U.S.Dist. LEXIS 17117 (N.D.Ill., Nov. 14, 1995); Tolentino v. Friedman, 833 F.Supp. 697 (N.D.Ill. 1993), aff'd in part and rev'd in part, 46 F.3d 645 (7th Cir. 1995); Ramirez v. Apex Fin. Mgmt., LLC, 567 F. Supp. 2d 1035 (N.D.Ill. 2008); Cotton v. Asset Acceptance, LLC, 07 C 5005, 2008 U.S. Dist. LEXIS 49042 (N.D.Ill., June 26, 2008); Buford v. Palisades Collection, LLC, 552 F. Supp. 2d 800 (N.D.Ill. 2008); Martin v. Cavalry Portfolio Servs., LLC, 07 C 4745, 2008 U.S. Dist. LEXIS 25904 (N.D.Ill., March 28, 2008); Ramirez v. Palisades Collection LLC, 250 F.R.D. 366 (N.D.Ill. 2008); Hernandez v. Midland Credit Mgmt., 04 C 7844, 2007 U.S. Dist. LEXIS 16054 (N.D.Ill., March 6, 2007, amended Sept. 25, 2007) (balance transfer program); Blakemore v. Pekay, 895 F.Supp.972 (N.D.Ill. 1995); Oglesby v. Rotche, 93 C 4183, 1993 U.S.Dist. LEXIS 15687 (N.D.Ill., Nov. 4, 1993), later opinion, 1994 U.S.Dist. LEXIS 4866 (N.D.Ill., April 15, 1994); Jones v. Cheslock, 98 C 6403, 1999 U.S.Dist. LEXIS 3416 (N.D.Ill., Mar. 8, 1999); Davis v. Commercial Check Control, Inc., 98 C 631, 1999 U.S. Dist. LEXIS 1682 (N.D.Ill., Feb. 12, 1999); Hoffman v. Partners in Collections, Inc., 93 C 4132, 1993 U.S.Dist. LEXIS 12702 (N.D.Ill., Sept. 15, 1993); Vaughn v. CSC Credit Services, Inc., 93 C 4151, 1994 U.S.Dist. LEXIS 2172 (N.D.Ill., March 1, 1994), adopted, 1995 U.S.Dist. LEXIS 1358 (N.D.Ill., Feb. 3, 1995); Beasley v. Blatt, 93 C 4978, 1994 U.S.Dist. LEXIS 9383 (N.D.Ill., July 14, 1994); Taylor v. Fink, 93 C 4941, 1994 U.S.Dist. LEXIS 16821 (N.D.Ill., Nov. 23, 1994); Gordon v. Fink, 93 C 4152, 1995 U.S.Dist. LEXIS 1509 (N.D.Ill., Feb. 7, 1995); Brujis v. Shaw, 876 F.Supp. 198 (N.D.Ill. 1995).

25.     Jenkins v. Heintz is a leading decision regarding the liability of attorneys under the Fair Debt Collection Practices Act. I argued it before the Supreme Court and Seventh Circuit. Avila v. Rubin is a leading decision on phony "attorney letters."

26.     **Fair Credit Reporting Act:** The firm has filed numerous cases under the Fair Credit Reporting Act, primarily as class actions. One line of cases alleges that lenders and automotive dealers, among others, improperly accessed consumers' credit information, without their consent and without having a purpose for doing so permitted by the FCRA. Important decisions in this area include: Cole v. U.S. Capital, Inc., 389 F.3d 719 (7th Cir. 2004), Murray v. GMAC Mortgage Corp., 434 F.3d 948 (7th Cir. 2006); Perry v. First National Bank, 459 F.3d 816 (7th Cir. 2006); Murray v. Sunrise Chevrolet, Inc., 441 F. Supp.2d 940 (N.D. Ill. 2006); Shellman v. Countrywide Home Loans, Inc., 1:05-CV-234-TS, 2007 U.S. Dist. LEXIS 27491 (N.D.Ind., April 12, 2007); In re Ocean Bank, 06 C 3515, 2007 U.S. Dist. LEXIS 28973 (N.D.Ill., March 16, 2007), later opinion, 2007 U.S. Dist. LEXIS 29443 (N.D. Ill., Apr. 9, 2007); Asbury v. People's Choice Home Loan, Inc., 05 C 5483, 2007 U.S. Dist. LEXIS 17654 (N.D.Ill., March 12, 2007); Claffey v. River Oaks Hyundai, Inc., 238 F.R.D. 464 (N.D.Ill. 2006); Murray v. IndyMac Bank, FSB, 461 F.Supp.2d 645 (N.D.Ill. 2006); Kudlicki v. Capital One Auto Finance, Inc., 2006 U.S. Dist. LEXIS 81103 (N.D. Ill., Nov. 2, 2006); Thomas v. Capital

