# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| DONITA J. STUBBS, | ) | |
| on behalf of plaintiff and a class, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 12-cv-7235 |
| v. | ) | |
| | ) | Judge Darrah |
| CAVALRY SPV I, LLC; and | ) | |
| CAVALRY PORTFOLIO | ) | Magistrate Judge Kim |
| SERVICES, LLC; | ) | |
| | ) | |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT  – CLASS ACTION

### INTRODUCTION

1.      Plaintiff Donita J. Stubbs brings this action to secure redress from unlawful credit and collection practices engaged in by defendants Cavalry SPV I, LLC ("Cavalry SPV") and Cavalry Portfolio Services, LLC ("CPS").   Plaintiff alleges violation of the Fair Debt Collection Practices Act, 15 U.S.C. §1692 et seq. ("FDCPA").

2.       The FDCPA broadly prohibits unfair or unconscionable collection methods; conduct which harasses, oppresses, or abuses any debtor; and any false, deceptive, or misleading statements, in connection with the collection of a debt; it also requires debt collectors to give debtors certain information.  15 U.S.C. §§1692d, 1692e, 1692f and 1692g.

### VENUE AND JURISDICTION

3.      This Court has jurisdiction under 15 U.S.C. §1692k (FDCPA) and 28 U.S.C. §§1331, 1337.

4.      Venue and personal jurisdiction in this District are proper because:

        a.      Defendants' collection communications and practices impacted plaintiff within this District; and

        b.      Each defendant does or transacts business within this District.

## PARTIES

5.     Plaintiff Donita J. Stubbs is an individual who resides in the Northern District of Illinois.

6.     Defendant CPS is a limited liability company chartered under Delaware law that does business in Illinois.  Its principal place of business is located at 4050 East Cotton Center, Building 2, Suite 20, Phoenix, AZ 85040.   Its registered agent and office is CT Corporation System, 208 S. LaSalle Street, Suite 814, Chicago, IL 60604.

7.     CPS is engaged in the business of a collection agency.

8.     CPS is a licensee under the Illinois Collection Agency Act, 225 ILCS 425/1 et seq.

9.     CPS has filed thousands of lawsuits in Illinois courts against Illinois residents.

10.     During the five month period between March 19, 2012 and August 21, 2012, CPS filed 1,000 lawsuits in the Circuit Court of Cook County, as well as other lawsuits in other Illinois courts.

11.     CPS uses the mails and telephone system in conducting its business.

12.     Cavalry SPV is engaged in the business of purchasing or acquiring, or claiming to purchase or acquire, allegedly defaulted debts originally owed to others and incurred for personal, family, or household purposes.

13.     Cavalry SPV pays an average of less than 5 cents on the dollar for the debts it purchases or claims to purchase.

14.     CPS files lawsuits to collect the debts allegedly acquired by Cavalry SPV.

15.     The mails and telephone system are used in connection with such lawsuits.

16.     Cavalry SPV is a debt collector as defined in the FDCPA.

## FACTS RELATING TO PLAINTIFF DONITA J. STUBBS

17.     Defendants have been attempting to collect from plaintiff Donita J. Stubbs

an alleged credit card balance claimed to have been incurred for personal, family, or household purposes and not for business purposes.

18.      On March 16, 2012, a lawsuit was filed by Cavalry Portfolio Services, LLC against Donita J. Stubbs in the Circuit Court of Cook County, Illinois, case 2012 M1 116644.

19.      A copy of the complaint is attached as Appendix A.

20.      Attached to the complaint is an affidavit of Stephanie Cappelli, Appendix B.

21.      Stephanie Cappelli was an employee of CPS.

22.      According to the affidavit, dated January 13, 2012, the debt defendants sought to collect was a  credit card issued by Bank of America or its wholly-owned credit card issuing subsidiary FIA Card Services, N.A.

23.      Appendix B states:

      a.    "I am an agent and duly authorized representative for Plaintiff and am competent to testify to the matter set forth herein."

      b.    "As of 12/5/2011, the balance due and owing by the account holder(s) on the account was $6,539.98, which balance is comprised of $4,504.65 of principal balance and $2,035.33 + $0 + $0 of other charges."

      c.    "In the normal course of business, Cavalry Portfolio Services, LLC maintains computerized account records for account holders. Cavalry Portfolio Services, LLC maintains such records in the ordinary and routine course of business and is charged with the duty to accurately record any business act, condition or event onto the computer record maintained for the accounts, with the entries made at or very near the time of any such occurrence. . . ."

3

d. "In connection with the purchase of the account, Bank of America/ FIA Card Services, N.A. transferred copies of its electronic business records to Cavalry SPV I, LLC, which records were loaded into the computer system of Cavalry Portfolio Services, LLC and which are maintained in an electronic format."

24. CPS produces none of the documents necessary to establish the veracity of Cappelli's Affidavit.

25. CPS does not have any business records "demonstrating" the amount owed was $6,539.98.

26. In her affidavit, Cappelli does not state what documents she referred to in drafting her Affidavit, nor does she maintain that any investigation was conducted by herself or CPS to verify the information.

27. Capelli did not review any Bank of America/ FIA Card Services, N.A. records prior to signing Appendix B.

28. While the Cappelli Affidavit refers to a $6,539.98 balance owed by Ms. Stubbs, "which balance is comprised of $4,504.65 of principal balance and $2,035.33 + $0 + $0 of other charges," the Complaint, Appendix A, to which the Affidavit is attached seeks $6,542.44.

29. The discrepancy between the amount sought in Appendix A and the amount sought in Appendix B is not addressed. One is clearly incorrect.

30. On information and belief, Cappelli is a "robosigner," i.e. an individual who is designated to execute documents. This means that her day to day activities would consist of signing and notarizing documents.

31. On information and believe, Cappelli does not research any of the information contained in the documents she signs, nor is she held personally liable for the truth of the information in the documents she signs. She signs more than 1,000 documents per day.

4

32.     On information and belief, defendants purport to acquire Bank of America/ FIA debts pursuant to agreements that disclaim the accuracy of the information provided.

33.     Attached as <u>Appendix C</u> is an  example of a 2008 FIA agreement with defendant Cavalry SPV for the sale of receivables.

34.     On information and belief, the provisions quoted below were included in the agreement applicable to the alleged purchase by Cavalry SPV of the portfolio in which plaintiff's debt was supposedly a part.

35.     In Article IX of the agreement, Bank of America/ FIA provides that the loans are sold "as is" and without "any representations, warranties, promises, covenants, agreements or guaranties of any kind or character whatsoever, whether express or implied, oral or written, past present or future, of, as to, concerning or with respect to the following: (a) the marketability, value, quality or condition of any loan or loans; (b) the validity, enforceability or collectibility of the evidence of indebtedness; . . . (d) the accuracy or completeness of any information provided by the seller to the buyer, including without limitation, the accuracy of any sums shown as current balance or accrued interest amounts due under the loans; and (e) any other matters pertaining to the loans."

36.     The debt buyer represents  that its  purchase decision is based upon its own independent expert evaluations of the nature, validity, collectability, enforceability, and value of the Accounts and that it is purchasing them 'AS IS, WHERE IS" and "WITH ALL FAULTS."

37.     Defendants endeavor to avoid producing their agreements for the purchase and  sale of debts in collection actions.  Where the consumer appears to be familiar with such agreements, or retains counsel who display such familiarity, defendants usually voluntarily dismiss a collection action.

38.     The purpose of affidavits such as <u>Appendix B</u> is to deceive debtors into

5

believing that Defendants can prove their case at trial.

39.     Stubbs retained counsel to defend the collection action brought by CPS, Case No. 12 M1 116644.

40.     Stubbs filed a motion to dismiss the complaint and, rather than respond to Stubbs' motion, CPS voluntarily dismissed its complaint.

41.     CPS routinely voluntarily dismisses cases on or before the day of trial when a debtor is represented by counsel.

42.     A document is not admissible as a "business record" under Illinois law if "the source of information or the method or circumstances of preparation indicate lack of trustworthiness . . . ." Illinois R. Evid. 803(6).

43.     By submitting to the consumer an affidavit in the form of Appendix B, while concealing documents in which the alleged account seller effectively disclaims the accuracy of its records and information, defendants perpetrate a fraud on the consumer.

## FACTS – GENERAL

44.     It is the policy and practice of defendants to serve consumers with affidavits in the form represented by Appendix B, even though the purchase and sale agreement contains disclaimers such as those quoted above.

45.     It is the policy and practice of defendants to serve consumers with affidavits in the form represented by Appendix B in all collection actions filed in Cook County and, on information and belief, those filed in other counties.

## COUNT I – FDCPA

46.     Plaintiff incorporates paragraphs 1-33.

47.     Defendants engaged in deceptive collection practices, in violation of 15 U.S.C. §§1692e, 1692e(2), and 1692e(10), by providing fraudulent affidavits to consumers.

48.     The provision of the false affidavits to consumers is material because they effectively represent to consumers that defendants can prove the debt, when they cannot.

6

49.     Section 1692e provides:

**§ 1692e. False or misleading representations [Section 807 of P.L.]**

**A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section: . . .**

**(2) The false representation of–**

**(A) the character, amount, or legal status of any debt; . . .**

**(10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer. . . .**

## CLASS ALLEGATIONS

50.     Plaintiff brings this action on behalf of a class, pursuant to Fed. R.Civ.P. 23(a) and (b)(3).

51.     The class consists of (a) all natural persons with Illinois addresses (b) to whom one or both of the defendants provided an affidavit in the form represented by Appendix B (c) concerning a debt that was the subject of an "as is" disclaimer in the agreement for its acquisitions (d) on or after a date one year prior to the filing of this action, and (e) on or before a date 20 days after the filing of this action.

52.     The class members are so numerous that joinder is impracticable.

53.     Based on the volume of defendants' cases and the prevalence of disclaimers,  there are more than 100 class members.