9

One Auto Finance, Inc., 2006 U.S. Dist. LEXIS 81358 (N.D. Ill., Oct. 24, 2006); Pavone v. Aegis Lending Corp., 2006 U.S. Dist. LEXIS 62157 (N.D. Ill., Aug. 31, 2006); Murray v. E*Trade Financial Corp., 2006 U.S. Dist. LEXIS 53945 (N.D. Ill., July 19, 2006); Bonner v. Home 123 Corp., 2006 U.S. Dist. LEXIS 37922 (N.D. Ind., May 25, 2006); Murray v. Sunrise Chevrolet , Inc., 2006 U.S. Dist. LEXIS 19626 (N.D. Ill., Mar. 30, 2006); and Murray v. Finance America, LLC, 2006 U.S. Dist. LEXIS 7349 (N.D. Ill., Jan 5, 2006).  More than 15 such cases have been settled on a classwide basis.

      **27.**    **Class action procedure:**  Important decisions include Crawford v. Equifax Payment Services, Inc., 201 F.3d 877 (7th Cir. 2000); Blair v. Equifax Check Services, Inc., 181 F.3d 832 (7th Cir. 1999); Mace v. Van Ru Credit Corp., 109 F.3d 338, 344 (7th Cir. 1997); and Gordon v. Boden, 224 Ill.App.3d 195, 586 N.E.2d 461 (1st Dist. 1991).

      **28.**    **Landlord-tenant:**  The firm has brought more than 20 class actions against landlords to enforce tenants' rights.  Claims include  failing to pay interest on security deposits or commingling security deposits.  Reported decisions include Wang v. Williams, 343 Ill. App. 3d 495; 797 N.E.2d 179 (5th Dist. 2003); Dickson v. West Koke Mill Vill. P'Ship, 329 Ill. App. 3d 341; 769 N.E.2d 971 (4th Dist. 2002); and Onni v. Apt. Inv. & Mgmt. Co., 344 Ill. App. 3d 1099; 801 N.E.2d 586 (2nd Dist. 2003).

      **29.**    **Insurance litigation:** Often securing recovery for a class requires enforcement of the rights under the defendant's insurance policy.  The firm has extensive experience with such litigation.  Reported decisions in such cases include:  American Family Mut. Ins. Co. v. C.M.A. Mortg., Inc., 1:06-cv-1044-SEB-JMS, 2008 U.S. Dist. LEXIS 30233 (S.D.Ind.  March 31, 2008); Record-A-Hit, Inc. v. Nat'l Fire Ins. Co., 377 Ill. App. 3d 642; 880 N.E.2d 205 (1st Dist. 2007); Pietras v. Sentry Ins. Co., 06 C 3576, 2007 U.S. Dist. LEXIS 16015 (N.D.Ill., March 6, 2007), later opinion, 513 F. Supp. 2d 983 (N.D.Ill. 2007); Auto-Owners Ins. Co. v. Websolv Computing, Inc., 06 C 2092, 2007 U.S. Dist. LEXIS 65339 (N.D.Ill., Aug. 31, 2007); Nat'l Fire Ins. Co. v. Tri-State Hose & Fitting, Inc., 06 C 5256, 2007 U.S. Dist. LEXIS 45685 (N.D.Ill., June 21, 2007): Nautilus Ins. Co. v. Easy Drop Off, LLC, 06 C 4286, 2007 U.S. Dist. LEXIS 42380 (N.D.Ill., June 4, 2007).