54.     There are questions of law and fact common to the class members, which common questions predominate over any questions that affect only individual class members. The predominant common questions are:

a.      Whether defendants regularly provides consumers with affidavits in the form of Appendix B;

b.      Whether defendants regularly obtain debts subject to "as is"

7

disclaimers; and

c.    Whether the provision of an affidavit in the form of <u>Appendix B</u> concerning a debt that is the subject of an "as is" disclaimer is fraudulent.

55.    Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

56.    Plaintiff will fairly and adequately represent the interests of the class members. Plaintiff has retained counsel experienced in consumer credit and debt collection abuse cases.

57.    A class action is superior to other alternative methods of adjudicating this dispute. Individual cases are not economically feasible, and in any event, are not sufficient to prevent defendants from continuing their violations of the law. Many debtors may not realize that their rights are violated.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and the class members and against defendants for:

(1)    Statutory damages;

(2)    Attorney's fees, litigation expenses and costs of suit; and

(3)    Such other or further relief as the Court deems proper.


s/Daniel A. Edelman
Daniel A. Edelman

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Catherine A. Ceko
EDELMAN, COMBS, LATTURNER & GOODWIN, L.L.C.
120 S. LaSalle Street, 18th Floor
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX) (may be used for service of pleadings)
Email address for service: courtecl@edcombs.com

8

## NOTICE OF LIEN AND ASSIGNMENT

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards. All rights relating to attorney's fees have been assigned to counsel.


s/Daniel A. Edelman
Daniel A. Edelman


Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Catherine A. Ceko
EDELMAN, COMBS, LATTURNER & GOODWIN, L.L.C.
120 S. LaSalle Street, 18th Floor
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX) (may be used for service of pleadings)
Email address for service: courtecl@edcombs.com

## CERTIFICATE OF SERVICE

I, Daniel A. Edelman, hereby certify that on December 19, 2012, a true and accurate copy of the foregoing document was filed via the Court's CM/ECF system and notification of such filing was sent to the following parties:

Raechelle D. Norman
rnorman@gradypilgrim.com

Anna-Katrina S. Christakis
kchristakis@gradypilgrim.com

s/ Daniel A. Edelman
Daniel A. Edelman

# APPENDIX A

93829

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## MUNICIPAL DEPARTMENT, FIRST DISTRICT

CAVALRY PORTFOLIO SERVICES, LLC,  )
                                      )
                                      )
        Plaintiff,                    )    No.   **12M1 116644**
                                        )
    vs.                              )   Return Date: ___ AUG 2 7 2012 _____
                                        )
DONITA J STUBBS,                 )
                                        )
        Defendant.                 )   Amount Claimed: $6,542.44, Plus court Costs

### SMALL CLAIMS COMPLAINT

NOW COMES the Plaintiff, Cavalry Portfolio Services, LLC, by and through their attorneys, The Shindler Law Firm., and complaining of the Defendant(s), states as follows:

1. The Defendant(s) DONITA J STUBBS, opened a credit card or line of credit account on 06/15/2006 with BANK OF AMERICA whereby Defendant(s) received a credit card or line of credit and could charge goods and services to their account and receive cash advances.

2. The Defendant(s) subsequently defaulted by failing to pay for the indebtedness incurred resulting in the balance due to BANK OF AMERICA in the amount of $4,504.65.

3. BANK OF AMERICA sold and assigned its right title and interest to defendant's account to Cavalry SPV I, LLC pursuant to a written assignment in conformity with the Illinois Collection Agency Act, 225 ILCS 425/8b.

4. Cavalry SPV I, LLC assigned its right to pursue collection of defendant's account to Plaintiff pursuant to a written assignment in conformity with the Illinois Collection Agency Act, 225 ILCS 425/8b.

5. In conformity with the Illinois Collection Agency Act, 225 ILCS 425/8b, Plaintiff is in possession of the aforementioned assignments which specifically state and include the effective date of assignment, the consideration paid and the identifying information for the account transferred.

6. Plaintiff is entitled to recover additional interest pursuant to the agreement between Defendant(s) and BANK OF AMERICA.

7. Due demand has been made on the Defendant(s) to pay the amount(s) due and owing and the Defendant(s) has failed to do so.

8. Defendant(s) has been credited with payments made after charge off.

WHEREFORE, Plaintiff prays for judgment against the Defendant(s) for $6,542.44 plus court costs.

_____
Brian D. Schulman ARDC #6216815

The Shindler Law Firm.
1990 E. Algonquin Rd Suite 180
Schaumburg, IL 60173
(847) 537-1000
Cook County #: 27053
DuPage County#: 21020
ARDC #: 6202882

THIS IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION WILL BE USED FOR THAT PURPOSE.



# APPENDIX B

93829

# AFFIDAVIT OF CLAIM

STATE OF NEW YORK )
) SS
COUNTY OF WESTCHESTER )

RE: Cavalry Portfolio Services, LLC, as assignee of Cavalry SPV I, LLC

vs.

DONITA J STUBBS

I, Stephanie Cappelli, being duly sworn on oath, depose and say:

1. I am an agent and duly authorized representative for Plaintiff and am competent to testify to the matters set forth herein.

2. I am acting in the capacity of Legal Administrator for my employer Cavalry Portfolio Services LLC, a Delaware limited liability company. Cavalry Portfolio Services, LLC performs recovery services for its affiliate, Cavalry SPV I, LLC. In performing recovery services for Cavalry SPV I, LLC, I am familiar with and have access to the books and records of Cavalry SPV I, LLC and of Cavalry Portfolio Services, LLC.

3. That the defendant, DONITA J STUBBS, the account holder(s), opened an account with Bank of America/FIA Card Services, N.A. on 6/15/2006, which account became delinquent and was charged off on 8/31/2009 (the "Account").

4. As of 12/5/2011, the balance due and owing by the account holder(s) on the account was $6,539.98, which balance is comprised of $4,504.65 of principal balance and $2,035.33 + $0 + $0 of other charges. The principal balance continues to accrue interest as of the 12/5/2011 at a rate of 19.99%. The account holder(s) have been credited for all payments, set-offs or other credits due.

5. That the Account was purchased by Cavalry SPV I, LLC on or about 8/23/2011 and the servicing and collection rights for the account were assigned by Cavalry SPV I, LLC to Cavalry Portfolio Services, LLC.

6. In the normal course of business, Cavalry Portfolio Services, LLC maintains computerized account records for account holders. Cavalry Portfolio Services, LLC maintains such records in the ordinary and routine course of business and is charged with the duty to accurately record any business act, condition or event onto the computer record maintained for the accounts, with the entries made at or very near the time of any such occurrence. I have reviewed the applicable computer record as it relates to the Account, and I make this Affidavit based upon information from that review, and if called as a witness, I could testify to the matters set forth herein based on that review.

7. In connection with the purchase of the account, Bank of America/FIA Card Services, N.A. transferred copies of its electronic business records to Cavalry SPV I, LLC, which records were loaded into the computer system of Cavalry Portfolio Services, LLC and which are maintained in an electronic format.

8. Upon information and belief, no Defendant is an infant or incompetent or an active member of the United States Armed Forces who would be entitled to stay relief.

9. Under oath, I am authorized to make this affidavit for Plaintiff and I am informed and believe the above statements are true and correct.

_____
Legal Administrator

Subscribed and sworn to before me on 1/13/2012

_____
Notary Public, State of New York

Law Office of Keith Shindler, Ltd.
16722057

Louis Dardignac
Notary Public - State of New York
No. 01DA5057380
Qualified in Rockland County
Commission Expires March 25, 2014

# APPENDIX C

# LOAN SALE AGREEMENT

## DATED AND EFFECTIVE AS OF October 29, 2008

### BY AND AMONG

SELLER:     FIA Card Services, N.A.,

AND

BUYER:     CAVALRY SPV I, LLC



DEFENDANT'S
EXHIBIT

vi

## LOAN SALE AGREEMENT

THIS LOAN SALE AGREEMENT (this "Agreement") is dated and effective as of the day and year as set forth on the cover page of this Agreement by and among FIA Card Services N. A. (the "Seller") and Cavalry SPV I, LLC (the "Buyer").

### RECITALS:

Recital 1. Seller desires (1) to sell certain loans, representing credit card and credit line receivables, as identified on the Loan Schedule a copy of which is attached hereto as Schedule 1;

Recital 2. The Seller has reached an agreement to sell the Loans to the Buyer for the consideration and under the express terms, provisions, conditions and limitations as set forth herein;

Recital 3. Seller is willing, subject to the express terms, provisions, conditions, limitations, waivers and disclaimers as set forth herein, to sell, transfer, assign and convey to Buyer all of Seller's right, title and interest in, to and under the Loans; and

NOW, THEREFORE, in consideration of the mutual promises herein set forth and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Seller and Buyer agree as follows:

### ARTICLE I

### DEFINITIONS AND INTERPRETATION

For purposes of this Agreement, the parties hereto agree to the following terms, which shall have the meanings indicated:

Section 1.1. "Affiliate" means any affiliate of Buyer.

Section 1.2. "Agreement" means this Loan Sale Agreement, including the cover page and all Addenda, Exhibits and Schedules hereto.

Section 1.3. "Bill of Sale and Assignment" means the document to be delivered in accordance with Section 3.1 to Buyer on or before each Transfer Date with respect to the Loans purchased under this Agreement, substantially in the form attached hereto as Exhibit C, together with the Loan Schedule describing the Loans being sold on such Transfer Date.

Section 1.4. "Business Day" means a day that is not a Saturday, Sunday or legal holiday recognized by the federal government.

CPS 002

Section 1.5. "Buyer" means Cavalry SPV I, LLC.

Section 1.6. "Claim" means any claim, demand, cause of action, judgment, loss, damage, penalty, fines, forfeitures, fees, liability, cost and expense (including attorneys' fees, whether suit is instituted or not), whether known or unknown, liquidated or contingent.