      **30.**    **Debtors' rights**.  Important decisions include:  Ramirez v. Palisades Collection LLC, 07 C 3840, 2008 U.S. Dist. LEXIS 48722 (N.D.Ill., June 23, 2008) (Illinois statute of limitations for credit card debts); Parkis v. Arrow Fin. Servs., 07 C 410,  2008 U.S. Dist. LEXIS 1212 (N.D. Ill., Jan.  8, 2008) (same);  Rawson v. Credigy Receivables, Inc., 05 C 6032, 2006 U.S. Dist. LEXIS 6450 (N.D.Ill., Feb. 16, 2006) (same); Jones v. Kunin, 99-818-GPM, 2000 U.S. Dist. LEXIS 6380 (S.D.Ill., May 1, 2000) (scope of Illinois bad check statute); Qualkenbush v. Harris Trust & Sav. Bank, 219 F. Supp. 2d 935 (N.D. Ill. 2002) (failure to allow cosigner to take over obligation prior to collection action); Wilson v. Harris N.A., 06 C 5840, 2007 U.S. Dist. LEXIS 65345 (N.D.Ill., September 4, 2007).

      **31.**    **Telephone Consumer Protection Act.**  The firm has brought a number of cases under the "junk fax" and "spam text message" provisions of the statute.  Important decisions include:  Brill v. Countrywide Home Loans, Inc., 427 F.3d 446 (7th Cir. 2005); Sadowski v. Med1 Online, LLC, 07 C 2973, 2008 U.S. Dist. LEXIS 41766 (N.D.Ill., May 27, 2008); Benedia v. Super Fair Cellular, Inc., 07 C 01390, 2007 U.S. Dist. LEXIS 71911 (N.D.Ill., September 26, 2007); Centerline Equip. Corp. v. Banner Pers. Serv., 545 F. Supp. 2d 768 (N.D.Ill. 2008).

32.    Some of the other reported decisions in our cases include:  <u>Elder v. Coronet Ins. Co.</u>, 201 Ill.App.3d 733, 558 N.E.2d 1312 (1st Dist. 1990); <u>Smith v. Keycorp Mtge., Inc.</u>, 151 B. R.  870 (N.D.Ill. 1992); <u>Gordon v. Boden</u>, 224 Ill.App.3d 195, 586 N.E.2d 461 (1st Dist. 1991), leave to appeal denied, 144 Ill.2d 633, 591 N.E.2d 21, cert. denied, U.S. (1992); <u>Armstrong v. Edelson</u>, 718 F.Supp. 1372 (N.D.Ill. 1989); <u>Newman v. 1st 1440 Investment, Inc.</u>, 89 C 6708, 1993 U.S.Dist. LEXIS 354 (N.D.Ill. Jan. 15, 1993); <u>Mountain States Tel. & Tel. Co. v. District Court</u>, 778 P.2d 667 (Colo. 1989); <u>Disher v. Fulgoni</u>, 124 Ill.App.3d 257, 464 N.E.2d 639, 643 (1st Dist. 1984); <u>Harman v. Lyphomed, Inc.</u>, 122 F.R.D. 522 (N.D.Ill. 1988); <u>Haslam v. Lefta, Inc.</u>, 93 C 4311, 1994 U.S.Dist. LEXIS 3623 (N.D.Ill., March 25, 1994); <u>Source One Mortgage Services Corp. v. Jones</u>, 88 C 8441, 1994 U.S.Dist. LEXIS 333 (N.D.Ill., Jan. 13, 1994).

33.    <u>Gordon v. Boden</u> is the first decision approving "fluid recovery" in an Illinois class action.  <u>Elder v. Coronet Insurance</u> held that an insurance company's reliance on lie detectors to process claims was an unfair and deceptive trade practice.


                              <u>s/ Daniel A. Edelman</u>
                              Daniel A. Edelman


EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois  60603
(312) 739-4200
(312) 419-0379 (FAX)