Section 1.7. "Current Balance" means the unpaid balance in United States Dollars for each Loan sold hereunder. The Current Balance for the Loans is as set forth in the Loan Schedule. The Buyer acknowledges that the figure provided as the Current Balance for any Loan may include interest (accrued or unaccrued), costs, fees and expenses and it is possible that the figure provided as the Current Balance for any Loan may not reflect credits for payments made by or on behalf of any Obligor prior to the Cut-Off Date. This figure may also reflect payments made by or on behalf of any Obligor which have been deposited and credited to the Current Balance of such Loan, but that may subsequently be returned to Seller due to insufficient funds to cover such payments. Buyer acknowledges, understands and agrees (i) that Seller makes no representations or warranties whatsoever, express or implied, as to the accuracy of the Current Balance, and (ii) except as set forth in Sections 8.5 and 10.2, that Buyer shall have no right, whatsoever, to make any claim against Seller should the actual unpaid balance of any Loan be different from the Current Balance of such Loan set forth in the Loan Schedule delivered to the Buyer in connection with the sale of such Loan.

Section 1.8. "Cut-Off Date" means no later than October 27, 2008.

Section 1.9. "Evidence of Indebtedness" means with respect to each Loan: (a) each loan agreement, line of credit agreement, or other evidence of indebtedness for such Loan, judgment, deficiency or charge-off; (b) any judgment against any Obligor; (c) any settlement agreements or other evidence of compromise by the creditor relating to the amounts due under any Loan or (d) any other evidence, including, without limitation, any Loan payment history data or computer printouts, creditor notations or any other Loan summary information upon which a creditor could reasonably rely in asserting that the same represents a balance due and owing on a right of collection. THE EXISTENCE OF AN EVIDENCE OF INDEBTEDNESS SHALL EVIDENCE AN UNPAID AND OUTSTANDING CLAIM AGAINST AN OBLIGOR BUT SHALL NOT BE DEEMED TO IMPLY THAT THE DEBT EVIDENCED THEREBY IS ENFORCEABLE. THE EVIDENCE OF INDEBTEDNESS MAY BE SUBJECT TO BANKRUPTCY OR OTHER ENFORCEMENT OR COLLECTION RESTRICTIONS. The Evidence of Indebtedness may include, without limitation, original documents or copies thereof, whether by photocopy, microfiche, microfilm or other reproduction process. Such Evidence of Indebtedness shall be provided to the Buyer on a case-by-case basis where proof of debtor's obligation to pay is requested, pursuant to the requirements and restrictions set forth in Sections 3.1, Exhibit E to this Agreement. Buyer expressly acknowledges that the sole Evidence of Indebtedness to be delivered to Buyer on any Transfer Date under the terms and provisions of this Agreement for any Loans shall be the information set forth on the Loan Schedule provided to the Buyer on computer tape or diskette, with any amendments or changes as shall be forwarded to the Buyer pursuant to the terms and provisions of this Agreement.

CPS 003

Section 1.10. "Financial Instruments Trust Account" means the account designated by Seller from time to time into which Buyer shall deposit the Purchase Price.

Section 1.11. "Information" means the confidential information and other information about the Loans supplied by the Seller, from time to time, to the Buyer and any work products or other materials produced from or incorporating such information.

Section 1.12. "Loan Schedule" means the Loan schedule delivered on computer tape or diskette for any sale of the Loans purchased by Buyer pursuant to the terms and provisions of this Agreement or repurchased by Seller pursuant to the provisions of Article 8, and with respect to the sale of Loans to the Buyer, setting forth the following information concerning each Loan, if available: the loan numbers for Seller (but not necessarily the loan numbers maintained or assigned by Seller), the name, address (including state and zip code), Social Security number and telephone numbers of Obligor, name of any co-maker, the date of charge-off, the last payment date, the interest rate immediately preceding charge off and the Current Balance of each of the Loans. A copy of the Loan Schedule shall be attached hereto as Schedule 1.

Section 1.13. "Loans" means (a) the obligations sold from time to time pursuant to this Agreement as identified in each Loan Schedule delivered by the Seller to the Buyer and which obligations represent unsecured credit card and credit line receivables which have been charged off by the Seller; (b) all rights, powers, liens or security interests of the Seller relating to the obligations identified in subsection (a) of this definition; (c) any judgments founded upon an Evidence of Indebtedness, to the extent attributable thereto, and any lien arising therefore; and (d) the proprietary interest of Seller in any Evidence of Indebtedness, forming the subject matter of any litigation (including, without limitation, any foreclosure, judgment, deficiency or charge-off) or bankruptcy to which Seller is a party or claimant. Nothing in this definition shall be deemed to imply that the Loans are enforceable; the Loans may constitute unenforceable Loans. "Loan" refers to an individual Loan and "Loans" refers, collectively, to all of the Loans purchased by Buyer pursuant to this Agreement.

Section 1.14. "Obligor" means with respect to each Loan, the obligor(s) on an Evidence of Indebtedness, including, without limitation, any and all makers, and the guarantors, sureties or other persons or entities liable on the Loan.

Section 1.15. "Purchase Price" means an amount equal to    REDACTED    REDACTED    , which Purchase Price is to be paid on the Transfer Date.

Section 1.16. "Retained Claims" means with respect to each Loan, the claims or causes of action retained by Seller pursuant to Article XIV.

Section 1.17. "Retention Price" means that amount calculated in accordance with the provisions of Section 5.2.

Section 1.18. "Transaction Documents" means this Agreement, the Mutual Non-Disclosure Agreement attached hereto as Exhibit F, and, with respect to the parties thereto, each

CPS 004

Assignment and Acceptance Agreement entered into pursuant to Section 11.2 hereof, and, with respect to each of such documents, all addenda, exhibits and schedules thereto.

Section 1.19. "Transfer Date" no later than October 29, 2008.

Section 1.20. "Transfer Documents" means the Bill of Sale and Assignment in substantially the form of Exhibit C hereto (accompanied by a Loan Schedule), which Bill of Sale and Assignment the Buyer and Seller hereby deem appropriate for the transfer of Seller's right, title and interest in and to the Loans purchased by Buyer pursuant to this Agreement.

Section 1.21. "Wire Transfer Instructions" means the instructions for wire transferring the Purchase Price to Seller as set forth on Exhibit D attached hereto or as set forth in any other written notice from the Seller to the Buyer.

Section 1.22. "Interpretation of Use of the Term "Buyer". Wherever in this Agreement the term "Buyer" is used, such term shall refer to the entity which is then the Buyer hereunder, provided, however, that with respect to obligations incurred and actions taken by an entity while it was the Buyer and with respect to the servicing and other ongoing matters related to Loans purchased by an entity while it was a Buyer hereunder, the term "Buyer" shall include such prior Buyers and assignment of the rights and obligations hereunder from one Buyer to the next shall not relieve any entity from the obligations it incurred while it was the Buyer hereunder or from the ongoing obligations with respect to Loans purchased while such entity was the Buyer hereunder.

CPS 005

ARTICLE II

PURCHASE AND SALE OF THE LOANS

Section 2.1. <u>Agreement to Sell and Purchase Loans</u>. Seller agrees to sell, and Buyer agrees to purchase on the Transfer Date the Loans described on the Loan Schedule, at the Purchase Price and subject to the terms, provisions, conditions, limitations, waivers and disclaimers set forth in this Agreement. The Seller's right, title and interest to the Loans purchased by the Buyer shall be transferred and assigned by delivery of the Transfer Documents to the Buyer. BUYER EXPRESSLY ACKNOWLEDGES AND AGREES THAT THE ORIGINAL ACCOUNT NUMBER WHICH IDENTIFIED ANY LOAN (PRIOR TO ITS CHARGE OFF BY THE SELLER AND THE ASSIGNMENT OF A NEW ACCOUNT NUMBER) AND THE ACCOUNT RELATING TO THE ORIGINAL ACCOUNT NUMBER, IS NOT BEING PURCHASED UNDER THIS AGREEMENT AND THAT BUYER WILL NOT ASSERT ANY OWNERSHIP OR OTHER INTEREST OVER THE ORIGINAL ACCOUNT NUMBER OR THE ACCOUNT RELATING THERETO. SELLER AGREES TO PROVIDE THE ORIGINAL ACCOUNT NUMBER TO BUYER SOLELY FOR THE PURPOSE OF ALLOWING BUYER TO USE THE ORIGINAL ACCOUNT NUMBER IN ITS COLLECTION ACTIVITIES RELATED TO THE LOANS.

Section 2.2. <u>Purchase Price</u>. The Purchase Price due on the Transfer Date shall be paid by the Buyer to the Seller prior to the close of business on the Transfer Date. Payment must be made in immediately available funds in United States dollars by wire transfer to the Financial Instruments Trust Account in accordance with the Wire Transfer Instructions.

Section 2.3. <u>Agreement to Assign/Buyer's Right to Act</u>. After Seller has confirmation of the receipt of the Purchase Price due on such date, Seller shall deliver to Buyer a Bill of Sale and Assignment, substantially in the form of <u>Exhibit C</u> hereto, executed by an authorized representative of Seller, which Transfer Documents shall sell, transfer, assign, set-over, quitclaim and convey to Buyer, without recourse, warranty or representation, all right, title and interest of Seller in and to each of the Loans sold on such Transfer Date, and the right to all principal and/or interest and/or other amounts due under the Loans and/or other proceeds of any kind paid thereon after the Cut-Off Date, but excluding any and all payments, proceeds or other consideration received by or on behalf of Seller on or before the Cut-Off Date with respect to such Loans, regardless of whether timely paid or applied, and excluding any amounts due or collected by Seller in connection with any Retained Claims. Upon each sale of Loans, the Loan Schedule relating to such Loans shall be attached to the Transfer Documents, identifying the Loans purchased by Buyer.

Section 2.4. <u>Payments Received</u>. Any payments received by Seller on or after the Effective Date and within eighteen (18) months of the Closing Date, with respect to an Account (except for any Account which has been replaced or repurchased by Seller under the terms of the Agreement), shall be forwarded to Buyer as promptly as possible. Seller shall have no obligation to remit any payments to Buyer that are received by Seller after the eighteen month period, and

CPS 006

any such payment that is received by Seller may be returned to the remitter of the payment. If Seller elects to remit to buyer after said period, a $5.00 fee may be charged per transaction.

## ARTICLE III

## TRANSFER OF LOANS AND LOAN DOCUMENTS

Section 3.1. Assignment of Loans and Loan Documents/Paid Off Loans.

a.      For three hundred sixty five days (365) after the Closing Date, with respect to Accounts sold on such Closing Date, Seller agrees to provide Buyer with copies (but only to the extent such material may exist, which extent is not guaranteed, warranted or represented) of only (a) the Account application, (b) signed charge slips, (c) last Account statement with respect to any Account, within a reasonable period of time following Seller's receipt of Buyer's request for such information, and (d) any Affidavits of Lost or Destroyed Documents. Up to one hundred (100) requests may be made per calendar day. (Requests for an application, charge slip and a statement on a single Account are deemed to be three (3) requests.) Notwithstanding any other provision in this Paragraph 3.2(a) to the contrary, Seller shall not be required to provide Buyer with  free copies of the Account application, signed charge slips and last Account statement when the total number of has exceeded twenty five percent (25%) of the number of Accounts sold on the Closing Date.  When the total number of requests exceeds twenty five percent (25%) of the number of Accounts sold, or after one year from the date of this Agreement, whichever shall first occur, Seller reserves the right to charge a $15.00 fee per document request. In the event that Buyer requests that document be provided to Buyer within five (5) business days of the date request, Seller may charge $25.00 for each such expedited request.

b.      With respect to information requests not covered in the paragraph above that occur in writing after the three hundred sixty five days (365) subsequent to the Closing Date has passed, Seller may provide Buyer with additional information from the books and records of Seller concerning the Accounts sold on such Closing Date if Buyer requests such information.  However, Seller shall have no obligation to provide such information, and shall have no obligation to execute or provide any documents, files, records, testimony or other information to Buyer, its successors or assigns, concerning any Account, except as set forth in section (a) above, or elsewhere in the Agreement, or unless otherwise agreed to by the parties.

c.      Buyer has been advised by Seller that (a) it is Seller's policy not to retain all Account Documents and (b) some of the Accounts do not have an original application or a copy thereof (whether by microfilm, microfiche or other media). To what extent applications are or are not available, is not known by Seller nor represented to Buyer.

CPS 007

ARTICLE IV

SERVICING OF THE LOANS

Section 4.1. <u>Servicing After Transfer Date</u>. The Loans shall be sold and conveyed to Buyer on a servicing-released basis. As of each Transfer Date, all rights, obligations, liabilities and responsibilities with respect to the post-Transfer Date servicing of the Loans sold on such Transfer Date shall pass to Buyer, and Seller shall be discharged from all liability therefore, except for any applicable indemnification obligation, as provided in Section 10.2 hereof. Seller shall have no obligation to perform any servicing activities with respect to the Loans from and after the Transfer Date of such Loans.

Section 4.2. <u>Interim Servicing/Buyer Bound</u>. Until the Transfer Date, Seller shall continue to service the Loans to be transferred and in connection therewith, Seller shall have the right, among other things, to postpone any pending litigation or bankruptcy matter until after the Transfer Date for such Loans. Buyer shall be bound by the actions taken by Seller with respect to any Loan prior to the Transfer Date of such Loan. BUYER SHALL TAKE NO ACTION TO COMMUNICATE WITH ANY OBLIGOR OR ITS ACCOUNTANTS OR ATTORNEYS OR ENFORCE OR OTHERWISE SERVICE OR MANAGE ANY SUCH LOAN UNTIL AFTER THE TRANSFER DATE OF SUCH LOAN. In no event shall Seller be deemed a fiduciary for the benefit of Buyer with respect to the Loans, or any Loan.

Section 4.3. <u>Buyer Servicer Requirements/Hold Harmless and Indemnity</u>. Buyer shall be responsible for complying with all state and federal laws, rules, regulations and other statutory requirements, if any, with respect to the ownership and/or servicing and/or collection of any of the Loans from and after the Transfer Date of such Loan including, without limitation, the obligation to notify any Obligor of the transfer of servicing rights from Seller to Buyer.

Section 4.4. <u>Disputes With Obligors Resolved Through Arbitration or Litigation</u>. Buyer acknowledges and agrees that any claim, dispute or action against an Obligor of a Loan shall be resolved by arbitration or litigation pursuant to the terms and conditions of the underlying loan agreement between Seller and such Obligor, which is assigned to and assumed by Buyer, pursuant to the terms of this Agreement. The underlying loan agreement provides that any arbitration shall be conducted by the National Arbitration Forum, under the Code of Procedure in effect at the time the claim is filed.

ARTICLE V

REPURCHASE OF LOAN AND REFUND OPTION OF SELLER

Section 5.1. <u>Seller's Right to Notification of Claims and Actions</u>. Buyer shall promptly notify Seller of any Claim, threatened Claim or pending or threatened arbitration or other legal

7

CPS 008

proceeding by any Obligor against Seller that arises from or relates to any of the loans purchased hereunder.

Section 5.2. Retention Refund. If Seller determines in its sole discretion that any of the circumstances set forth in Section 5.3 exist with respect to any Loan and Seller elects to retain or repurchase the Loan, Seller shall refund a portion of the Purchase Price relating to such Loan equal to the amount determined according to the following formula: (i) (a) the current outstanding principal balance of the Loan (or if such loan is to be retained prior to transfer to the Buyer the amount set forth on the Loan Schedule containing the Loan being retained); multiplied by REDACTED b) then (ii) the amount determined under the preceding clause (i), shall be decreased by the aggregate amount of other payments, credits or other consideration, if any, attributable to such Loan only to the extent that such credits or other consideration were actually paid over or delivered by the related Obligors or the Seller to the Buyer after the date of the repurchase notice.

Section 5.3. Seller's Right to Retain and to Repurchase Loan(s). If any of the circumstances described in (a), (b) or (c) of this section exist with respect to any loan which is charged off by the Seller, the Seller may retain such loan and not include such loan in the Loans designated for sale or sold to the Buyer.

In addition, if Seller determines (i) after the designation of Loans for sale and the determination of Purchase Price of the Loans to be sold on any Transfer Date or (ii) after the Transfer Date that any of the following circumstances exist with respect to any of such Loan or Loans, then Seller shall have the right but not the obligation, to refund to Buyer the Retention Price relating to such Loan(s) calculated pursuant to the provisions set forth in Section 5.2 and withdraw such Loan or Loans from the - Loan Schedule and from the Transfer Documents and Buyer, upon ten (10) days written notice, agrees to reconvey such Loan or Loans to Seller:

(a)    The loan is participated among different financial entities or depository institutions or is otherwise subject to an agreement between Seller and another depository institution or third party, which restricts or otherwise limits the sale, transfer or assignment of the loan or the servicing of the loan without obtaining the prior consent of such third party; or

(b)    Seller determines that there is a pending or threatened suit, action, arbitration, bankruptcy proceeding or other legal proceeding or investigation relating to the loan or any Obligor for such loan and naming Seller or otherwise involving Seller's interest therein in a manner unacceptable to Seller, or Seller otherwise determines that such matter cannot be resolved and/or that Seller's interest therein cannot be adequately protected without Seller owning such loan, or for which a settlement agreement was entered into prior to the Cut-off Date for such loan; or

(c)    Seller determines that the loan is (i) cross defaulted, (ii) cross collateralized, or (iii) otherwise so inextricably related to any loan, asset, claim, or right of action owned by Seller or any of Seller's predecessors in interest and not expressly transferred to Buyer pursuant to this Agreement, that Seller determines that it reasonably requires the retention of such loan in order to protect Seller's interests in such other loan, asset claim or right of action.

8

CPS 009

## ARTICLE VI

### NO RIGHT TO REPURCHASE

OTHER THAN SELLER'S RIGHT TO RETAIN OR REPURCHASE A LOAN PURSUANT TO ARTICLE V, OR SELLER'S DUTY TO REPURCHASE A LOAN PURSUANT TO THE TERMS AND PROVISIONS OF ARTICLE VIII, BUYER ACKNOWLEDGES AND AGREES THAT THE LOANS MAY BE UNENFORCEABLE LOANS AND MAY HAVE LITTLE OR NO VALUE AND THAT SELLER SHALL HAVE NO OBLIGATION TO REPURCHASE ANY LOAN SOLD HEREUNDER.

## ARTICLE VII

### REPRESENTATIONS, WARRANTIES AND COVENANTS OF BUYER

Buyer hereby represents, warrants and covenants, to and with Seller, as of the effective date of this Agreement, as of the Effective Date of each Assignment and Acceptance Agreement entered into as provided in Section 11.2 of this Agreement and as of the Transfer Date that:

Section 7.1. No Collusion. Neither Buyer, its affiliates, nor any of their respective officers, partners, agents, representatives, employees or parties in interest (i) has in any way colluded, conspired, connived or agreed directly or indirectly with any other bidder, firm or person to submit a collusive or sham bid or offer, or any bid other than a bona fide bid, in connection with the selection of the Buyer to purchase the Loans subject to this Agreement, or (ii) has, in any manner, directly or indirectly, sought by agreement or collusion or communication or conference with any other bidder, firm or person to fix the price or prices, or to fix any overhead, profit or cost element of the bid price or terms of the agreement the bid price or terms of the agreement of any other bidder with respect to the selection of the Buyer to purchase the Loans subject to this Agreement, or to secure any advantages against Seller.

Section 7.2. Authorization. Buyer is duly and legally authorized to enter into this Agreement and the other Transaction Documents and has complied with all laws, rules, regulations, charter provisions and bylaws to which it may be subject or by which its assets may be bound and that the undersigned representative is authorized to act on behalf of and bind Buyer to the terms of this Agreement. Buyer will deliver to Seller, contemporaneously with this Agreement (or, where applicable, with the Assignment and Acceptance Agreement described in Section 11.2 of this Agreement), a certified copy of a resolution of its Board of Directors authorizing Buyer's entry into this Agreement through such representative, together with such documents as evidence Buyer's authority.

Section 7.3. Binding Obligations. Assuming due authorization, execution and delivery by Seller, this Agreement and each of this other Transaction Documents and all of the obligations of Buyer hereunder and thereunder are the legal, valid and binding obligations of Buyer, enforceable in accordance with their respective terms, except as such enforcement may be limited

CPS 010

by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and by general equity principles (regardless of whether such enforcement is considered in a proceeding in equity or at law.)

Section 7.4. <u>No Breach or Default</u>. The execution and delivery of this Agreement (or, where applicable, the Assignment and Acceptance Agreement described in Section 11.2 of this Agreement) and the performance of its obligations hereunder by Buyer will not conflict with any provision of any law or regulation to which Buyer is subject or by which any of its assets may be bound or conflict with or result in a breach of or constitute a default under any of the terms, conditions or provisions of any agreement or instrument to which Buyer is a party or by which it or any of its assets may be bound, or any order or decree applicable to Buyer.

Section 7.5. <u>Nondisclosure and Compliance with Transaction Documents</u>. Buyer is in full compliance with its obligations under the terms of the Mutual Non-Disclosure Agreement, attached hereto as <u>Exhibit F</u> and the terms thereof are hereby incorporated herein, subject to Buyer's ownership rights and interests acquired by Buyer hereunder.

Section 7.6. <u>Identity</u>. Buyer is a "United States person" within the meaning of Paragraph 7701(a) (30) of the Internal Revenue Code of 1986, as amended.

Section 7.7. <u>No Affiliation with Seller</u>. Except as may have been previously disclosed to Seller in writing, Buyer is not or has not been affiliated, directly or indirectly, with Seller, or any of its respective agents, affiliates or employees.

Section 7.8. <u>Assistance of Third Parties</u>. Buyer hereby agrees, acknowledges, confirms and understands that Seller shall have no responsibility or liability to Buyer arising out of or related to any third party's failure to assist or cooperate with Buyer. In addition, Buyer is not relying upon the continued actions or efforts of Seller or any third party in connection with its decision to purchase the Loans. The risks attendant to the potential failure or refusal of third parties to assist or cooperate with Buyer and/or Seller in the effective transfer, assignment, and conveyance of the purchased Loans, and/or assigned rights shall be borne by Buyer.

Section 7.9. <u>Enforcement/Legal Actions/Unfair Collection Practices</u>. Buyer covenants, agrees, warrants and represents that Buyer shall not institute any enforcement or legal action or proceeding in the name of Seller or any subsidiary or affiliate thereof. Buyer also represents warrants and covenants not to take any enforcement action against any Obligor that would be commercially unreasonable by the standards applicable to companies in the same industry as Buyer, and Buyer shall not misrepresent, mislead, deceive, or otherwise fail adequately to disclose to any particular Obligor the identity of Buyer as the owner of the Loans. Buyer further represents, warrants and covenants not to use, adopt, exploit, or allude to Seller or any name derived therefrom or confusingly similar therewith or the name of any other local, state or federal agency or association to promote Buyer's sale, enforcement, collection, or management of the Loans. Buyer covenants, agrees, warrants and represents that it will not violate any laws relating to unfair credit collection practices in connection with any of the Loans transferred to Buyer pursuant to this Agreement. Buyer agrees, acknowledges, confirms and understands that there

CPS 011

may be no adequate remedy at law for a violation of the terms, provisions, conditions and limitations set forth in this Section 7.9 and Seller shall have the right to seek the entry of an order by a court of competent jurisdiction enjoining any violation hereof. Buyer agrees to notify Seller within ten (10) business days of notice or knowledge of any Claim or demand.

Section 7.10. Status of Buyer. Buyer represents, warrants and certifies to Seller that it is (i) a financial institution, (ii) an institutional purchaser including a sophisticated purchaser that is in the business of buying or originating loans of the type being purchased or that otherwise deals in such loans in the ordinary course of the Buyer's business, or (iii) an entity that is defined as an accredited investor under the federal securities laws. Buyer covenants, agrees, represents and warrants that all information provided to Seller or its agents by or on behalf of Buyer in connection with this Agreement and the transactions contemplated hereby is true and correct in all material respects and does not fail to state any fact required to make the information contained therein not misleading.

Section 7.11. No Broker's/Finder's Fees. Buyer has not dealt with any broker, agent or finder in connection with the transaction contemplated by this Agreement that would give rise to a claim for a brokerage commission or finder's fee. Buyer hereby indemnifies and agrees to defend and hold harmless Seller from and against any claims for brokerage fees or commissions of any broker, agent or finder resulting from the transaction contemplated by this Agreement. Buyer acknowledges that Seller shall have no liability for the payment of Buyer's brokerage fees, commissions or finder's fees in connection with the transaction contemplated by this Agreement.

Section 7.12. Buyer Insurance Requirements shall, at its sole cost and expense, procure and maintain in full force and effect the following insurance coverages with an insurance carrier which is at least "A" rated by Best.

| General Liability | $2,000,000 General Aggregate |
|---|---|
| | $2,000,000 Product Aggregate |
| | $1,000,000 Each Occurrence |
| Excess Liability | $5,000,000 Each Accident |
| | $5,000,000 Aggregate |

Seller must be provided a certificate of insurance evidencing that such coverage is in effect prior to execution of this Agreement and upon each assignment to a subsequent Buyer as provided in Section 11.2 hereof. All certificates of insurance shall be amended to name Seller and its affiliates as additional insured parties, and shall require that Seller be provided with at least 30 days advance written notice of cancellation or material change in the stated coverage of such insurance. Amended certificates of insurance shall be delivered to the attention of the Seller's Corporate Insurance Department at the address provided in Exhibit A, and approved by said department prior to the commencement of any collection efforts by the Buyer on the Loans. Buyer shall furnish to Seller renewal certificates of insurance, on an annual basis, until all collection efforts with respect to the Loans have ceased.

CPS 012

Section 7.13. No Proceeding. There is no litigation or administrative proceeding before any court, tribunal or governmental body presently pending or, to the knowledge of Buyer, threatened against Buyer which would have a material adverse effect on the transactions contemplated by, or Buyer's ability to perform its obligations under, this Agreement, or any of the other Transaction Documents.

Section 7.14. Survival of Representations, Warranties and Covenants. The representations, warranties and covenants set forth in this Article shall continue notwithstanding the closing on the sale of any Loans.

ARTICLE VIII

LIMITED REPURCHASE/REPRESENTATIONS AND WARRANTIES OF SELLER

Section 8.1. Limited Repurchase at Buyer's Option. The Buyer may, twice, at any time within one hundred eighty (180) days of the Transfer Date of a specific Loan pool, submit a listing of Loans and require the Seller to repurchase Loans from such pool, in the event that, with respect to any Loan on such list, prior to the Cut-Off Date:

1.  All Obligors have filed an active bankruptcy proceeding as of the Cut-Off Date which has not been adjudicated or discharged and the Loan is listed or is reasonably likely to be listed as one of the obligations to be extinguished in such proceeding; or,

2.  All Obligors were declared legally dead prior to the Cut-Off Date; or,

3.  The Seller, or any of its duly appointed agents, had delivered to all Obligors a release of liability or satisfaction of their obligations to the Seller; or

4.  That the Seller, acting alone or in concert with its duly appointed agents, knowingly created a forged, fraudulent or fictitious Loan; or

5.  That the Seller, on the Cut-Off Date, did not have good and marketable title to the Loan, (except for any defect in title, lien or encumbrance arising from, related to, or resulting from (i) the expiration of any statute of limitations, or (ii) Seller's inability to produce documentation for such Loan, either of which shall negate Seller's obligation to repurchase the Loan pursuant to the terms of this Section 8.1.5); or

6.  That, prior to the Transfer Date, the Seller was not in substantial compliance with any material provisions of state and federal consumer credit laws, including, without limitation, the Truth-in-Lending Act, the Equal Credit Opportunity Act, the Fair Debt Collection Practices Act and the Fair Credit Billing Act, that Seller was required to comply with in its origination (if the Loan was originated by the Seller) or servicing of the Loan.

7.  That, prior to the Transfer Date, the Seller issued a 1099-C to any Obligor.

12

CPS 013

Section 8.2. <u>Repurchase of Loans</u>. In the event that Buyer gives Seller written notice of Buyer's election to have Seller repurchase Loans pursuant to the provisions of Section 8.1, and supplies the Seller with evidence satisfactory to Seller that the same constitutes Loans subject to repurchase, on or before one hundred and eighty (180) days after the Transfer Date of such Loan (the "<u>Repurchase Period</u>"), then Seller shall repurchase the Loan(s) identified in such notice for an amount equal to the Retention Price calculated in accordance with the terms of Section 5.2. Buyer and Seller agree that with respect to any individual monthly Loan sale pool, Seller will only be obligated to perform this repurchase and its attendant procedures and operations once, and that Buyer will submit only two notifications, during the 180 day period from the Transfer Date. Seller shall not be responsible for replacing or repurchasing the first five (5%) percent of accounts sold pursuant to this agreement and submitted by Buyer for repurchase or replacement.

Repurchase by the Seller pursuant to the provisions of this Article VIII shall constitute the sole and exclusive remedy of the Buyer. Except for the remedies in this Section 8.2, Buyer hereby waives any and all rights and remedies to sue Seller in law or equity for damages and other relief, including, without limitation, actual, special, consequential or punitive damages. Seller shall have no obligation to repurchase any Loan for which notice and all supporting evidence have not been received by Seller within the one hundred and eighty (180) day period following the Transfer Date of such Loan. Within thirty (30) days of receiving the Retention Price from Seller, Buyer shall reconvey the repurchased Loan to Seller using the same form of Bill of Sale and Assignment Seller used to transfer the Loan to Buyer, along with any amounts due or collected by Buyer in connection with such Loan and release its security interest on any repurchased Loan.

Section 8.3. <u>Representations and Warranties of Seller</u>. The Seller hereby represents and warrants, to the Buyer, as of the effective date of this Agreement and as of each Transfer Date that:

(a)     Seller is a national banking association duly organized, validly existing and in good standing under the laws of the United States with full power and authority to enter into this Agreement to sell the Loans and to carry out the terms and provisions hereof;

(b)     The execution and delivery of this Agreement and the performance hereunder have been duly authorized on or prior to the effective date of this Agreement, by all necessary action on the part of the Seller and no provision of applicable law or regulation or the charter or bylaws of Seller or any judgment, injunction, order, decree or other instrument binding upon Seller is or will be contravened by Seller's execution and delivery of this Agreement or Seller's performances hereunder;

(c)     Assuming due authorization, execution and delivery by Buyer, this Agreement and all of the obligations of Seller hereunder are the legal, valid and binding obligations of Seller, enforceable in accordance with the terms of this Agreement, except as such enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and by general equity

CPS 014

principles (regardless of whether such enforcement is considered in a proceeding in equity or at law);

(d)    No authorization, consent, approval, license, qualification or formal exemption from, nor any filing, declaration or registration with, any governmental agency or regulatory authority or any other body is required in connection with the execution, delivery or performance by Seller of this Agreement, which authorization, consent, approval, license, qualification or formal exemption from, or filing, declaration or registration has not been obtained on or prior to the Transfer Date; and

(e)    No authorization, consent, approval, license, qualification or formal exemption from, nor any filing, declaration or registration with, any governmental agency or regulatory authority or other body is required in connection with the sale of any or all of the Loans to be sold on the Transfer Date, which authorization, consent, approval, license, qualification or formal exemption, or filing, declaration or registration has not been obtained on or prior to such date.

Section 8.4.   Survival of Representations, Warranties and Covenants.  The representations, warranties and covenants set forth in this Article shall continue notwithstanding the closing on the sale of any Loans.

Section 8.5   Discrepancies in Current Balance.  In the event that during the Repurchase Period either party gives notice to the other that the aggregate Current Balance given to Buyer by Seller (upon which the purchase price is based) for the Loans sold hereunder differs from the actual aggregate Current Balance of the Loans (after the application of all credits, payments, interest, costs, fees, expenses and deductions for returned payments)(the "Discrepancy"), the parties hereto agree that an amount equal to the amount of the Discrepancy, multiplied by REDACTED shall be paid by the positively affected party to the adversely affected party.

## ARTICLE IX

### BUYER'S EVALUATION AND ACCEPTANCE OF RISK OF LOANS SOLD "AS-IS"

Buyer hereby represents, warrants, acknowledges and agrees to the following:

Section 9.1.  Independent Evaluation.  Buyer's decision to enter into this Agreement and to purchase the Loans pursuant to this Agreement is and was based upon Buyer's own independent evaluation of information deemed relevant by Buyer, including, but not limited to, the information made available by Seller to the Buyer, and Buyer's independent evaluation of the Loans and related information. Buyer has relied solely on its own investigation and it has not relied upon any oral or written information provided by Seller or its employees, contractors, officers, representatives, directors or agents.

14

CPS 015

Section 9.2. <u>Due Diligence</u>. Buyer has had the opportunity to conduct such due diligence review and analyses of the Information together with such records as are generally available to the public from local, county, state and federal authorities, record keeping offices and courts (including, without limitation, any bankruptcy courts in which any Obligor(s), if any, may be subject to any pending bankruptcy proceedings); as Buyer deemed necessary, proper or appropriate in order to make a complete informed decision with respect to the purchase and acquisition of the Loans.

Section 9.3. <u>Economic Risk</u>. Buyer acknowledges that the Loans may have limited or no liquidity and Buyer has the financial wherewithal to own the Loans for an indefinite period of time and to bear the economic risk of an outright purchase of the Loans and a total loss of the Purchase Price for the Loans. Buyer acknowledges that the Loans may be unenforceable Loans.

Section 9.4. <u>Loans Sold As Is</u>. With respect to this paragraph, the term Seller shall include its affiliates, agents, directors, officers, representatives, contractors and employees. THE BUYER ACKNOWLEDGES AND AGREES THAT THE SALE OF ALL LOANS MADE BY SELLER PURSUANT TO THIS AGREEMENT SHALL BE WITHOUT RECOURSE, REPRESENTATION OR WARRANTY, AND THAT SELLER HAS NOT MADE, DID NOT MAKE AND SPECIFICALLY DISCLAIMS (AND BUYER IS NOT RELYING ON SELLER WITH RESPECT TO) ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO THE FOLLOWING:

    (a)    THE MARKETABILITY, VALUE, QUALITY OR CONDITION OF ANY LOAN OR LOANS;

    (b)    THE VALIDITY, ENFORCEABILITY OR COLLECTIBILITY OF THE EVIDENCE OF INDEBTEDNESS;

    (c)    THE COMPLIANCE OF THE LOANS WITH ANY STATE OR FEDERAL USURY LAWS AND REGULATIONS APPLICABLE THERETO;

    (d)    THE ACCURACY OR COMPLETENESS OF ANY INFORMATION PROVIDED BY THE SELLER TO THE BUYER, INCLUDING WITHOUT LIMITATION, THE ACCURACY OF ANY SUMS SHOWN AS CURRENT BALANCE OR ACCRUED INTEREST AMOUNTS DUE UNDER THE LOANS; AND

    (e)    ANY OTHER MATTERS PERTAINING TO THE LOANS.

IN ADDITION, SELLER EXPRESSLY DISCLAIMS ANY EXPRESS OR IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

CPS 016

BUYER ACKNOWLEDGES AND AGREES THAT BUYER IS PURCHASING THE LOANS BASED UPON BUYER'S INDEPENDENT EXAMINATION, STUDY, INSPECTION AND KNOWLEDGE OF THE LOANS AND THAT BUYER IS RELYING UPON ITS OWN DETERMINATION OF THE QUALITY, VALUE AND CONDITION OF THE LOANS AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY SELLER. BUYER ACKNOWLEDGES AND AGREES THAT ANY INFORMATION PROVIDED OR TO BE PROVIDED WITH RESPECT TO THE LOANS WAS OR WILL BE OBTAINED FROM A VARIETY OF SOURCES AND THAT SELLER HAS NOT MADE OR WILL NOT BE OBLIGATED TO MAKE AN INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION AND SELLER MAKES NO REPRESENTATIONS AS TO THE ACCURACY OR COMPLETENESS OR SUCH INFORMATION. BUYER ACKNOWLEDGES AND AGREES THAT SELLER HAS NOT UNDERTAKEN TO CORRECT ANY MISINFORMATION OR OMISSION OF INFORMATION WHICH MIGHT BE NECESSARY TO MAKE ANY INFORMATION DISCLOSED TO SUCH BUYER NOT MISLEADING IN ANY RESPECT. FINALLY BUYER SHALL BE DEEMED TO UNDERSTAND THAT ANY DOCUMENTS EXCLUDED FROM THE INFORMATION PROVIDED TO BUYER COULD CONTAIN INFORMATION WHICH, IF KNOWN TO BUYER, COULD HAVE A MATERIAL IMPACT ON ITS DETERMINATION OF VALUE OF THE LOANS. EXECUTION OF THIS AGREEMENT SHALL CONSTITUTE AN ACKNOWLEDGMENT BY BUYER THAT THE EXISTING LOANS WERE ACCEPTED WITHOUT REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED OR OTHERWISE IN AN "AS IS", "WHERE IS" AND "WITH ALL FAULTS" CONDITION BASED SOLELY ON BUYER'S OWN INSPECTION. NO EVENT OR CONDITION SHALL ENTITLE BUYER TO REFUSE TO PURCHASE A LOAN OR TO REQUEST SELLER TO REPURCHASE A LOAN, EXCEPT AS SPECIFIED IN THIS AGREEMENT. NOTHING IN THIS SECTION 9.4 AFFECTS SELLER'S INDEMNIFICATION OBLIGATIONS SET FORTH IN SECTION 10.2.

CPS 017

ARTICLE X

INDEMNIFICATION

Section 10.1. Buyer's Indemnification. From and after the Transfer Date, Buyer shall defend, indemnify and hold harmless Seller or Seller's agents, affiliates, employees, contractors, officers, directors and representatives against and from any and all liability for, and from and against any and all losses or damages Seller may suffer as a result of any Claim or threatened Claim that Seller shall incur or suffer as a result of (i) any act or omission of Buyer or Buyer's agents, affiliates, employees, contractors, officers, assignees, directors and representatives in connection with the Loans and its purchase of the Loans, pursuant to the Agreement, or (ii) the breach or inaccuracy of any of Buyer's representations or warranties as set forth in this Agreement and in the other documents executed in connection with the selection of the Buyer to enter into this agreement and the sale of the Loans, or (iii) the breach of any of Buyer's covenants as set forth in this Agreement and in the other documents executed in connection with Buyer's purchase of the Loans or in the Mutual Non-Disclosure Agreement attached hereto as Exhibit F or (iv) any Claim or threatened Claim by any Obligor regarding any assignment, enforcement, servicing or administration of the Loans by Buyer or Buyer's agents, affiliates, employees, contractors, officers, directors, assignees and representatives on or after the Transfer Date.

Section 10.2. Seller's Indemnification. From and after the first Transfer Date, Seller shall defend, indemnify and hold harmless Buyer or Buyer's agents, affiliates, employees, contractors, officers, directors and representatives against and from any and all liability for, and from and against any and all losses or damages Buyer may suffer as a result of any Claim or threatened Claim that Buyer shall incur or suffer as a result of (i) any act or omission of Seller or Seller's agents, affiliates, employees, contractors, officers, assignees, directors and representatives in connection with the Loans and its sale of the Loans, pursuant to the Agreement, (ii) the breach or inaccuracy of any of the Seller's representations or warranties as set forth in this Agreement and in the other documents executed by the Seller in connection with the sale of the Loans, or (iii) the breach of any of Seller's covenants as set forth in this Agreement and in the other documents executed in connection with Seller's sale of the Loans, or (iv) any Claim or threatened Claim by any Obligor regarding any assignment, enforcement, servicing or administration of the Loans by Seller or Seller's agents, affiliates, employees, contractors, officers, directors, assignees and representatives arising prior to the Transfer Date.

CPS 018

ARTICLE XI

ASSIGNMENT OF RIGHTS TO THIRD PARTIES

Section 11.1. Assignment of Agreement; Assignment of Loans. Buyer may assign this Agreement to an Affiliate as provided in Section 11.2. of this Agreement and may assign the Loans for purposes of collateralizing financing arrangements as provided in Section 11.3. of this Agreement. Except as provided in Sections 11.2. and 11.3. of this Agreement, Buyer shall not assign, encumber, transfer or convey its rights under this Agreement or any Loan purchased pursuant to the terms of this Agreement, without the prior written consent of Seller, in each instance, which approval shall not be unreasonably withheld. ALL REQUESTS TO ASSIGN OR TRANSFER BUYER'S INTEREST IN, TO OR UNDER THIS AGREEMENT MUST BE MADE IN WRITING AND RECEIVED BY SELLER PURSUANT TO THE NOTICE PROVISIONS OF THIS AGREEMENT. Buyer may not resell or transfer any Account, with the exception of any Account involved in a bankruptcy proceeding, to any third party within the first twelve (12) months from the Closing Date.

Notwithstanding any consent by Seller to any assignment or transfer of this Agreement or any Loan, no assignee or transferee shall, except in compliance with the terms of Section 11.2. or 11.3. below, further assign or transfer this Agreement or any Loan without Seller's prior written consent in each instance. No assignment or transfer of the Agreement or any Loan shall relieve Buyer of any of its liabilities or obligations under this Agreement. Each transferee of this Agreement shall be bound by all of the terms and provisions of this Agreement, and Buyer shall remain liable for all obligations of Buyer to Seller hereunder, notwithstanding such assignment.

Section 11.2. Assignment to Affiliate. Such entity as may from time to time be the Buyer hereunder may assign all of its rights and obligations with respect to the purchase and sale of Loans occurring after such assignment to an Affiliate provided that assignor, assignee and the Seller enter into an Assignment and Acceptance Agreement, substantially in the form of Exhibit G attached hereto and, upon on delivery of such Assignment and Acceptance Agreement to the Seller, the assignee named in such document shall, as of the Effective Date set forth in such Agreement, become the Buyer under the terms of this Agreement and shall be bound by the terms of this Agreement and shall, as of the time of such assignment be deemed to have made all of the representations, warranties and covenants of the Buyer set forth in Article VII of this Agreement. Each such assignment shall be effective only if such assignment is made to an Affiliate.

Section 11.3. Assignment of Loans. The Buyer and any Affiliate may assign its rights under this Agreement and the Loans purchased hereunder to a bank or to or through any other entity as collateral for a loan or other funding arrangement to be made for the purposes of financing the purchase of such Loans and the Buyer or any Affiliate may assign its rights under this Agreement and the Loans into a trust or other special purpose entity for purpose of providing collateral in the context of a securitization of such Loans as a financing vehicle for the Buyer or an Affiliate. Any Loan assigned pursuant this Section 11.3 may not be subsequently sold,

18

CPS 019

assigned or transferred to any person or entity (a 'subsequent assignee') unless Seller grants its prior written consent, which consent may not be unreasonably withheld or delayed. Notwithstanding the transfer of Loans and any of its rights under this Agreement pursuant to the terms of this Section 11.3, the Buyer which transfers such Loans or rights shall remain liable for all obligations of the Buyer hereunder and with respect to such Loans and/or rights.

## ARTICLE XII

### FILES AND RECORDS

Section 12.1. <u>Conformity to Law</u>. Buyer agrees, at its sole cost and expense, to abide by all applicable state and federal laws, rules and regulations regarding the handling, maintenance, servicing and collection of all Loans and in the maintenance of all documents and records relating to the Loans purchased hereunder, including, but not limited to, the length of time such documents and records are to be retained, and making any disclosures to Obligors as may be required by law.

Section 12.2. <u>Credit Bureau Reporting</u>. Seller agrees to report all Loans as sold or transferred to another lender, as permitted by the Fair Credit Reporting Act.

## ARTICLE XIII

### INFORMATIONAL TAX REPORTING

Section 13.1. <u>Informational Tax Reporting</u>. Buyer hereby agrees to perform all of its obligations with respect to federal and/or state tax reporting relating to or arising out of the Loans sold and assigned pursuant to this Agreement including, without limitation, the obligations with respect to Form 1099 and backup withholding with respect to the same, if required, for the year 2008 and thereafter. Seller reserves the right to notify Buyer that Seller shall file such reporting forms relating to the accounts that have received a payment during the period prior to the Transfer Date. Upon reasonable request, each party will provide the requesting party with copies, delivered in a commercially reasonable format, of their respective Form 1099.

CPS 020

ARTICLE XIV

RETAINED CLAIMS

Section 14.1. Retained Claims. Buyer and Seller agree that the sale of the Loans pursuant to this Agreement shall exclude the transfer to Buyer of any and all claims and/or causes of action Seller has or may have (i) against officers, directors, employees, insiders, accountants, attorneys, other persons employed by Seller, underwriters or any other similar person or persons who have caused a loss to Seller in connection with the initiation, origination or administration of any of the Loans, or (ii) against any third parties involved in any alleged fraud or other misconduct relating to the making or servicing of any of the Loans, or (iii) against any other party from whom Seller contracted services in connection with any of the Loans.

ARTICLE XV

NOTICES

Section 15.1. Notices. All notices, waivers, demands, requests and other communications required or permitted by this Agreement (collectively, "Notices") shall be in writing and given as follows by (a) personal delivery, (b) established overnight commercial courier with delivery charges prepaid or duly charged, or (c) registered or certified mail, return receipt requested, first class postage prepaid. All Notices which relate to any of the Loans shall specify the Transfer Date of such Loans. Such Notices shall be addressed to the Buyer, as the case may be, at the address set forth on Exhibit B to this Agreement and incorporated herein or with respect to Buyers subsequent to the initial Buyer to the address provided in the Assignment and Acceptance Agreement. Such Notices shall be sent to Seller at the address set forth on Exhibit A to this Agreement and incorporated herein. Notices so given by personal delivery shall be presumed to have been received upon tender to the applicable natural person designated below to receive notices or, in the absence of such a designation, upon tender to the person signing this Agreement on behalf of the applicable party. Notices so given by overnight courier shall be presumed to have been received the next Business Day after delivery to such overnight commercial courier. Notices so given by mail shall be presumed to have been received on the third (3rd) day after deposit into the United States postal system. All copies to the applicable persons or entity(ies) designated above to receive copies shall be given in the same manner as the original Notice, and such giving shall be a prerequisite to the effectiveness of any Notice.

CPS 021

ARTICLE XVI

WAIVER AND RELEASE

Section 16.1. <u>Waiver and Release</u>. Buyer, its affiliates, officers, directors, successors or assignees thereof, and all subsequent transferees of the Loans, and all others claiming by or through Buyer or subsequent transferees, hereby disclaim and waive any right or cause of action they may now or in the future have against Seller, and any of Seller's respective contractor's officers, directors, employees, attorneys, agents, and predecessors in interest as a result of the purchase of the Loans; <u>provided</u>, <u>however</u>, that this waiver and release shall not extend to any liability of Seller arising from Seller's failure to perform its obligations in accordance with the terms of this Agreement or any liability of Seller to Buyer indemnified pursuant to Section 10.2. In addition, Buyer, its affiliates, officers, directors, successors or assignees thereof, and all subsequent transferees of the Loans, and all others claiming by or through Buyer or subsequent transferees, hereby release Seller, its agents, officers, directors, representatives, contractors, employees, attorneys and their successors and assigns, from any and all Claims arising from or related to the Loans or arising out of the violation of any applicable laws (including, without limitation, state and federal securities laws), except for Claims indemnified pursuant to Section 10.2.

ARTICLE XVII

MISCELLANEOUS PROVISIONS

Section 17.1. <u>Severability</u>. If any term, covenant, condition or provision hereof is unlawful, invalid, or unenforceable for any reason whatsoever, and such illegality, invalidity, or unenforceability does not affect the remaining parts of this Agreement, then all such remaining parts hereof shall be valid and enforceable and have full force and effect as if the invalid or unenforceable part had not been included. In addition, the parties hereto agree to amend the Agreement to add a legally valid and enforceable provision, which will provide the same or similar economic benefits or other benefits to the affected party as the deleted, unenforceable or invalid provision.

Section 17.2. <u>Rights Cumulative; Waivers</u>. The rights of each of the parties under this Agreement are cumulative and may be exercised as often as any party considers appropriate under the terms and conditions specifically set forth. The rights of each of the parties hereunder shall not be capable of being waived or varied otherwise than by an express waiver or variation in writing. Any failure to exercise or any delay in exercising any of such rights shall not operate as a waiver or variation of that or any other such right. Any defective or partial exercise of any of

CPS 022

such rights shall not preclude any other or further exercise of that or any other such right. No act or course of conduct or negotiation on the part of any party shall in any way preclude such party from exercising any such right or constitute a suspension or any variation of any such right.

Section 17.3. <u>Headings</u>. The headings of the Articles and Sections contained in this Agreement are inserted for convenience only and shall not affect the meaning or interpretation of this Agreement or any provision hereof.

Section 17.4. <u>Construction</u>. Unless the context otherwise requires, singular nouns and pronouns, when used herein, shall be deemed to include the plural of such noun or pronoun, and pronouns of one gender shall be deemed to include the equivalent pronoun of the other gender.

Section 17.5. <u>Assignment</u>. Subject to the restrictions set forth in Article XI, this Agreement and the terms, covenants, conditions, provisions, obligations, undertakings, rights and benefits hereof, including the Addenda, Exhibits and Schedules hereto, shall be binding upon, and shall inure to the benefit of, the undersigned parties and their respective heirs, executors, administrators, representatives, successors and assigns.

Section 17.6. <u>Prior Understandings</u>. This Agreement supersedes any and all prior discussions and agreements among Seller and Buyer with respect to the purchase of the Loans and other matters contained herein, and the Transaction Documents contain the sole and entire understanding between the parties hereto with respect to the transactions contemplated herein.

Section 17.7. <u>Integrated Agreement</u>. The Transaction Documents hereto constitute the final complete expression of the intent and understanding of Buyer and Seller. This Agreement shall not be altered or modified except by a subsequent writing, signed by Buyer and Seller.

Section 17.8. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall constitute one and the same instrument, and any party hereto may execute this Agreement by signing any such counterpart. This Agreement shall be deemed to be binding when executed by Buyer and Seller and signature pages have been exchanged by the parties hereto via facsimile. Telecopy signatures shall be deemed valid and binding to the same extent as original signatures.

Section 17.9. <u>Non-Merger/Survival</u>. Each and every covenant made by Buyer or Seller in the Transaction Documents including, without limitation, any representation, warranty, covenant and any indemnity shall survive the execution and delivery of the Transfer Documents and this Agreement and shall not merge into the Transfer Documents, but instead shall be independently enforceable.

Section 17.10. <u>Governing Law/Choice of Forum</u>. This Agreement shall be construed, and the rights and obligations of Seller and Buyer hereunder determined, in accordance with the laws of the State of Delaware.

CPS 023

Section 17.11. <u>No Third-Party Beneficiaries</u>. Each of the provisions of this Agreement is for the sole and exclusive benefit of the parties hereto, and none of the provisions of this Agreement shall be deemed to be for the benefit of any other person or entity.

IN TESTIMONY WHEREOF, the parties hereto have executed this Agreement.

BUYER: CAVALRY SPV I, LLC

By: _____
    Name: Michael S. Godner
    Title: Chief Financial Officer


SELLER: FIA CARD SERVICES, N.A.

By: _____
    Name: Jim Novosad
    Title: Senior Vice President

23

CPS 024

Section 17.11. <u>No Third-Party Beneficiaries</u>. Each of the provisions of this Agreement is for the sole and exclusive benefit of the parties hereto, and none of the provisions of this Agreement shall be deemed to be for the benefit of any other person or entity.

IN TESTIMONY WHEREOF, the parties hereto have executed this Agreement.

BUYER: CAVALRY SPV I, LLC

By: _____

      Name: Michael S. Godner
      Title: Chief Financial Officer

SELLER: FIA CARD SERVICES, N.A.

By: _____

      Name: Jim Novosad
      Title: Senior Vice President

23

CPS 025

**SCHEDULE 1**

Loan Schedule

Seller Name     Loan Asset No.     Obligor Last Name     Current Balance (approximate)

FIA CARD SERVICES, N.A.

Summary:

|  | Number of Accounts | Current Balance | Purchase Price Percentage | Purchase Price |
|---|---|---|---|---|
| MBNA | REDACTED | REDACTED | REDACTED | REDACTED |

CPS 026

## EXHIBIT A

### IDENTITY OF SELLER

Name: FIA CARD SERVICES, N. A.

Address:     655 Papermill Rd Newark, De 19884-1322
             City/State/Zip Code

Contact Person:     Manager of Sales Support
                    Attention: Jim Novosad

Telephone No.:     (602) 597-3737
Telecopy No.:      (602) 597-2385

## EXHIBIT B

### IDENTITY OF BUYER

Name:     Cavalry SPV I, LLC

Address:     7 Skyline Drive, Hawthorne, New York, 10532

Contact Person: Michael S. Godner

Telephone No.: 914-347-3440 x 13409

Telecopy No.: 914-347-7552

Tax I.D./SS No.: 01-0711035

Seller will document systematically Buyer's name and telephone number on each Loan purchased in this Agreement. Seller shall maintain these accounts on computer system for 5 years.

Seller will provide Buyer with a support person to handle inquiries related to the sale of the Loans in this Agreement.

**EXHIBIT C**

<u>BILL OF SALE AND ASSIGNMENT OF LOANS</u>

    The undersigned Assignor ("<u>Assignor</u>") on and as of the date hereof hereby absolutely sells, transfers, assigns, sets-over, quitclaims and conveys to Cavalry SPV I, LLC a limited liability company organized under the laws of Delaware ("<u>Assignee</u>") without recourse and without representations or warranties of any type, kind, character or nature, express or implied, subject to Buyer's repurchase rights as set forth in Sections 8.1 and 8.2, all of Assignor's right, title and interest in and to each of the loans identified in the loan schedule ("<u>Loan Schedule</u>") attached hereto (the "<u>Loans</u>"), together with the right to all principal, interest or other proceeds of any kind with respect to the Loans remaining due and owing as of the Cut-Off Date applicable to such Loans as set forth in the Loan Sale Agreement pursuant to which the Loans are being sold (including but not limited to proceeds derived from the conversion, voluntary or involuntary, of any of the Loans into cash or other liquidated property).

DATED: —————————October 29, 2008.

                    ASSIGNOR: FIA CARD SERVICES, N.A.

                    Name: _____

                    Title: _____

CPS 029

**EXHIBIT D**

WIRE TRANSFER INSTRUCTIONS

Bank Name:   FIA CARD SERVICES, N.A. - NEWARK, DE

ABA Number:   REDACTED

DDA Code:   REDACTED

Reference:   Please indicate that the funds are loan sale proceeds, along with your name.

Attention:  Mike Crowe

In order to assure proper allocation of funds to Buyer's purchase price, this information must be included on all wire transfers.

## EXHIBIT E

### DELIVERY OF CREDIT APPLICATIONS
### AND STATEMENTS

Seller will deliver to Buyer one copy of the credit application (or affidavit if application is not available) and statements for three consecutive months for the Loans upon request for 25% of the Loans purchased by Buyer. Seller will deliver to Buyer additional copies of the credit application and statements for the Loans upon receipt of payment of $15.00 per application or statement (or other available information to be provided under the terms of Section 3.1 of this Agreement) requested by Buyer, within three hundred sixty five (365) days after the Transfer Date of such Loan, if such documents are available. With respect to any such request, Seller shall have sixty (60) days from the receipt of the Buyer's request to deliver the requested documents, provided the number of requests does not exceed two hundred (200) items in any one calendar month. Otherwise, Seller shall have ninety (90) days from the receipt of the Buyer's request to deliver the requested documents. Buyer expressly acknowledges that Seller only retains the credit applications for a period of five (5) years and that documentation may not exist with respect to the Loans purchased by Buyer.

CPS 031

**EXHIBIT F**

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

CPS 032

**EXHIBIT F**

<u>MUTUAL NON-DISCLOSURE AGREEMENT</u>

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

.REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

CPS 035

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

EXHIBIT G

FORM OF
ASSIGNMENT AND ACCEPTANCE AGREEMENT

THIS ASSIGNMENT AND ACCEPTANCE AGREEMENT (the "Assignment Agreement") dated as of _____, 2008 is entered into among _____ ("Assignor"), _____ ("Assignee") and FIA Card Services, N.A. (the "Seller").

Reference is made to the Loan Sale Agreement _____, as amended and modified from time to time (the "Loan Sale Agreement") between Buyer, Guarantor and Seller. Terms defined in the Loan Sale Agreement are used herein with the same meaning.

The Assignor hereby sells and assigns, without recourse, to the Assignee, and the Assignee hereby purchases and assumes, without recourse, from the Assignor, effective as of _____, 2008 (the "Effective Date") all of the Assignor's rights and obligations under the Loan Sale Agreement with respect to the purchase and sale of Additional Loans occurring after such Effective date ("Future Sales"). From and after the Effective Date (i) the Assignee shall be the "Buyer" under, and be bound by the provisions of the Loan Sale Agreement and have the rights and obligations of the Buyer thereunder with respect to Future Sales and (i) the Assignor shall relinquish its rights and be released from it obligations under the Loan Sale Agreement with respect to Future Sales. The Assignee hereby makes all of the representations, warranties and covenants set forth in Article VII of the Loan Agreement as of the Effective Date. Notwithstanding anything to the contrary herein contained, the representations and warranties made by the Seller to the Assignor in the Loan Sale Agreement shall survive, with respect to the Assignor, the assignment effected by this Agreement.

This Assignment Agreement shall be governed by and construed in accordance with the laws of the State of Delaware.

The terms set forth above are hereby agreed to by

_____, as Assignor

By: _____
Name: _____
Title: _____


_____, as Assignee

By: _____
Name: _____
Title: _____

_____, as Seller

By: _____
Name: _____
Title: _____

Address and information relating to the Assignee:

Name:

Address:

Contact Person:

Telephone No.:

Telecopy No.:

Tax I.D. /ss No:



## EXHIBIT C

### BILL OF SALE AND ASSIGNMENT OF LOANS

The undersigned Assignor ("Assignor") on and as of the date hereof hereby absolutely sells, transfers, assigns, sets-over, quitclaims and conveys to Cavalry SPV I, LLC a limited liability company organized under the laws of Delaware ("Assignee") without recourse and without representations or warranties of any type, kind, character or nature, express or implied, subject to Buyer's repurchase rights as set forth in Sections 8.1 and 8.2, all of Assignor's right, title and interest in and to each of the loans identified in the loan schedule ("Loan Schedule") attached hereto (the "Loans"), together with the right to all principal, interest or other proceeds of any kind with respect to the Loans remaining due and owing as of the Cut-Off Date applicable to such Loans as set forth in the Loan Sale Agreement pursuant to which the Loans are being sold (including but not limited to proceeds derived from the conversion, voluntary or involuntary, of any of the Loans into cash or other liquidated property).

DATED: October 29, 2008.

ASSIGNOR: FIA CARD SERVICES, N.A.

Name: Debra L. Pellicciaro
Title: Assistant Vice President